UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| In re: | Chapter 11 |
| Evan P. Jowers, et al. | Case No. 24−13584−MAM |
| Debtor. | |

### DEBTOR'S RESPONSE TO COUNSEL HOLDINGS' MOTION FOR RELIEF FROM THE  STAY  UNDER 11 U.S.C. § 362

Evan Jowers, the debtor-in-possession ("Mr. Jowers"), hereby files this Response to

Counsel Holdings, Inc.'s Motion for Relief from the automatic stay, Docket No. 14 (the

"Motion") filed by Counsel Holdings, Inc. (the "Movant" or "Counsel Holdings") on April 22,

2024, and respectfully represents as follows:

### BACKGROUND:

1.  The automatic stay is one of the most fundamental protections afforded to a debtor under
    the Bankruptcy Code. the automatic stay provides a debtor with a "breathing spell"
    during which Mr. Jowers may concentrate on his Chapter 11 case, preserve the integrity
    of his assets, and operate in a manner that maximizes value for creditors and affords them
    equitable treatment. Granting the Motion at this critical stage of Mr. Jowers' Chapter 11
    efforts would frustrate this fundamental protection.

2.  Over the past decade, Counsel Holdings, through its President and representative, Robert
    Kinney, ("Mr. Kinney") has consistently hounded Mr. Jowers, going so far as to harass
    and threaten his family. *See* Mr. Kinney's Previous Communications to Mr. Jowers, REK
    DECL. Exhibit E. ("Exhibit B") (Mr. Kinney threatened Mr. Jowers that he would "take

that car away from [Plaintiff's] mom… put it on YouTube and send it to all to see that [Mr. Kinney] did it… com[e] after [Plaintiff's] wife's mink coat… his bank accounts, everything… [Mr. Kinney would] literally spend the rest of my life… coming after his business… I'll take his trademarks… his website… and I'll take his used dental floss."); *also see* Mr. Kinney's Motion to Sanction ("Exhibit C"); Jowers' Motion to Dismiss ("Exhibit D").

3. In addition, Counsel Holdings, through Mr. Kinney, has caused false criminal investigations against Mr. Jowers in Hong Kong through their Independent Commission Against Corruption. ("ICAC"). He intentionally caused these investigations, through his politically connected friends in Hong Kong, not because Mr. Jowers did anything wrong, but to ruin his business. The ICAC operates in secret to combat high level bribery of government officials and other forms of high-level government corruption. Mr. Jowers was tipped off by a whistle blower in February 2023 about the ICAC secret investigation against him, and in late 2023 the ICAC started to phone Mr. Jowers directly, asking him to return to Hong Kong and to discuss their investigation of government bribery and corruption.  As a direct result of these patently false accusations and the ICAC's secrecy coupled with no due process rights, Mr. Jowers and his Hong Kong based business partner (who had to escape Hong Kong on short notice with his native Hong Kong wife, a managing director at Goldman Sachs at the time, and infant child) were forced to abandon their company's headquarters in Hong Kong, and have been unable to travel or return there or face potential arrest by the ICAC. As a result of Mr. Jowers and his key Hong Kong based business partner not being available to clients in person in Hong Kong for more than a year now, Mr. Jowers client relationships in Hong Kong have been

naturally affected by the lack of in-person contact and availability. Mr. Kinney's and Counsel Holdings' scorched earth actions in Hong Kong has already done damage to Mr. Jowers' bankruptcy estate. Mr. Jowers' attorney recruiting business suffered greatly in 2023 as a direct result of Mr. Kinney's and Counsel Holdings actions in Hong Kong, and Mr. Jowers's business has just recovered and is producing again in 2024.

4.  On April 15, 2024, (the "Petition Date"), Mr. Jowers filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). After filing his petition, this court transitioned Mr. Jowers' accounts to debtor-in-possession accounts following its Order on 4/15/24.

5.  Following the petition and notification to the Western District Court of Texas, Mr. Kinney and Counsel Holdings sought to depose Mr. Jowers in a deposition for litigation in the Western District of Texas, despite earlier notification of the automatic stay on April 15th 2024 via email to Mr. Kinney's email Robert@kinneypc.com and robert@kinneyrecruiting.com.  While Mr. Kinney and Counsel Holdings ultimately canceled the deposition, they did so only after attempting to get Mr. Jowers to attend, and therefore, they, breached the automatic stay.

6.  Furthermore, after filing the petition on April 15, 2024, Mr. Jowers's counsel, Zachary Zermay, ("Debtor's Counsel") contacted Seth Kretzer, who was appointed as a receiver for Counsel Holdings. Debtor's Counsel contacted Mr. Kretzer, informing him of the automatic stay by emailing him at seth@kretzerfirm.com and leaving him a telephonic voice message.  However, on April 23, Mr. Kretzer, garnished Mr. Jowers' personal bank account at Wells Fargo. While Wells Fargo returned the funds taken after Debtor's Counsel notified Wells Fargo, this garnishment constituted yet another violation of the

automatic stay by Counsel Holdings (this time by and through Mr. Kretzer) and illegally tapping of accounts belonging to the estate. *See* Wells Fargo Reversal and Payment Amount, ("Exhibit A") It was only after Mr. Jowers protested to Wells Fargo that the money was returned. *Id*.

7. On April 22, 2024, Counsel Holdings, filed a motion to lift the automatic stay in these proceedings, seeking relief from the automatic stay. It failed to articulate any cause to grant the relief it requested.

8. As seen, Counsel Holdings and Mr. Kinney present a danger to the maintenance and distribution of the estate, there is a clear and significant harm to the Debtor if the Court grants the Motion. Due to Mr. Kinney's and Counsel Holdings' past actions, they have demonstrated that allowing the automatic stay to lift will result in continued threats, appropriated funds from the estate's accounts, and the continuance of multiple litigation proceedings, and disruptive harassment of Debtor's business which will further diminish the estate. To be clear, if the stay is lifted, Counsel Holdings (and Mr. Kinney) will continue to bury Debtor with legal fees stemming from attempts to collect on its unsecured judgment, keep sending unhinged communications to Debtor and his family to collect the alleged debt, deprive Debtor of capital he needs to continue operating his business, keep trying to have Debtor imprisoned in foreign countries[1], and cripple the bankruptcy estate thereby harming other creditors.  Additionally, since Counsel Holdings

---

[1]Mr. Kinney transferred Mr. Jowers to Hong Kong in 2015, but subsequently cancelled Mr. Jowers HK work visa application, without Mr. Jowers' knowledge, and forced Mr. Jowers to work illegally in Hong Kong for 18 months while promising dozens of times that he would have a work visa. Mr. Kinney admitted in writing, after Mr. Jowers finally left Mr. Kinney's company in December 2016 to avoid arrest by HK immigration authorities, that he never intended to get Mr. Jowers a HK work visa and he was misleading Mr. Jowers about the work visa for the entire 18 months.

has unsecured alleged debt that will not diminish, there would be little, if any, prejudice to Movant if the Court denies the Motion.

9.  Accordingly, there is no cause to lift the automatic stay under the circumstances of these cases. The harm to the Debtor and the estate from lifting the automatic stay far outweighs any harm to Movant from maintaining the automatic stay. Therefore, for all of these reasons, and as set forth in more detail below, the Court should deny the Motion.

## ARGUMENT

### A.  Standard of Review

10. The automatic stay of section 362 of the Bankruptcy Code is "one of the most fundamental protections granted the debtor under the Bankruptcy Code." *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.*), 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986)). The purpose of the automatic stay is threefold: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Ind., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting *St. Croix Condo. Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)).

11. The automatic stay is designed to give a debtor a "breathing spell" **free from lawsuits** and other collection-type activities while the debtor attempts to reorganize its affairs. *See Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991); H.R. Rep. No. 595, 95th Cong. 1st Sess. 340 (1977). Implementation and maintenance of the

automatic stay is fundamental to the effective administration of pending bankruptcy cases as it provides a debtor protection from "a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y. 1981) (internal citations omitted).

12. Section 362(d)(1) of the Bankruptcy Code permits a court to grant relief from the automatic stay "for cause." 11 U.S.C. § 362. "The term 'cause' as used in section 362(d) has no obvious definition and is determined on a case-by-case basis." *See In re Integrated Health Servs., Inc.*, 2000 Bankr. LEXIS 1319, at *2 (Bankr. D. Del. Aug. 11, 2000); *In re Lincoln*, 264 B.R 370, 372 (Bankr. E.D. Pa. 2001) ("Each request for relief for 'cause' under [section] 362(d)(1) must be considered on its own facts.").

13. A lift of the automatic stay is rare and requires a movant to establish the burden of proof. *See generally Timbers of Inwood Forest,* 108 S. Ct. 626, 632 (1988); 11 U.S.C. § 362(g). In order to lift the automatic stay, a court must consider four factors. "When balancing those potential harms, courts consider a number of factors, including (i) the harm to the party seeking relief from the automatic stay if the automatic stay is not lifted; (ii) the harm to the debtor if the automatic stay is lifted; (iii) the interests of creditors; and (iv) the effect on the fair and efficient administration of justice." *See generally*, *In re Vital Pharms.*, 655 B.R. 374, 387 (Bankr. S.D. Fla. 2023).

B. **There Is No "Cause" To Modify the automatic stay.**

   a. **Movant cannot lift the automatic stay under 362(d)(4) because Movant does not provide "cause" and the debt in dispute is unsecured and does not involve "property."**

14. A review of the factors to lift the automatic stay demonstrates that lifting the automatic stay is not warranted. To justify lifting the automatic stay, the Mover asserts that

"Counsel Holdings nevertheless asserts that "cause" exists to modify or lift the automatic stay pursuant to subsection (d) of § 362." However, Counsel Holdings misrepresents the statute. While the provision allows lifting of the automatic stay for cause, such cause must be related to "a property." Specifically,

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

   (1) for cause, including the lack of adequate protection of **an interest in property** of such party in interest." 11 U.S.C. § 362(d)

15. Consequently, courts have only lifted the automatic stay "for cause" when the debt at issue is secured with "property," or some collateral. See *Baker v. Sepich*, No. 18-cv-81595-MIDDLEBROOKS, 2021 U.S. Dist. LEXIS 235415, at *3-4 (S.D. Fla. Oct. 28, 2021) (lifting the automatic stay because the debtor deliberately abused the automatic stay to transfer **property** away from the estate and the debtor's creditor.); *Ohlsson v. U.S. Bank N.A.* (*In re Ohlsson*), No. 21-12784, 2022 U.S. App. LEXIS 28345 (11th Cir. Oct. 12, 2022) (a foreclosure action involving "**real property**"); *Baker v. Bank of Am., N.A.*, 837 F. App'x 754, 756 (11th Cir. 2020) ("a **home** in Fulton County, Georgia") (emphasis added).

16. Since Counsel Holdings' motion lacks cause and does not relate to property, Counsel Holdings' motion should be denied because Counsel Holdings has failed to establish its burden of proof. However, even if this Court rules that Counsel Holdings' legal judgment is property or has cause, granting such a motion violates the very purposes of the Bankruptcy Code. *In re Celsius Network LLC*, 642 B.R. 497, 499 (Bankr. S.D.N.Y. 2022) ("A fundamental tenet of the Bankruptcy Code is equality of distribution. Chapter 11 cases are collective proceedings designed to assure that all prepetition creditors of the

same class are entitled to equal treatment consistent with the absolute priority rule.") By allowing Counsel Holdings to lift the automatic stay for its unsecured debt, this Court would prioritize one unsecured creditor and allow it to ransack Mr. Jower's estate at the detriment of his current secured creditors and all other equally situated unsecured creditors. Thus, Movant failed to show that it would be harmed if the automatic stay is not lifted. Further, even if Counsel Holdings demonstrated the requisite harm (which they did not), its relief would come at the **expense of every other creditor**.

17. On the other hand, Mr. Jowers' estate would suffer significant prejudice if the Court were to lift the automatic stay at this critical juncture of the Chapter 11 Cases. Mr. Jowers is currently operating his business, negotiating with stakeholders, responding to the demands of these Chapter 11 Cases, and managing his business to dutifully pay off legitimate creditors.

18. Lifting the automatic stay would deplete the Debtor's limited resources and undermine one of the key objectives of the automatic stay. *See Rexene*, 141 B.R. at 576; *Borman*, 946 F.2d at 1036 ("The automatic stay was designed … to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it. …"). In addition, lifting the automatic stay could directly affect the Debtor's assets and prejudice the Debtor and its other creditors. *See In re Continental Airlines*, 177 B.R. 475, 481 (D. Del. 1993) (upholding bankruptcy court's finding that the automatic stay applied and further enjoining prosecution of litigation based, in part, on the direct impact on the debtor's assets caused by the debtor having to bear indemnification obligations and advancement of defense costs in the absence of insurance); *Majestic Star Casino v. City of Gary* (*In re Majestic Star Casino, LLC*), 2010 Bankr. LEXIS 1874, at *5 (Bankr. D. Del. Apr. 28,

2010) ("In addition, the Debtor will have to advance defense costs thereby, at the very least, temporarily diverting much-needed funds—and funds which they do not have to expend absent their lenders' acquiescence.") (citing Continental, 177 B.R. at 481).

C. **The Balance of Harms Weighs Against Granting the Motion.**

19. The most important factor to consider when addressing whether cause exists to lift the automatic stay is the effect on the administration of the Chapter 11 Cases. *See In re W.R. Grace*, 2007 Bankr. LEXIS 1214, at *9 n.7 ("Even slight interference [with the administration of the case] … may be enough to preclude relief in the absence of a commensurate benefit."); *see also In re DBSI, Inc.,* 407 B.R. 159, 166 (Bankr. D. Del. 2009) ("Courts also place emphasis on whether lifting the automatic stay will impede […] the orderly administration of the debtor's estate."); *In re Penn-Dixie Indus., Inc.*, 6 B.R. 832, 836 (Bankr. S.D.N.Y. 1980) ("Interference by creditors in the administration of the estate, no matter how small, through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is prohibited."). As a result, cause exists only if the harm that Movant would suffer from maintaining the automatic stay "considerably outweighs" the harm that the Debtor would suffer from lifting of the automatic stay. *See, e.g., DBSI*, 407 B.R. at 166.

a. **Lifting the Automatic Stay Interferes with the Estate.**

20. As seen with Counsel Holdings' and Mr. Kinney's previous conduct, they have a demonstrated history of hounding and harassing Mr. Jowers, his family, and his business associates with repeated suits, garnishing Mr. Jower's estate's accounts, and acting on their own interests at the detriment of the estate (see Exhibits B, C, and D). Counsel Holdings also diminished Mr. Jowers' estate by causing false bribery and government

corruption investigation, in secret and with no due process, against Mr. Jowers and his

business partner in a foreign country where he conducts a significant amount of business,

thus denying him access to his office in Hong Kong. As seen with Counsel Holdings'

constant harassment, threats of imprisonment, threats against his family, causing

knowingly false serious criminal investigations in Hong Kong, and active attempts to

garnish Mr. Jowers' account, Mr. Jowers will be forced to spend more of his limited

resources that should rightfully go to all creditors of his estate, due to Counsel Holdings'

significant drain on the estate's resources, as well as burdening Mr. Jowers' counsel with

unnecessary litigation in addition to the Bankruptcy. Since lifting the automatic stay

would impede the administration of the estate due to the imminent harassment from

Counsel Holdings, and by Mr. Kinney, as well as the increased litigation cost and

resource burden, lifting the automatic stay will impede the estate, justifying the denial of

the Motion.

### b. Lifting the Automatic Stay Unfairly Prejudices and Harms All Other Creditors.

21. Moreover, lifting the automatic stay here would harm both Mr. Jowers and the creditors

in this case. Forcing Mr. Jowers to litigate at this point would distract and hinder Mr.

Jowers from his reorganization efforts and diminish his ability to preserve the value of

the estate for the benefit of all creditors. If the Motion is granted, it will invite other lift

stay motions that will be filed by similarly situated claimants, leading to an unnecessary

drain on the estate--and the Court's--resources. Counsel Holdings fails to show it would

sustain more significant harm than other similarly situated claimants if the Motion is

denied. Since there are many unsecured creditors, similarly situated to Counsel Holdings,

it has not demonstrated that it will be more prejudiced than any other potential creditor by

a delay until a plan is in place. *See In re Celsius Network LLC*, 642 B.R. 497, 499 (Bankr. S.D.N.Y. 2022) (holding that 362(d)(4) does not apply to unsecured creditors, and dismissing the motion for relief.).

22. As described above, the harm that the Debtor would suffer if the automatic stay were lifted would be substantial. Also, Movant would unjustly benefit from lifting the automatic stay at the expense of all other creditors. Since Counsel Holdings, as a Creditor, is not unjustly prejudiced, and willfully violated the automatic stay twice (that we know of) as of the filing of this response, this Court should not reward such open contempt of the fundamental rules of bankruptcy, nor should this Court aid a clear danger to the estate.

23. Thus, the Motion should be denied.

## CONCLUSION

In sum, Counsel Holdings has utterly failed to demonstrate "cause" for lifting the automatic stay. Contrary to the assertions in the Motion, Mr. Jowers will suffer prejudice if forced to defend against Movant's claims at this stage in the case, while Movant has failed to make a legitimate showing of prejudice to itself.  Granting the relief requested in the Motion will deplete estate resources, be highly disruptive to Mr. Jowers' reorganization efforts, and offend the basic purposes of the automatic stay. Accordingly, the  Motion should be denied.

Dated:    5/7/24

          Miami, Florida


Respectfully Submitted,

ZERMAY LAW PA.

---

Zachary Z. Zermay

Attorney for Debtor
Florida Bar No 1002905

3000 Coral Way, Suite 1115

Coral Gables, Florida 33145

Email: zach@zermaylaw.com


*Counsel to Debtor in Possession*

EXHIBIT-A

# Transaction details

# $10.00

Transaction: 04/23/2024

Posted: 04/23/2024

---

# Additional info

## Category

Other Insurance/Financial

## Transaction description

LEGAL ORDER DEBIT - CONTACT SETH KRETZER, COURT APPONTED RECEIVER (713) 775-3050 - CASE# 19414124





<         2   Sign off

## WELLS FARGO CLEAR ACCESS BANKING ...4501

# $20.00

Available balance ⓘ

| Overview | Manage | Routing & balance info |
|----------|--------|------------------------|

## Transactions ⓘ       🔍 

| | | |
|---|---|---|
| 🕐 | **Pending**<br>ZELLE FROM MICHAEL CARR ON 04/25 REF # BACP8MZD | +$10.00 |
| ✓ | 04/23/2024<br>**LEGAL ORDER REVERSAL - CONTACT SETH KRETZER, COURT APPONTED RECEIVER (713) 775-3050 - CASE# 19414124** | +$10.00 |
| ✓ | 04/23/2024<br>**LEGAL ORDER DEBIT - CONTACT SETH KRETZER, COURT APPONTED RECEIVER (713) 775-3050 - CASE# 19414124** | $10.00 |
| ✓ | 04/22/2024<br>**ZELLE FROM MICHAEL CARR ON 04/20 REF # BACM07AEE81L CHIPOTLE** | +$10.00 |

 **Accounts**      Deposit      Pay & Transfer      Explore      Menu

EXHIBIT-B

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA
GAINESVILLE DIVISION

EVAN JOWERS,

     Plaintiff,

     v.                        Case No.: 01-2022-CA-3042, Division K

ROBERT E. KINNEY, and
MWK RECRUITING, INC.,

     Defendants

_____

**DECLARATION OF ROBERT E. KINNEY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS**

I, Robert E. Kinney, declare as follows:

1.      I am a Texas-licensed attorney, and I am acting as pro se counsel for myself in this matter. I am over the age of 18, and if called to testify at a hearing, would truthfully testify to the following facts. I am representing myself pro se in this matter and I have retained Richard Schorfer of Lorium Law to represent MWK Recruiting, Inc. (now known as Counsel Holdings, Inc.).

2.      Attached as **Exhibit A** hereto is a true and correct copy of the findings of fact and conclusions of law issued on September 16, 2022, by Judge Robert Pitman the United States District Court for the Western District of Texas, Austin Division. *MWK Recruiting Inc. v. Jowers*, 1:18-CV-444-RP, at *43 (W.D. Tex. Sep. 15, 2022). This lawsuit is referred to herein as the "**Texas Case**".

3.      Attached as **Exhibit B** hereto is a true and correct copy of the judgment issued by Judge Pitman on September 19, 2022, in the Texas Case (the "**Texas Judgment**"). The Texas Judgment specifies that Evan Jowers ("Jowers") owes MWK $3,640,132.60, of which $515,326.20 is for misappropriation of trade secrets, $3,082,841.72 is for breach of Jowers's employment agreement with MWK's subsidiary, $26,204.90 is for breach of a forgivable loan agreement, and $15,759.78 is for breach of a revolving loan agreement.

4.      Jowers is the plaintiff in the instant case.

5.      Attached as **Exhibit C** hereto is a true and correct copy of the Motion for Admission Pro Hac Vice of Kevin Cole, filed in the Texas Case. The motion demonstrates that Mr. Cole is a resident of California and a California-licensed attorney whose office is in Los Angeles, California. Attached as **Exhibit D** is a copy

of the order in the Texas case admitting Mr. Cole as counsel for Jowers. Mr. Cole remains attorney of record for Jowers in the Texas case, as a simple review of the record on Pacer can confirm. A freely available copy of the docket sheet is available at this link: https://www.courtlistener.com/docket/6923200/parties/mwk-recruiting-inc-v-jowers/.

6.      Attached as **Exhibit E** is a true, correct, and complete record of communications between myself and Mr. Cole on September 22, 2022, related to a possible mediation of the Texas Case following issuance of the Texas Judgment. Mr. Cole and I also spoke by telephone on that date. At the time I wrote these messages and spoke to Mr. Cole, I was in Austin, Texas and Mr. Cole was in Los Angeles, California. The time stamps on the messages attached indicate that Mr. Cole was on Pacific Time. At 6:00 PM Central Time, I wrote an email to Mr. Cole thanking him for his assistance in attempting to obtain a settlement of the Texas Judgment. Shortly thereafter, I learned that Mr. Jowers had boasted on social media about buying his mother a $70,000 car, even though he was unwilling to make a down payment on the judgment debt. Jowers also had told us through Mr. Cole that he did not want to conduct a mediation until late November and that he wanted a stay of any activities to collect the Texas Judgment. I wrote Mr. Cole a second message at 6:28 PM Central time telling him about this issue. Because the time stamp on that message was generated by Mr. Cole's server in California, **Exhibit E** shows that Mr. Cole received the message at 4:28 PM Pacific Time.

7.    Since before the Texas Case was filed against Jowers in March 2017, I have not communicated with Mr. Jowers by email, telephone, or any other means. Because he is represented by counsel, I have communicated solely with his counsel.

**Personal Jurisdiction**

8.    In an affidavit dated 8 December 2022 and submitted by counsel for Jowers to the High Court in Hong Kong, Jowers claims that he is "ordinarily resident in Hong Kong" and that he has "every intention to return to Hong Kong." This affidavit was first submitted to the Hong Kong Court in unsigned form on October 28, 2022, then later verified and refiled December 12, 2022. A true, correct, and complete copy of the sworn version of Jowers's affidavit dated December 8, 2022, is attached hereto as **Exhibit F.** I have highlighted the portions that relate to Jowers's claim that he is ordinarily resident in Hong Kong.

9.    On September 22, 2022, I received a copy of a screenshot of Jowers's Facebook post, which says that the post was made while he was in Metairie, Louisiana. A true and correct copy of the Facebook post is attached hereto as **Exhibit G**. Based on this Facebook post from Jowers, which has a time stamp saying that it is 12 hours old, I believed that Jowers was located in Louisiana. On that same day, shortly after receiving that post, I sent the email messages attached as **Exhibit E** to Mr. Cole, who was in California.

10.    I am a resident of Texas. I have never lived or worked in Florida, nor have I ever been personally obligated to pay taxes in Florida based on my income or property. I have been to Florida approximately 12 times in my entire life, including one trip to Miami Beach as a child in 1982, two trips to Disney World with my

children, in 2002 and 2014, approximately five total trips of a few days to the Orlando and Miami areas during 2006-2010 to visit with business associates, and approximately five trips to the beach with my family in Seaside and Anna Maria Island. The last time I was in Florida was in June of 2018, for a 3 day trip to visit elderly relatives who are now deceased. Prior to that, I was last in Florida in January 2014 (for the aforementioned trip to visit Disney World). As a legal recruiter, I have not made a placement in Florida or attempted to place a candidate in Florida in more than ten years. I have never processed, serviced, or manufactured products or materials in Florida.

11.    MWK Recruiting, Inc. ("MWK") does not exist as an independent company. MWK Recruiting, Inc. merged with Counsel Holdings, Inc. ("Counsel Holdings"), effective January 1, 2019, and MWK Recruiting, Inc. ceased to exist. A true and correct copy of the Certificate of Merger effecting this transaction is attached hereto as **Exhibit H**. This certificate of merger was admitted in evidence in the Texas Case, In the Findings of Fact in the Texas Case, attached hereto as **Exhibit A**, on page 42, the court expressly found that MWK "has merged with Counsel Holdings, Inc." I anticipate that the court will amend the final judgment and the style of the case to reflect that the judgment creditor is Counsel Holdings.

12.    Neither MWK nor Counsel Holdings has ever done business in Florida. Neither MWK nor Counsel Holdings has ever had an employee in Florida, nor has either of these entities ever solicited business in Florida. Neither MWK nor Counsel Holdings holds any accounts in Florida with any financial institution. Neither MWK nor Counsel Holdings any mailing address or telephone number in Florida. Neither

MWK nor Counsel Holdings has ever been obligated to pay taxes in Florida. Neither MWK nor Counsel Holdings has ever been qualified, licensed, authorized, or registered to do business in Florida. Neither MWK nor Counsel Holdings has ever processed, serviced, or manufactured products or materials in Florida. Neither MWK nor Counsel Holdings has ever had any employees in Florida, nor has either of them ever had any person or subsidiary in Florida who can exercise discretion or control over MWK or Counsel Holdings.

### Not Consumer Debt

13.    Jowers asserts that I violated the FCCPA in part because the statements I made to Cole violated Fla. Stat. 559.72(9). That statute prohibits any "Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." Because of the Texas Judgment, I know that the debt is legitimate. Further, the legal rights I outlined to Cole that I anticipate using to collect the debt are all rights that I know exist. Specifically, transfers of items of value by a judgment debtor such as Jowers to a third party without receiving equivalent value constitute fraudulent transfers. The transferee of a fraudulent transfer is subject to being liable to the judgment creditor, and a seizure by a sheriff and sale of the fraudulently transferred property is a remedy that very much exists. The steps that I told Cole that we are prepared to take to collect on the Judgment are steps that I verily believed and continue to believe we have the legal right to take.

14.     Mr. Jowers was upset because he believes that an attorney named Mark Poe who is now based in Hawaii assisted me in the prosecution of the Texas Case by informing me that Mr. Jowers's other counsel in the Texas Case (Robert Tauler) had been sanctioned by certain California courts. Shortly before the judgment in the Texas Case was issued, Mr. Jowers sued Mr. Poe in Monroe County, Florida, on the theory that Mr. Poe had tortiously interfered with Mr. Jowers's contract with his Mr. Tauler. A true and correct copy of the order dismissing the claims against Mr. Poe in the Monroe County case is attached hereto as **Exhibit I**.

I declare under penalty of perjury under the laws of the United States and the state of Florida that the foregoing statements are true and correct. Executed on February 24, 2023.

/s/ Robert E. Kinney
Robert E. Kinney

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically and e-Served by the Florida Court's E-Filing Portal to the following counsel of record on February 24, 2023.

Zachary Z. Zermay
zach@zermaylaw.com
203 Labelle Ave.
Tice, FL 33905
*Counsel for Plaintiff*

/s/ Robert E. Kinney
Robert E. Kinney

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MWK RECRUITING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:18-CV-444-RP |
| | § | |
| EVAN P. JOWERS, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| EVAN P. JOWERS, | § | |
| | § | |
| Counterplaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MWK RECRUITING, INC., ROBERT E. | § | |
| KINNEY, RECRUITING PARTNERS GP, | § | |
| INC., KINNEY RECRUITNG, LLC, | § | |
| COUNSEL UNLIMITED, LLC, and | § | |
| KINNEY RECRUITING LIMITED, | § | |
| | § | |
| Counterdefendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On December 7 and 8, 2021, the Court held a bench trial in this matter. (Dkts. 338, 339).

The parties submitted post-trial briefs. (Pl. Br., Dkt. 342; Deft. Br., Dkt. 343). Having considered the

evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing

law, the Court enters the following findings of fact and conclusions of law.

## I. BACKGROUND

The issues in this case stem primarily from an employment dispute between

Defendant/Counterplaintiff Evan P. Jowers ("Jowers") and Plaintiff/Counterdefendant MWK

Recruiting, Inc. ("MWK"). Beginning in April 2006, Jowers worked as a legal recruiter for MWK

**Exhibit A to REK Decl.**                                                    **Page 1 of 44**

and its associated entities,[1] which are all lead by Robert E. Kinney ("Kinney"). (Second Am. Compl., Dkt. 80, at 2–6; Third Am. Answer, Dkt. 237, at 40). In 2006, shortly after he was hired, Jowers signed an Associate Recruiter Employment Agreement ("Jowers Agreement"), which includes non-compete and non-solicitation covenants. (Jowers Emp't Agreement, Dkt. 80-1). Jowers resigned from MWK on December 16, 2016. (Tr. I, at 149).

During his employment, Jowers originally recruited attorneys for placements at large law firms based in the United States and United Kingdom, but around 2015 he relocated to Hong Kong to place attorneys with law firms in Asia. (Second Am. Compl., Dkt. 80, at 14). In December 2016, Jowers ended his employment with Kinney Recruiting HK and joined Legis Ventures as an attorney recruiter. (Second Am. Compl., Dkt. 80, at 14). MWK alleges that Jowers submitted six MWK candidates through Alejandro Vargas ("Vargas"), the founder of Legis Ventures, while he was still employed with MWK. (*Id.*). Specifically, MWK alleges that Jowers sent Kinney an email stating Jowers had submitted candidates named James Chang, Longhao Zhang, Richard Han, Pamela U, Claudia Lau, and Xiao Zhang through Vargas. (*Id.*).

Jowers also obtained two loans related to his employment in 2012. First, Jowers entered into a Forgivable Loan Agreement and Promissory Note (the "Forgivable Loan"). (*Id.* at 6). Second, Jowers entered into a Loan Agreement and Promissory Note (the "Revolving Loan"). (*Id.* at 8). As of the date of Jowers's resignation, Kinney alleges Jowers still owed money on both loans (*Id.* at 43, 44). For his part, Jowers alleges that, despite promising to do so, MWK refused to reimburse him for work related expenses in Hong Kong, refused to provide him with a Hong Kong work visa, and failed to provide an office location and housing costs in Hong Kong. (Third Am. Answer, Dkt. 237, at 51, 54–55). Jowers also asserts that the Jowers Agreement provided that he would receive certain

---

[1] Jowers worked for Kinney Recruiting, L.P., (P-2, Dkt. 341-1, at 3), then Recruiting Partners GP, Inc., and then its affiliate, Kinney Recruiting, LLC. (Second Am. Compl., Dkt. 80, at 2–6). Recruiting Partners GP, Inc. is a Texas corporation and the predecessor entity of MWK. (*Id.* at 2, 9).

**Exhibit A to REK Decl.**                              **Page 2 of 44**

commission amounts for placing attorney candidates, but that these commission rates were

unilaterally reduced after commissions were earned. (*Id.* at 54).

## II. SUMMARY OF THE EVIDENCE

During the trial, the Court heard testimony from Kinney, Jowers, and Alexis Lamb. (Dkt.

340). The Court also entered exhibits provided by both parties. (Dkt. 341).

### A. Misappropriation of MWK's Trade Secrets

In its complaint, MWK alleges that Jowers misappropriated MWK's trade secrets related to

information about law firm clients and attorney candidates (Second Am. Compl., Dkt. 80, at 24, 32–

36). MWK brings these claims under both the Federal Defend Trade Secret Act ("FDTSA"), and

the Texas Uniform Trade Secret Acts ("TUTSA"). At trial, Kinney testified that Jowers

misappropriated MWK's trade secrets by utilizing confidential information he'd obtained during his

final year of employment with MWK to place six candidates at law firms in the year following his

departure from MWK. (Tr. I, at 77). Those candidates included Steve Kang ("Kang"), James Chang

("Chang"), Rose Zhu ("Zhu"), Pamela Usukumah ("Usukumah"), Longhao Wang ("Wang"), and

Meng Ding ("Ding"). (*Id.* at 157).

Kinney testified that he became aware that Jowers was working with Wang, Chang, and

Usukumah through an email Jowers sent to him following his departure from MWK, which stated

he had been sent the three names "right before I left Kinney." (*Id.* at 50; P-53, Dkt. 341-2, at 2). An

email from Jowers through his Kinney Recruiting email address shows that he began making

contacts with firms on behalf of Rose Zhu in October of 2016. (P-20, Dkt. 341-1, at 150). Kinney

further testified that he did not find out about Jowers's work with Kang and Ding until he issued

**Exhibit A to REK Decl.**                                **Page 3 of 44**

subpoenas during discovery and found that Jowers had been communicating with these candidates

through a personal email address while working at MWK. (Tr. I, at 45–47, 121).

Kinney testified that the Jowers Agreement included nondisclosure clauses. (*Id.* at 144). The

clauses state:

> At all times during and after the Employee's employment, the Employee shall not
> use or disclose to any person the Company's Proprietary Information, except as such
> disclosure or use may be required in connection with the Employee's employment,
> or unless the Robert Kinney expressly authorizes such in writing.

(P-2, Dkt. 341-1, at 6–7).

> For a period of one year following the effective date of termination of the
> Employee's employment, the Employee shall not, in the course of the personnel
> placement service business, solicit or provide services to any candidate or client with
> whom the Employee had contact with, knowledge of, or access to during the twelve
> months immediately preceding the effective date of termination, and shall not assist
> any entity other than the Company in so doing.

(*Id.* at 7). Kinney testified that he did not give Jowers any authorization in writing permitting him to

utilize or disclose the information obtained about the six candidates. (Tr. I, at 144).

Regarding what Kinney considers to be proprietary information regarding MWK's

candidates, he stated "their identity," "information about them" that is "not readily ascertainable by

people." (*Id.* at 158). This information could include specifics about deals clients had made, how

much experience clients had, clients' law school information, why and where clients would want to

move, and what their most confidential desires about their future employment were. (*Id.* at 166). He

testified that recruiters at MWK establish trust and confidence relationships in order to place

candidates, relationships which take a long time to develop. (*Id.* at 158–59). Kinney stated that the

information MWK gathers about candidates in order to build trust and make placements is,

therefore, a valuable business asset and offers MWK significant competitive advantages against

other recruiting businesses that do not have the same information. (*Id.* at 159). On cross-

examination, Kinney noted that he wasn't sure if a candidate's name alone constituted a trade secret.

4

(*Id.* at 216). Jowers testified that the confidential information he gathered from the candidates was based on his own personal relationships with the candidates and that MWK did not take measures to protect the information at issue, nor did Kinney ever tell him he needed to keep information secret. (*Id.* at 213–14).

The parties provided specific evidence regarding the alleged trade secret misappropriation for each of the six candidates. Regarding Kang, Jowers first met Kang while working for MWK. (Tr. II, at 139–41; 242–44; P-130, Dkt. 341-4, at 734). Jowers testified that, before leaving MWK, he obtained information regarding Kang's desire to transfer firms and sent an email to Latham & Watkins regarding Kang's candidacy from his personal email address. (Tr. II, at 247). After leaving MWK, as early as December 14, 2016, Jowers continued to communicate with Latham & Watkins about Kang, including information about Kang's clients and how much Kang's practice was worth. (P-57, Dkt. 341-2, at 9). Jowers testified that he believed Kinney would "blow up the whole deal" if he involved Kinney in the placement of Kang at Latham & Watkins. (Tr. II, at 147–48). Kang was ultimately hired by Latham & Watkins and Jowers received a placement fee. (P-130, Dkt. 341-4, at 724).

Chang emailed back and forth with Jowers in December 2016 to set up a phone conversation. (P-20, at 169–70). On December 14, 2016, Chang emailed Jowers, expressed his interest in changing firms, and listed his clients. (P-59, at 66). On December 23, 2016, Kinney emailed Chang and asked him if he had heard from Jowers. (*Id.* at 65). On March 7, 2017, Jowers emailed the law firm DLA Piper to put forward Chang's candidacy. (P-61, Dkt. 341-2, at 67). In the email, Jowers discusses Chang's language abilities, his "stellar" end-of-year reviews, his desire to

move back to China, his deal sheet and clients, and his resume. (*Id.*). Chang was ultimately hired by DLA Piper, and Jowers was paid a placement fee. (P-126, Dkt. 341-4, at 642).

Jowers began sending information about Zhu out to firms as early as October 20, 2016 using his MWK email address. (P-20, Dkt. 341-1, at 150). In his emails, Jowers details how much Zhu's practice was worth and her client list. (*Id.*). Following his resignation, Jowers continued to send emails to law firms on behalf of Zhu, containing the same information he had sent to firms while working at MWK. (P-63, Dkt. 341-2, at 93; P-64, Dkt. 341-2, at 96; P-65, Dkt. 341-2, at 99). The law firm Baker & McKenzie hired Zhu "on or about May 17, 2017," and paid a placement fee to Jowers for her placement. (P-122, Dkt. 341-4, at 590).

Jowers became aware of Wang's interest in changing firms while working at MWK. (P-53, Dkt. 341-2, at 5) (referring to Wang as "Longhao Zhang"). Before Jowers left MWK, Alejandro Vargas ("Vargas") began sending out emails to law firms about Wang's candidacy. (P-69, Dkt. 341-2, at 136). When Jowers left MWK, he and Vargas started their own recruiting firm. (Tr. I, at 152). Vargas's emails included Wang's language skills, law school record, and reasons for changing firms and moving to China. (*Id.*). On January 5, 2017, Kinney sent an email to Wang, stating that "by cooperating with" Jowers, Wang was "being put in a position where [Wang was] assisting [Jowers] in converting [Kinney's] proprietary information . . . ." (D-341, Dkt. 341-8, at 29). Wang "ended up moving to Skadden's Hong Kong offices in 2017" without Jowers's help. (P-143, Dkt. 341-1, at 976; Tr. II, at 153 (Jowers testifying that Wang "was placed by another recruiter because he was afraid" of Kinney and that Jowers found out about Wang's placement at Skadden "just like the public finds out")). In 2018, Jowers assisted Wang in getting hired by Latham & Watkins and Jowers was paid a placement fee. (P-130, Dkt. 341-1, at 726).

Usukumah emailed MWK in June 2016 to request that MWK assist her with her job search in Asia, and her email was forwarded to Jowers. (P-71, Dkt. 341-3, at 1). In her email, Usukumah

**Exhibit A to REK Decl.**                                          **Page 6 of 44**

listed her language skills, discussed what she was looking for in a job, and noted that she was

working with other recruiting services but wasn't getting enough traction. (*Id.*). In November 2016,

Usukumah emailed Jowers her resume, corporate deal sheet, and law school transcript. (P-72, Dkt.

341-3, at 3). On December 14, 2016, shortly before Jowers resigned from MWK, Vargas began

reaching out to law firms on behalf of Usukumah with emails that included Usukumah's interest in

moving to Asia, her resume, her deal sheet, and her transcript. (P-73, Dkt. 341-3, at 4). In the email,

Vargas states that he has "known [Usukumah] for about 6 months, as she reached out to me then . .

. ." (*Id.*). In January 2017, Vargas received feedback from a law firm on Usukumah's candidacy and

forwarded the email to Jowers. (P-74, Dkt. 341-3, at 6). Around that same time, Usukumah

forwarded Jowers an email she had received from Kinney in which Kinney stated "I don't want to

complicate your life or your search, but if you listen to Evan and do not get in touch with me, you

will be in an awkward position . . . At the very least, I'd like to help you avoid getting in the middle

of a battle between Evan and his old company, something that could get you deposed, or worse."

(D-337, Dkt. 341-8, at 26). When Usukumah forwarded this email to Jowers, she stated "I really,

really do not want my search to be adversely affected by this . . . . At the very least, should I confirm

that I did want to continue representation with you as my recruiter after you had left Kinney?" (*Id.* at

25). Jowers ultimately succeeded in getting Usukumah placed at a law firm in Singapore in August

2017 and received a placement fee. (Tr. II, at 251; P-132, Dkt. 341-4, at 773–74).

Finally, Jowers began working on marketing Ding for in-house positions around July 2016

while Jowers was working at MWK. (P-78, Dkt. 341-3, at 21). However, Jowers determined that

Ding's situation at his current firm had improved, and believed that Ding may not be in a hurry to

change jobs. (*Id.*). After Jowers resigned from MWK, he had an email exchange with Ding using his

new company's email account. (P-77, Dkt. 341-3, at 20). In the email exchange, Ding sent Jowers his

resume and deal list and requested that Jowers keep them in the strictest confidence, which Jowers

**Exhibit A to REK Decl.**                    **Page 7 of 44**

agreed to do. (*Id.*). In July of 2017, Jowers reached out to a law firm on behalf of Ding and included information about Ding's clients, his interests, and his goals for a potential move. (P-80, Dkt. 341-3, at 35). Jowers also included Ding's resume and deal sheet, which he stated was last updated in December 2016. (*Id.* at 36). The law firm Kirkland & Ellis hired Ding in November 2017 and paid Jowers a placement fee. (P-129, Dkt. 341-4, at 708).

### B.    Breach of the Jowers Agreement

MWK's next claim alleges that Jowers breached provisions in the Jowers Agreement, which is governed by Florida law, (*see infra* Part III.B). (Second Am. Compl., Dkt. 80, at 39). The trial evidence shows that after beginning to work with MWK, Jowers became interested in expanding the company's work in Asia. (Tr. I, at 63; Tr. II, at 165–69). Kinney testified that he believed the company's expansion into Asia would be expensive. (Tr. I, at 64–65). In August 2006, Jowers sent an email to Kinney that said "[s]ince you are investing money in me . . . I would be happy to sign a non-compete to give you peace of mind. I guess that is always an issue that you would be dealing with in building up a recruiting company." (P-17, Dkt. 341-1, at 97). The parties agree that the Jowers Agreement was fully executed in December 2006. (Pl. Br., Dkt. 342, at 98–99; Deft. Br., Dkt. 343, at 2). MWK alleges Jowers breached the confidentiality and non-solicitation covenants in the Jowers Agreement. (*Id.*)

The Jowers agreement included clauses intended to maintain confidentiality of MWK's proprietary information. (P-2, Dkt. 341-1, at 4). In particular, the clauses at issue state:

> 3.2    The employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in the strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

8

(*Id.*) (Clause 3.2).[2]

> 4.4    The employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

(*Id.* at 5) (Clause 4.4).

> 8.1    For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

(*Id.* at 7) (Clause 8.1).

> 9.1    The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employee shall pay the Company, upon demand, as liquidated damages, and not as a penalty, the following:
>> 9.1.1    Any fee paid for services rendered in violation of Sections 7 and/or 8, whether paid to the Employee or to any other person, firm or entity; plus
>> 9.1.2    All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation.

(*Id.*) (Clauses 9.1, 9.1.1, 9.1.2).

---

[2] The agreement defines "Proprietary Information" as:

> [T]he Company's confidential information, including but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records, and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists' include information contained in or reproduced from the memory of an employee. The Company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.

(*Id.*) (Clause 1.6).

**Exhibit A to REK Decl.**                                    **Page 9 of 44**

> 9.4    The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a violation of that Section.

(*Id.*) (Clause 9.4).

The contract notes that these restrictive clauses are intended to protect MWK's business interests, stating that "[t]he protection of the Company's Proprietary Information, good will, and relationships with its clients and candidates is vital to the continued successful operation of the Company's business." (*Id.* at 4) (Clause 3.3). Kinney testified that this clause was intended to acknowledge that MWK would "expend considerable time and money procuring and training [employees], providing facilities for the conduct of its business, and establishing relationships and goodwill with existing and prospective clients and candidates." (Tr. I, at 87).

At trial, MWK argued that Jowers breached clauses 3.2 and 4.4 of the contract prior to leaving MWK. (Pl. Br., Dkt. 342, at 26–27). Specifically, MWK provided evidence that Jowers secretly sent candidate information to law firms and to Vargas while still employed at MWK. *See supra* Part II.A (describing how Jowers sent information about Kang, Wang, and Usukumah to law firms and Vargas using a personal email while working at MWK). MWK also argued that Jowers breached clause 8.1 of the contract. The trial evidence shows Jowers had contact with each of the following law firm clients of MWK between December 17, 2015, and December 16, 2016 using his MWK email address: Allen & Overy (P-20, Dkt. 341-1, at 156); Cleary, Gottlieb, Steen, & Hamilton (*id.* at 109); Cooley (*id.* at 99); Covington & Burling (*id.* at 123); DLA Piper (*id.* at 159); Gibson, Dunn & Crutcher (*id.* at 163); Kirkland & Ellis (*id.* at 152); Latham & Watkins (*id.* at 138); Linklaters (*id.* at 150); Morrison & Foerster (*id.* at 162); Skadden, Arps, Slate, Meagher & Flom (*id.* at 131), and Weil, Gotshal & Manges (*id.* at 155). While Jowers told candidates he would send their information to the law firms Baker & McKenzie and Gunderson Dettmer, there is no evidence in the record that

**Exhibit A to REK Decl.**                    **Page 10 of 44**

Jowers was actually in contact with these firms during his last year at MWK. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

Jowers also had contacts with the following candidates during his last year at MWK: Zhu, Chang, Ding, Kang, Wang, Usukumah (*see supra* Part II.A); Kevin Cooper ("Cooper") (P-20, Dkt. 341-1, at 101); Ferish Patel ("Patel") (*id.* at 122); Ingram Weber ("Weber") (*id.* at 132); Nicole (Wenhan) Ma ("Ma") (*id.* at 123–30); Jason (Jiaxing) Xu ("Xu") (*id.* at 138–39); Benjamin Su ("Su") (*id.* at 138); and Amit Singh ("Singh") (*id.* at 156–57).

The evidence presented at trial likewise shows that Jowers solicited or provided personnel placement services to the above-mentioned firms and candidates following his departure from MWK.[3] Specifically, he pitched candidates to the law firm Weil, Gotshal & Manges on April 19, 2017, March 15, 2018, July 17, 2020, and November 16, 2020, (P-21, Dkt. 341-1, at 176, 185–86, 202–03), and the law firm Latham & Watkins on March 14, 2018 and October 21, 2019 (*id.* at 178, 183–84, 196–201). He also placed Zhu, Chang, Ding, Kang, Wang, Usukumah, Cooper, Patel, Weber, Ma, Xu, Su, and Singh on the following dates:

| Candidates | |
|---|---|
| **Candidate Name** | **Placement** |
| Zhu | Baker & McKenzie<br>May 17, 2017<br>(P-122, Dkt. 341-4, at 590) |
| Chang | DLA Piper<br>August 1, 2017<br>(P-126, Dkt. 341-4, at 642) |
| Ding | Kirkland & Ellis<br>November 16, 2017<br>(P-129, Dkt. 341-4, at 708) |
| Kang | Latham & Watkins<br>June 28, 2017<br>(P-130, Dkt. 341-4, at 724) |
| Wang | Latham & Watkins<br>September 24, 2018<br>(P-130, Dkt. 341-1, at 726 |

---

[3] Jowers assists with each of the placements that are made by his current recruiting firm. (Tr. II, at 128–30).

| | |
|---|---|
| Usukumah | Morrison & Foerster<br>August 1, 2017<br>(Tr. II, at 251; P-132, Dkt. 341-4, at 773–74) |
| Cooper | Cooley<br>March 20, 2020<br>(P-124, Dkt. 341-4, at 614–15) |
| Patel | Cooley<br>July 29, 2019<br>(P-124, Dkt. 341-4, at 612–13) |
| Weber | Allen & Overy<br>May 16, 2018<br>(P-121, Dkt. 341-4, Dkt. 577–78) |
| Ma | Covington & Burling<br>September 13, 2017<br>(P-96, Dkt. 341-3, at 100) |
| Xu | Gibson, Dunn & Crutcher<br>July 23, 2018<br>(P-127, Dkt. 341-4, at 655–66) |
| Su | Latham & Watkins<br>March 14, 2018<br>(P-130, Dkt. 341-4, at 727–28) |
| Singh | Linklaters<br>December 20, 2018<br>(P-131, Dkt. 341-4, at 763) |

Jowers also placed candidates at the following firms on the following dates:

| Firms | |
|---|---|
| **Firm Name** | **Placement** |
| Weil, Gotshal & Manges | September 20, 2017, (P-134, Dkt. 341-4, at 807)<br>April 6, 2020, (P-134, Dkt. 341-4, at 808) |
| Allen & Overy | July 31, 2018, (P-121, Dkt. 341-4, 579) |
| Cleary, Gottlieb, Steen & Hamilton | October 24, 2017, (P-123, Dkt. 341-4, at 602) |
| Cooley | October 4, 2019, (P-124, Dkt. 341-4, at 614)<br>January 30, 2020, (P-124, Dkt. 341-4, at 616) |
| DLA Piper | January 8, 2020, (P-126, Dkt. 341-4, at 646) |
| Gibson, Dunn & Crutcher | June 24, 2019, (P-127, Dkt. 341-4, at 657)<br>August 12, 2019, (P-127, Dkt. 341-4, at 672)<br>September 23, 2019, (P-127, Dkt. 341-4, at 658) |
| Morrison & Foerster | January 30, 2018 (P-132, Dkt. 341-4, at 775)<br>December 6, 2018, (P-132, Dkt. 341-4, at 777)<br>March 20, 2019, (P-132, Dkt. 341-4, at 777)<br>April 18, 2019, (P-132, Dkt. 341-4, at 779)<br>June 17, 2019, (P-132, Dkt. 341-4, 782) |

12

| Skadden, Arps, Slate, Meagher & Flom | April 20, 2018, (P-133, Dkt. 341-4, at 729)<br>November 4, 2019, (P-133, Dkt. 341-4, at 794)<br>November 12, 2019, (P-133, Dkt. 341-4, at 795) |
|---|---|
| Gunderson Dettmer | March 6, 2017, (P-128, Dkt. 341-4, at 683)<br>August 14, 2017, (P-128, Dkt. 341-4, at 682)<br>April 18, 2018, (P-128, Dkt. 341-4, at 684)<br>February 26, 2019, (P-128, Dkt. 341-4, at 686)<br>May 7, 2019, (P-128, Dkt. 341-4, at 687)<br>August 5, 2019, (P-128, Dkt. 341-4, at 689)<br>April 13, 2020, (P-128, Dkt. 341-4, at 691)<br>May 2, 2020, (P-128, Dkt. 341-4, at 693) |
| Baker & McKenzie | May 17, 2017, (P-122, Dkt. 341-4, at 591) |
| Latham & Watkins | August 24, 2017, (P-130, Dkt. 341-4, at 726)<br>April 20, 2018, (P-130, Dkt. 341-4, at 729)<br>April 20, 2018, (P-130, Dkt. 341-4, at 728)<br>August 24, 2017, (P-130, Dkt. 341-4, at 727)<br>July 16, 2018, (P-130, Dkt. 341-4, at 729) |
| Kirkland & Ellis | October 3, 2017, (P-129, Dkt. 341-4, at 705)<br>November 2, 2017, (P-129, Dkt. 341-4, at 706) |
| Linklaters | December 20, 2018, (P-131, Dkt. 341-4, at 761)<br>March 25, 2019, (P-131, Dkt. 341-4, at 754)<br>March 25, 2019, (P-131, Dkt. 341-4, at 758)<br>April 9, 2019, (P-131, Dkt. 341-4, at 760)<br>November 21, 2019, (P-131, Dkt.341-4, at 756) |

Jowers asserts several defenses to his liability under the Jowers Agreement. In his Third Amended Answer, Jowers asserts that Kinney threatened not to pay Jowers his commissions unless he signed the Jowers Agreement. (Dkt. 237, at 33). At trial, Jowers testified that Kinney did not physically threaten him to sign the agreement, but that he "felt that [the Jowers Agreement] was signed under duress and that [he] had to sign it in order to not be robbed" of his income "and to avoid bankruptcy." (Tr. II, at 139–40).

Jowers also asserts that MWK and Kinney materially breached the Jowers Agreement prior to any breaches by Jowers. (Dkt. 237, at 33). The record suggests that the breaches Jowers alleges relate to Kinney changing Jowers's commission rate following the execution of the Jowers Agreement in 2006. When Jowers signed the agreement in 2006, he was subject to a base pay of

**Exhibit A to REK Decl.**                                    **Page 13 of 44**

$3,000 monthly plus commissions, which were "45% of the first $75,000; 50% of the next $75,000; 55% of the next $75,000; 60% of the next $75,000; 65% of the excess over $300,000." (P-2, Dkt. 341-1, at 11). Throughout Jowers's employment, MWK instituted changes to Jowers's commission structure. (*See* D-49, Dkt. 341-5, at 18 (changing commission structure to "45% across the board"); Tr. II, at 191 (Jowers testifying that he was comfortable with his commissions going to "62.5 percent across the board"); (P-158, Dkt. 341-4, at 1119) (email from Kinney to Jowers stating Jowers's commissions would stop at 50%, and Jowers's response: "I don't think it is fair that I am only getting 50% as the checks come in"); P-159, Dkt. 341-4, at 1121 (Jowers acknowledging email from Kinney stating Jowers would get 45 percent for any placement)). At trial, Jowers testified, "I didn't think I can have – my commissions could just be lowered to 45 percent, but he told me that I had like an hour to decide. He's doing payroll and if I don't say yes, I'm fired basically." (Tr. II, at 196).

Jowers also alleges that the restrictive covenants clauses are overbroad, overlong, not reasonably necessary, and unconscionable. (Dkt. 237, at 34, 36). He asserts the restrictive covenants are overbroad in both scope and geographic area, overlong because of the tolling requirement, not reasonably necessary to protect MWK's business interests, and unconscionable because they "purport to restrain Defendant's ability to earn a living worldwide for an indefinite period of time." (*Id.* at 34–36). Kinney testified at trial that "[t]he confidential information that we have . . . could easily be of value for more than a year, but one year was a compromise . . . to establish a reasonable level of protection." (Tr. I, at 81–82). He further testified that the restrictive covenant "only affects ability to work in placement of personnel at a business, which means for our client list, which is predominantly law firms, and some corporations, you could do other things for them. You could create war rooms, or do discovery work, or utilize your relationships in another way for that year period, but you had to stay out of the personnel placement service business" or "the employee has the option of limiting their access to certain clients or candidates -- for example, I don't want to see

any new candidates. I'm just going to work with my old candidates -- in order to limit the effect of the non-solicitation agreement." (*Id.* at 83–84). When Jowers's attorney asked Kinney, "[s]o [Jowers] can't work anywhere in the world?" Kinney responded, "[t]hat's not a correct statement." (Tr. II, at 49).

In addition, Jowers argues that the liquidated damages clause does "not explain why [MWK] should be entitled to 100% of the gross revenue generated by a third party entities Legis Ventures, Jowers Vargas LLC, or Jowers Langers LLC – entities that are not parties in these proceedings, even though they are the only parties that were paid" the fees for the above-mentioned placements. (Deft. Br., Dkt. 343, at 8) (*see also* P-2, Dkt. 341-1, at 7; Tr. I, at 183).[4] In short, Jowers argues, MWK failed to prove that the placements were made by Jowers or caused MWK any harm, as there is no proof MWK would have made these same placements. (P-2, Dkt. 341-1, at 19).[5]

Finally, Jowers asserts that argues that Hong Kong law should govern the Jowers Agreement instead of Florida law. In an email from Kinney to Jowers on January 28, 2009, Kinney stated that "[t]he noncompete will be amended to apply to Hong Kong/China and be fully enforceable." At trial, Kinney testified that, around 2009, he was trying to get a Hong Kong work permit for Lamb: "I gave our people that were trying to get her a work permit our existing contract, and I remember they suggested some changes to it and that the provisions that they suggested were different from

---

[4] The Court has previously found that Jowers waived his right to challenge the liquidated damages clause. (Dkt. 285, at 21–22). However, the Court will address Jowers's argument here, as it is principally concerned with causation.

[5] In Jowers's Third Amended Complaint, he asserts additional defenses, including (1) failure to state a claim, (Dkt. 237, at 33); (2) fraud, (*id.* at 34); (3) waiver, (*id.*); (4) estoppel, (*id.*); lack of consideration, (*id.* at 35); rescission, (*id.*); and unclean hands, (*id.*). The Court denied summary judgment to Jowers as to all of Plaintiff's claims, (Dkt. 80), and thus declines to revisit any arguments for failure to state a claim. (Dkt. 285). The Court also disposed of Jowers's fraud argument in its Motion for Judgment on the Pleadings. (Dkt. 229, at 7–14). While Jowers subsequently filed an amended answer, he included the same language from his fraud defense in his previous answer, which the Court had already dismissed. (Dkt. 237, at 34). Further, Jowers failed to testify or direct the Court to any evidence regarding his defenses of waiver, estoppel, lack of consideration, rescission, or unclean hands, nor did he mention the defenses in his post-trial briefing. The Court therefore declines to rule in Jowers's favor based on these defenses.

Exhibit A to REK Decl.                                          Page 15 of 44

the Florida law provisions that were contained in" the Jowers Agreement. (Tr. I, at 199–200). Lamb testified that Hong Kong non-compete agreements differ from Florida non-compete agreements in that they are required to have a "garden leave" provision. (Tr. III, at 15–24). Specifically, Lamb testified that employees must be paid their salary during the period in which their employment contract restrains their mobility. (*Id.*). Jowers asserts that without a specific Hong Kong employment agreement, the non-compete in the Jowers Agreement should not apply to him. (Deft. Br., Dkt. 343, at 10).

In addition, Jowers asserts that there *was* a Hong Kong contract and that he reasonably relied on it to his detriment. On August 7, 2015, Kinney sent an email to a Hong Kong law firm with a draft employment agreement, stating "[o]nce these documents are in good form we can arrange to have [Jowers] sign them." (D-130, Dkt. 341-5, at 45). Jowers testified that he believed this contract was required to contain a garden-leave provision and that Kinney was imminently going to sign the contract. (Tr. II, at 227). Kinney testified that he told Jowers he had concerns and was uncomfortable signing the Hong Kong agreement in Fall 2015. (Tr. II, at 30–31).

### C. Loan Agreements

#### 1. 2012 Forgivable Loan

On February 1, 2012, Jowers entered into the Forgivable Loan. (P-5, Dkt. 341-1). The Forgivable Loan was intended to be an "extra reward" for Jowers. (P-37, Dkt. 341-1, at 473). When describing the loan to Jowers, Kinney stated, "whatever I do for you I plan to structure as a forgivable loan so that you will not have to pay tax on the money immediately . . . . The term will be nine years . . . . The downside is that if you were to split in 9 years, you'd have to pay me back." (*Id.*). Jowers responded, "Sure, it is great for me to get a nice deserved bonus, but not worth it for you if someone in my shoes takes a big bonus after a great year and then splits[.]" (*Id.*). The Forgivable Loan has an associated promissory note of $50,000, which is signed by Jowers as the debtor. (P-5,

**Exhibit A to REK Decl.**                                            **Page 16 of 44**

Dkt. 341-1, at 22). The promissory note states that it shall be "exclusively governed by, and construed and enforced in accordance with, the laws of the State of Texas." (*Id.*). The terms of the Forgivable Loan stated that "upon Employee's termination of employment with the Company for any reason, any outstanding Principal Amount will be immediately due and payable." (*Id.* at 18).

When Jowers left MWK in December 2016, the balance of the Forgivable Loan was $25,982.18 with a 1.17 percent simple interest per annum, which Jowers does not dispute. (Tr. II, at 100). MWK therefore seeks damages in the amount of $25,982.18 plus interest growing at 78.7 cents per day since December 6, 2021, as well as attorney fees and costs. (Tr. I, at 182). Kinney testified that Jowers has made no payments on the loan since he left MWK. (Tr. I, at 181). Jowers testified that he feels the loan should have been considered a "bonus," (Tr. II, at 99).[6] In his Third Amended Answer, Jowers also asserts MWK "coerced [him] into signing the [Forgivable Loan Agreement] by threatening to terminate Defendant and withhold all pending commissions," and that the MWK's claim for breach of the Forgivable Loan agreement is barred because of MWK's prior material breaches of its obligations under the contract. (Dkt. 237, at 33).

### 2. 2012 Revolving Loan

MWK and Jowers entered into the Revolving Loan on December 29, 2012. (P-9, Dkt. 341-1, at 32). Both parties signed the agreement. (*Id.* at 48–49). The Revolving Loan had an associated promissory note of $150,000, which Jowers signed as the debtor. (P-8, Dkt. 341-1). The Revolving Loan also had an associated security agreement, which Jowers also signed as the debtor. (P-10, Dkt. 341-1). The loan had a per annum interest rate of 17 percent. (P-8, Dkt. 341-1, at 26). Jowers testified that he authorized charges to the Revolving Loan, which were presented to him in

---

[6] In response, Kinney testified: "So if you're deciding whether to give somebody a bonus, you can either pay them in cash, in which case, they have an immediate tax hit and you have to risk that that person's going to take that cash and leave, and then, you get nothing out of that and they also have less disposable cash, than if they got a loan. So if you structure it as a loan and then, you forgive it over a period of time, you can solve that problem." (Tr. II, at 41).

**Exhibit A to REK Decl.**                                    **Page 17 of 44**

accountings he received each pay period. (Tr. II, at 102). Kinney testified that Jowers has not

provided his own accounting of what is due on the loan. (Tr. I, at 150–51).

The parties dispute the amount that is due on the loan. Jowers asserts that MWK's

accountings of the loan balance have changed throughout the course of this litigation. Specifically,

Jowers alleges that MWK initially plead that Jowers owed $48,535.98 under the loan when he

resigned, (Tr. I, at 230), even though MWK's accountant Renee Sommers ("Sommers") told Jowers

when he resigned that the line of credit had been paid back. (P-51, Dkt. 341-2, at 1) (email from

Sommers saying "Yes, I think the remaining regular bonus and Hui Xu commission will just cover

the remaining balance, might be a few hundred short."). Kinney testified that the balance on the date

of Jowers's resignation was $48,535.98, but that MWK is only seeking "$14,000 roughly as of this

date." (Tr. I, at 230). Kinney further testified that this discrepancy is due to MWK applying the

commission Jowers received after his departure for the placement of candidate Hui Zhu to Jowers's

loan balance. (*Id.* at 55, 231). Kinney testified that the balance Jowers owed at the end of January

2017 was $8,001.84, and with the addition of the 17 percent interest per annum, the total amount

Jowers owes on the loan as of December 6, 2021 is $14,690.04 plus interest growing a $3.78 per day

since that date. (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131). Jowers argues that this accounting is

inconsistent with the Sommers's accounting that Jowers was "maybe a couple hundred dollars"

short on the loan when he left MWK. (Deft. Br., Dkt. 343, at 14).

The trial evidence demonstrates that at the time of his resignation, Jowers also owed $30,000

on an interest-free loan that was given to him to cover housing expenses in Hong Kong. (Tr. I, at

39–41; P-39, Dkt. 341-1, at 494). Jowers asserts that upon his resignation, MWK converted the

$30,000 interest-free loan to be part of the Revolving Loan with a 17 percent interest rate. (P-327,

Dkt. 341-8, at 24). Kinney testified that he did not transfer the amount Jowers owed under the

$30,000 interest-free loan to the interest-bearing loan; instead, he states that $30,147.85 was withheld

**Exhibit A to REK Decl.**                                    **Page 18 of 44**

from Jowers's last paycheck, and that $30,000 of that money was applied to pay off the interest-free loan, while the other $147.85 was applied to help pay of the Revolving Loan. (Tr. II, at 6). MWK's summary of its accounting for the Revolving Loan does not show the addition of $30,000 to Jowers's balance under the Revolving Loan. (P-165, Dkt. 341-1, at 1131).

In addition to Jowers's defense that Sommers confirmed he paid off the Revolving Loan, (Dkt. 237, at 36), Jowers also asserts that MWK "coerced [him] into signing the [Revolving Loan Agreement] by threatening to terminate Defendant and withhold all pending commissions," and that the MWK's claim for breach of the Revolving Loan is barred because of MWK's prior material breaches of its obligations under the contract. (Dkt. 237, at 33).

### 3. Assignment of Employment and Loan Agreements

In addition to his specific objections to MWK's claims under the Jowers Agreement, Forgivable Loan, and Revolving Loan, Jowers also asserts that all three agreements are void because the agreements were transferred and assigned between different entities without notice to Jowers. (Deft. Br., Dkt. 343, at 9–11, 20). Each of the agreements permitted assignments. The Jowers Agreement specifically stated, "The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignee and/or successors." (P-2, Dkt. 341-1, at 9). The Forgivable Loan does not prohibit assignment of the Agreement, nor does it require notice of any assignment to be provided to Jowers. (P-5, at 22). The Revolving Loan states "This Agreement is made for the sole protection of Debtor and Lender, and Lender's successors and assigns." (P-9, Dkt. 341-1, at 44).

The evidence demonstrates that, effective January 1, 2007, Kinney Recruiting, L.P. assigned the Jowers Agreement to Recruiting Partners GP, Inc. (P-4, Dkt. 341-1, at 16). Jowers received notice that the entity he was employed by had changed through his W-2. (P-15, Dkt. 341-1, at 88). As of October 16, 2012, Recruiting Partners GP, Inc. assigned the Jowers Agreement to Kinney

**Exhibit A to REK Decl.**                                                                    **Page 19 of 44**

Recruiting, LLC. (P-7, Dkt. 341-1, at 24). Jowers received notice that the entity he was employed by had changed through his W-2. (P-15, Dkt. 341-1, at 91–92). The Forgivable Loan was initially issued by Recruiting Partners GP, Inc., (P-5, Dkt. 341-1, at 17), and was assigned to Kinney Recruiting, LLC on October 16, 2012. (P-7, Dkt. 341-1, at 24). The Jowers Agreement and Forgivable Loan were transferred to MWK on January 31, 2017. (P-11, Dkt. 341-1, at 73). Finally, the Revolving Loan was initially issued by Counsel Unlimited, LLC, and on January 31, 2017, Counsel Unlimited, LLC assigned the loan to MWK. (P-12, Dkt. 341-1, at 74). Therefore, as of January 31, 2017, MWK was the owner of the Jowers Agreement, Forgivable Loan, and Revolving Loan. Jowers testified that he has never personally seen any of these assignments. (Tr. II, at 198).

### D.  Hui Xu Commission

In his Third Amended Answer, Jowers asserts that he was retroactively denied commissions he had already earned. (Dkt. 237, at 53–54). Although the Court initially granted summary judgment to MWK on this claim, (Dkt. 285, at 12), the Court later determined that a genuine fact issue existed as to the payment of Jowers's commission of $41,009 for a candidate named Hui Xu ("Hui"). (Dkt. 314, at 8). Kinney testified that the Hui commission was applied to Jowers's balance under the Revolving Loan. (Tr. I, at 172). Specifically, Kinney testified that when MWK realized Jowers had breached the restrictive covenants in the Jowers Agreement, MWK felt that it could hold "back his commissions to be applied to potential breaches of the employment agreement[.]" (*Id.* at 173). Kinney Recruiting, LLC (the owner of the Jowers Agreement) assigned its interest in the Jowers Agreement to MWK on January 31, 2017. (*Id.*). That same day, Counsel Unlimited, LLC assigned the Revolving Loan to MWK. (P-12, Dkt. 341-1, at 74). As Kinney testified, as of January 31, 2017, MWK was both the assignee of the Jowers Agreement and the commission money it had held back pursuant to it, as well as the assignee of the Revolving Loan. (*Id.* at 174). Once the Hui commission and the Revolving Loan had a consolidated owner, Kinney applied the Hui commission to the

**Exhibit A to REK Decl.**                                      **Page 20 of 44**

balance Jowers owed under the Revolving Loan. (*Id*). The evidence also shows that Jowers expected the Hui commission to be applied to his Revolving Loan balance. (P-51, Dkt. 341-2, at 1).

### E.  Hong Kong Expenses

Jowers's second counterclaim is that MWK made Jowers charge business expenses to the Revolving Loan. (Deft. Br., Dkt. 343, at 15). Specifically, Jowers alleges MWK made him pay for housing in Hong Kong, even though Jowers testified that he worked 24-7 out of his apartment. (Tr. II, at 130). The Jowers Agreement states that "The Company will pay all of the usual and ordinary expenses involved in the operation of the Office." (P-2, Dkt. 341-1, at 4). Kinney testified at trial that housing does not qualify under "expenses" in the Jowers Agreement since they are not "usual and ordinary." (Tr. I, at 239–40). Kinney testified that he has sole discretion as to what business expense is "usual and ordinary." (*Id.* at 242). Kinney testified that in 2015, MWK, charged Jowers's housing expenses to the Revolving Loan, but that MWK paid off the balance as a bonus to Jowers and backdated the interest. (Tr. I, at 245). This process prompted Kinney to create the $30,000 interest-free loan so that MWK could loan Jowers money for housing without interest. (*Id.* at 245). However, Kinney also testified that some of Jowers's housing costs were charged to the Revolving Loan in 2016. (Tr. II, at 17). Those charges were for $10,720 on August 11, 2016, $5,314.63 on September 25, 2016, and $10,309.93 on October 18, 2016. (D-327, Dkt. 341-8, at 24). The evidence appears to demonstrate that these were charged to the Revolving Loan because Jowers had used up the $30,000 limit on the interest-free loan by July of 2016. (*Id.*).

### III. DISCUSSION

### A.  Misappropriation of MWK's Trade Secrets

MWK brings its trade secrets claims under both the Federal Defend Trade Secret Act ("FDTSA"), and the Texas Uniform Trade Secret Acts ("TUTSA"). District Courts consider "federal and state trade secret misappropriation claims together because they will likely require proof

**Exhibit A to REK Decl.**                                        **Page 21 of 44**

of the same elements." *StoneCoat of Tex., LLC v. Procal Stone Design, LLC*, 426 F. Supp. 3d 311, 339 (E.D. Tex. 2019); *Lifesize, Inc. v. Chimene*, No. 1:16-CV-1109-RP, 2017 WL 1532609, at *8 n.4 (W.D. Tex. Apr. 26, 2017).

## 1. Trade Secrets

Under both the DTSA and TUTSA, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 274 (5th Cir. 2009) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). "It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business. . . . A trade secret is a process or device for continuous use in the operation of the business." *Id.* (quoting Restatement of Torts § 757, cmt. B.). To determine whether a trade secret exists, courts examine several factors:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

The Court finds that the information that Jowers gathered regarding clients and potential clients of MWK's recruiting business falls under the categories of information that Texas courts have considered to be trade secrets. *See, e.g.*, *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 441 (S.D. Tex. 2008) ("Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets."); *Nova Consulting*

**Exhibit A to REK Decl.**                                                    **Page 22 of 44**

*Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, No. CIV. SA03CA305FB, 2005 WL 2708811, at *10 (W.D.

Tex. June 3, 2005), *report and recommendation adopted*, No. SA-03-CA-0305-FB, 2005 WL 8156326

(W.D. Tex. Sept. 28, 2005) ("[Plaintiff] seeks trade secret status for information it has obtained

about clients and client contact persons as well as for the relationships [plaintiff] has developed with

those clients and contacts. . . . [T]he relationships developed with client contacts was not generally

known or readily accessible to its competitors.").

    In a similar situation to the information at issue here, "Texas courts consistently consider

three factors when determining whether a customer list is a trade secret: (1) what steps, if any, an

employer has taken to maintain the confidentiality of a customer list; (2) whether a departing

employee acknowledges that the customer list is confidential; and (3) whether the content of the list

is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). All of

MWK's employees who access the company's proprietary information are required to sign an

agreement with confidentiality provisions, such as the Jowers Agreement, which MWK enforces

through legal redress when applicable. (P-2, Dkt. 341-1, at 6–7). Thus, MWK has demonstrated that

Jowers would have known the information was confidential and that MWK attempted to keep the

information it learned about candidates and clients confidential. *See Nova Consulting Grp., Inc. v. Eng'g

Consulting Servs., Ltd.*, No. CIV. SA03CA305FB, 2005 WL 2708811, at *10 (W.D. Tex. June 3, 2005),

*report and recommendation adopted*, No. SA-03-CA-0305-FB, 2005 WL 8156326 (W.D. Tex. Sept. 28,

2005) ("There is evidence [plaintiff] attempted to protect the information relevant to its [client]

relationships by[] having employees sign agreements containing nondisclosure covenants."). In

addition, information about potential candidates that other recruiting firms also had access to can

still be considered a trade secret. *See also Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625–26

(S.D. Tex. 2011) ("Even if the information is readily available in the industry, it will be protected if

the competitor obtained it working for the former employer.").

**Exhibit A to REK Decl.**                                    **Page 23 of 44**

The Court finds that the information Jowers gathered as to Kang, Zhu, Usukumah, Ding, Chang, and Wang—including their names, their clients, how much their practices were worth, their language skills, their goals for switching firms, and their law school records—constituted MWK's trade secrets. *See supra* Part II.A. The evidence supports that Jowers received and acted on this information about these clients while he was working at MWK. *Id.* Further, Jowers was under an obligation to maintain the privacy of these candidates through the Jowers Agreement and through the nature of the recruiting business, which depends on establishing long-term trust relationships with clients. (Tr. I, at 158–59). Indeed, several of these candidates specifically requested that their information be kept in confidence, and Jowers himself declined to disclose to Kinney that he was working with Kang, Ding, and Zhu after he left MWK. *See supra* Part II.A.

In his Third Amended Complaint, Jowers argues that the information he gained about the six candidates was not a trade secret, because it was "readily ascertainable by proper means." (Dkt. 237, at 36). However, Jowers's own testimony belies the argument that this information was readily ascertainable, as he testified repeatedly about his clients' desires to keep their information secret and that much of the information he was able to gather about the six candidates was because he had long-time relationships with them. (*See* Tr. II, at 154 ("[The information Jowers had about Kang] couldn't be monetized or used by any other recruiter if they had it because you can't just take this and throw it into some system and start making placements."); *id.* at 214 ("[Client information is] highly confidential sensitive information that clients provide and you can't let that get out in the public."); *see also* P-77, Dkt. 341-3, at 20 (email from Ding asking Jowers to keep his information "in strict confidence")).

2.   Misappropriation

The Court turns next to whether Jowers misappropriated MWK's trade secrets as to Kang, Zhu, Usukumah, Ding, Chang, and Wang. Misappropriation under both statutes includes (1)

"disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Tex. Civ. Prac. & Rem. Code § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. § 1839(6)(A). A defendant can be liable for misappropriation of trade secrets if, at the time of the unauthorized use or disclosure of the information, the defendant knew he obtained the information under circumstances giving rise to a duty to maintain its secrecy. Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(ii)(b); *see also HIS Co. v. Stover*, 202 F. Supp. 3d 685, 696 (S.D. Tex. 2016).

The Court has already found that Jowers was aware of his obligation to maintain the confidentiality of the information he received from Kang, Zhu, Usukumah, Ding, Chang, and Wang while he was employed at MWK. Therefore, the Court must assess whether Jowers engaged in the unauthorized use or disclosure of that information. The evidence demonstrates that Jowers did not receive Kinney's permission to disclose the information Jowers had gathered about Kang, Zhu, Usukumah, Ding, Chang, and Wang while Jowers worked at MWK. (*See* P-53, Dkt. 341-2, at 2; Tr. I, at 45–47, 121).

The evidence further demonstrates that Jowers shared the information he learned about these candidates while at MWK with Vargas and law firms seeking to hire the candidates. (Tr. II, at 247; P-57, Dkt. 341-2, at 9) (detailing the information Jowers shared with Latham & Watkins about Kang while Jowers still worked at MWK); (P-20, Dkt. 341-1, at 150; P-63, Dkt. 341-2, at 93; P-64, Dkt. 341-2, at 96; P-65, Dkt. 341-2, at 99) (showing that Jowers's emails to law firms regarding Zhu both before and after his resignation from MWK contain much of the same information); (P-53, Dkt. 341-2, at 5; P-69, Dkt. 341-2, at 136) (demonstrating that Jowers was aware of Wang before he

left MWK, and that Vargas—Jowers's eventual business partner—was emailing firms about Wang before Jowers left MWK); (P-71, Dkt. 341-3, at 1; P-73, Dkt. 341-3, at 4) (showing that Usukumah worked with Jowers at MWK during the last of 2016 and that Vargas began sending out emails on Usukumah's behalf shortly before Jowers resigned); (P-78, Dkt. 341-3, at 21; P-77, Dkt. 341-3, at 20) (demonstrating that Jowers began market Ding to potential employers while he was working with MWK and continued to work on placing Ding at a firm following his resignation). This evidence supports a finding that Jowers disclosed trade secrets he had gathered about Kang, Zhu, Usukumah, Ding, Chang, and Wang without MWK's authorization.

In his Third Amended Complaint, Jowers asserts that he "did not misappropriate any MWK trade secrets because Defendant independently developed the information MWK alleges he misappropriated." (Dkt. 237, at 36). Jowers testified in support of the independent relationships he built with candidates through his work:

> Q: Is it fair to say that you cared deeply about your candidates?
> A: Yes.
> Q: In fact, if I asked you, do you think it's fair to say that you remember your entire career since you entered the legal recruiting field in 2005, do you think it's fair to say that you can remember every placement more or less that you did an didn't make?
> A: Most of them.
> Q: This is your passion, is it not?
> A: It is. Yeah.
> Q: These people that you place, these attorneys, they rely on you for advice, right?
> A: It's a privilege, yes.
> Q: They rely on you for mentorship?
> A: Yes.
> Q: You care about what happens to them?
> A: Yes.

(Tr. II, at 244–45). While the Court does not doubt that Jowers's relationships with the six candidates at issue here were personal and individualized, building relationships with candidates was also a requirement of his job as a recruiter for MWK. In other words, he was required to develop these relationships in order to fulfill his job description and requirements. And, despite the parties' disagreements over the extent to which MWK supported Jowers in developing these relationships,

**Exhibit A to REK Decl.**                                    **Page 26 of 44**

the evidence demonstrates that MWK invested resources that provided Jowers with the opportunity to work with Kang, Chang, Usukumah, Ding, Wang, and Zhu. (P-36, Dkt. 341-1) (Jowers's paystubs showing $90,883.63 in expense reimbursements). Thus, the Court declines to rule in Jowers's favor on this basis.

### 3.   Damages

"Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret[;] the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 879 (5th Cir. 2013). They can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing actual loss. Tex. Civ. Prac. & Rem. Code § 134A.004(a). "Estimation of damages should not be based on sheer speculation. If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable." *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 352 (E.D. Tex. 2019).

MWK alleges that it is owed damages based on the "total amount of fees earned by Jowers and his company" for the placement of the abovementioned candidates. MWK also seeks exemplary damages, attorney fees, and costs. The Court will assess damages against Jowers for his actual profits from the use of the trade secrets as to Kang, Zhu, Usukumah, Chang, and Ding. *See Wellogix*, 716 F.3d at 879. Jowers received 1,342,492 Hong Kong Dollars for the placement of Kang on August 7, 2019, (P-130, Dkt. 341-4, at 725); 453,600 Hong Kong Dollars for Zhu on March 14, 2018, (P-93, Dkt. 341-3, at 53); 458,893 Hong Kong Dollars for Usukumah on August 1, 2017, (P-102, Dkt. 341-4, at 27); 979,765 Hong Kong Dollars for Ding on January 8, 2018, (P-129, Dkt. 341-4, at 12); and 798,034 Hong Kong Dollars for Chang on December 12, 2017. (P-126, Dkt. 341-4, at 643). On

**Exhibit A to REK Decl.**                    **Page 27 of 44**

April 27, 2022, the Court granted MWK's motion for judicial notice of the exchange rate between the Hong Kong Dollar and the United States Dollar. (*See* Text Order, 4/27/2022). Applying the exchange rates on the relevant dates, the Court will grant MWK damages in the amounts of $171,172.91 for Kang, $57,919.94 for Zhu, $58,741.31 for Usukumah, $125,270.42 for Ding, and $102,221.62 for Chang, totaling $515,326.20.

The Court will not assess damages against Jowers for the misappropriation of MWK's trade secrets as to Wang. While Jowers did share confidential information about Wang with Vargas without authorization, Wang chose not to proceed with recruiting services from either MWK or Jowers and "ended up moving to Skadden's Hong Kong offices in 2017" without Jowers's help. (P-143, Dkt. 341-1, at 976; Tr. II, at 153 (Jowers testifying that he found out about Wang's placement at Skadden "just like the public finds out")). It was not until 2018, during a separate job search, that Jowers assisted Wang in getting hired by Latham & Watkins. (P-130, Dkt. 341-1, at 726). There is no evidence in the record that the information Jowers relied on to place Wang at Latham & Watkins was the same information he garnered about Wang while at MWK—indeed, the information was likely different, as Wang had worked at Skadden for a year before his job search with Jowers.

The Court likewise will not assess exemplary damages or attorney fees and costs. Exemplary damages are available "if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence. *Thomas v. Hughes*, 27 F.4th 995, 1008 (5th Cir. 2022) (citing Tex. Civ. Prac. & Rem. Code § 41.003(a)). Whether or not to award exemplary damages is within the Court's discretion. *See Brady v. State of Lousiana*, 998 F.2d 1013 (5th Cir. 1993) ("We review a punitive damages award for abuse of discretion."). A court may award attorney fees to the prevailing party in a claim for misappropriation of trade secrets under the TUTSA and FDTSA if the misappropriation is "willful and malicious." Tex. Civ. Prac. & Rem. Code § 134A.005(3); 18 U.S.C. §

**Exhibit A to REK Decl.**                    **Page 28 of 44**

1836(b)(3)(D). The evidence presented at trial supports a finding that at least some of the candidates at issue here were long-time friends of Jowers or specifically requested Jowers's assistance with their job search after he left MWK. (*See, e.g.*, Tr. II, at 148–52; D-337, Dkt. 341-8, at 25–26). Further, certain candidates affirmatively chose not to work with MWK after Kinney reached out to them following Jowers's departure. (*See, e.g.*, *id.*; P-143, Dkt. 341-1, at 976; Tr. II, at 153). For these reasons, the Court declines to use its discretion to award exemplary damages or attorney fees and costs. The Court will thus assess damages against Jowers for the misappropriation of MWK's trade secrets in the amount of $515,326.20.

### B.  Breach of the Jowers Agreement

As a threshold matter, the Court will address Jowers's argument that Hong Kong law should be applied to the Jowers Agreement. First, the Court notes that it granted MWK summary judgment as to Jowers's claims for promissory estoppel, including his claim that he relied on MWK's promise "that Jowers's employment would not be subject to a non-solicitation agreement[.]" (Dkt. 237, at 54–55; Dkt. 285, at 12 n.4) ("Jowers's complaint also lists several other alleged promises under his promissory estoppel claim, but none of those are mentioned by Jowers in his response to the motion for summary judgment . . . . Accordingly, the Court grants MWK summary judgment on the promissory estoppel claim[.]"). The Court has also previously found that the Jowers Agreement is governed by Florida law. (Dkt. 87, at 10 n.7) ("[T]he Court looks to Florida law to interpret and apply the Jowers Employment Agreement."). Further, Jowers himself has argued throughout this litigation that Florida law should apply to the Jowers Agreement. (Dkt. 84, at 29) ("The Jowers Employment Agreement is governed by Florida Law."); (Dkt. 289, at 8) (noting the "public policy limits on Texas jurists interpreting Florida law regarding non-competes."). Therefore, the Court finds that Florida law applies to the Jowers Agreement. (P-2, Dkt. 341-1, at 8) ("This Agreement,

**Exhibit A to REK Decl.**                                          **Page 29 of 44**

and any controversies, claims, disputes, or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida.").

Under Florida law, "a contract providing restrictions on competition must involve a legitimate business interest as defined by statute to be enforceable." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So.3d 774, 779 (Fla. 2017); see also Fla. Stat. § 542.335(1)(b). Restrictive covenants are enforceable if (1) they are reasonable in time, area, and line of business; set forth in a writing signed by the party against whom enforcement is sought; and are reasonably necessary to protect that interest; and (2) the contractually specified restraint is supported by at least one legitimate business interest justifying the restraint. *See* Fla. Stat. § 542.335(1); *Env'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1263 (Fla. 5th Dist. Ct. App. 2009). Legitimate business interests include: (1) trade secrets, (2) valuable confidential business or professional information that otherwise does not qualify as trade secrets; (3) substantial relationships with specific prospective or existing customers, patients, or clients business; (4) customer, patient, or client goodwill; or (5) extraordinary or specialized training. Fla. Stat. § 542.335(1)(b). A person seeking enforcement of a restrictive covenant bears the initial burden to establish a prima facie case that the restraint is reasonably necessary. *Id.* § 542.335(1)(c). The burden then shifts to the person opposing enforcement to show that the restraint is overbroad or not reasonably necessary. *Id.* The court must then "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." *Id.*

The Court finds that MWK has articulated legitimate business interests justifying the restrictive covenant. The Court has already found that the confidential information Jowers garnered about candidates through his role at MWK constitutes trade secrets. *See* Fla. Stat. § 542.335(1)(b). And, indeed, what constitutes a "legitimate business interest" under Florida law includes more than trade secrets. *Id.* (noting that legitimate business interests include "confidential business or professional information," "substantial relationships with specific" customers, and customer

goodwill). Thus, the Court also finds that the restrictive covenant's restraint on Jowers providing personnel placement services for 12 months after termination to candidates and clients he had "contact with" in the year before termination serves a legitimate business interest, as those contacts and associations helped form the basis of MWK's valuable relationships and goodwill with its clients and candidates.

On the other hand, the Court finds that the restrictive covenant's language precluding services to clients or candidates Jowers had "knowledge of" or "access to" in the twelve months preceding his termination is overbroad. A person seeking enforcement of a restrictive covenant bears the initial burden to establish a prima facie case that the restraint is reasonably necessary. *Id.* § 542.335(1)(c). In his testimony, Kinney states that Jowers would have had knowledge of or access to potential clients and candidates as a "result of [Kinney] having sent him a candidate list or client lists, having sent him leads." (Tr. I, at 189). However, MWK failed to produce evidence or testimony that demonstrates how Jowers's mere knowledge of or access to potential candidates or clients was confidential information, or how it furthered its stated business interest of establishing goodwill and relationships with existing and prospective clients and candidates. (P-2, Dkt. 341-1, at 4; Tr. I, at 87). Indeed, as Kinney testified, "[t]he recruiter's job is to develop relationships with law firms and candidates." (*Id.* at 14). Knowledge of or access to potential clients and candidates offers the possibility of eventually establishing a relationship, but MWK provided no evidence that the possibility of eventually establishing a relationship rises to the level of a legitimate business interest, such as "*substantial relationships* with specific" customers. *Id.* § 542.335 (emphasis added); *see also Vital Pharm., Inc. v. Alfieri*, No. 20-14217, 2022 U.S. App. LEXIS 1771, at *18–19 (11th Cir. Jan. 20, 2022) ("A party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party "plead[s] and prove[s]" the identity of specific customers and the *substantiality of the relationship* with those customers.") (emphasis added).

**Exhibit A to REK Decl.**                    **Page 31 of 44**

Where, as here, the provisions of a restrictive covenant are unreasonable, the correct procedure is for the Court to modify, or "blue pencil," the agreement and award an appropriate remedy. *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1227 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not necessary to protect the legitimate business interest or interests, a court *shall* modify the restraint and grant only the relief necessary to protect such interest or interests) (emphasis added). As a result, the Court finds that Jowers did not breach the Jowers Agreement when he provided personnel placement services to Baker & McKenzie and Gunderson Dettmer in the years after his termination, as the trial evidence does not demonstrate that Jowers had contact with those firms in the 12 months preceding his termination. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

The Court finds the restrictive terms in the Jowers Agreement are not overbroad in geographic area, overlong because of the tolling requirement, or unconscionable because they "purport to restrain Defendant's ability to earn a living worldwide for an indefinite period of time." (Dkt. 237, at 34–36); *see* Fla. Stat. § 542.335(1)(g)(1) ("In determining the enforceability of a restrictive covenant, a court ... [s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought.") (emphasis added). The Court finds that the restrictive covenant's worldwide geographic scope is reasonably necessary to protect MWK's legitimate business interest in building and maintaining relationships with clients and candidates and keeping the information gathered from those relationships confidential. Evidence presented at trial establishes that many of the placements Jowers made both before and after leaving MWK were international. (*See* Tr. II, at 171) (Jowers testifying that he "thought as a byproduct of being known as the Asia experts and the branding where [MWK was] international . . . [he] could make these deals happen like from the U.S. to Asia . . . . [MWK] also can do the basic New York placements"). In addition, the one-year period during which Jowers was restricted was reasonable.

**Exhibit A to REK Decl.**                    **Page 32 of 44**

Fla. Stat. § 542.335(1)(e) ("In determining the reasonableness in time of a postterm restrictive covenant predicated upon the protection of trade secrets, a court shall presume reasonable in time any restraint of 5 years or less and shall presume unreasonable in time any restraint of more than 10 years. All such presumptions shall be rebuttable presumptions.").

Finally, the Court finds that the tolling clause was likewise reasonable. After trial on the merits, such clauses are routinely enforced in courts applying Florida law. *See, e.g.*, *Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1232 (11th Cir. 2009) (affirming the district court's holding that a "breach could be used to toll the six-month restrictive period even if that breach was not intentional"). Another recent Eleventh Circuit case applying Florida law considered the tolling clause unremarkable, holding, "To be sure, the employment agreements toll the duration of the twelve-month-long non-compete and employee non-solicitation covenants for as long as 'the [e]mployee is found to have been in violation of such restriction[s].'" *Vital Pharm.*, 2022 U.S. App. LEXIS 1771, at *11. In addition, MWK is not seeking damages beyond any accrued after April 13, 2021, (Pl. Br., Dkt. 342, at 82), approximately four and a half years after Jowers's termination, and thus less than the five years presumed reasonable under Florida's statutes. *See* Fla. Stat. § 542.335(1)(e). While the Jowers Agreement's tolling provision could result in a restrictive covenant that lasted indefinitely—which would be presumptively unreasonable under Florida law—MWK is not seeking damages beyond five years. The Court does not offer an opinion on the validity of the restrictive covenant were MWK to seek damages beyond five years.

The Court likewise finds that Jowers has not met his burden to establish that he signed the Jowers Agreement under duress. Under Florida law, in order to prove duress, "it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *City of Miami v. Kory*, 394 So.2d 494 (Fla. 3d DCA 1981). "Threatened

33

action cannot constitute duress, when there are adequate legal remedies available with which to challenge it." *Id.* (citing *Hartsville Oil Mill v. United States*, 271 U.S. 43 (1926)). Jowers had the opportunity to review and negotiate the Jowers Agreement. (P-17, Dkt. 341-1, at 97; Trans. II, at 179–82 (Jowers describing discussions with Kinney); Trans. I, at 84–85). While Jowers asserted that Kinney threatened not to pay Jowers his commissions unless he signed the Jowers Agreement, there were "adequate legal remedies available" to Jowers to challenge the alleged withholding of his commissions—indeed, one of Jowers's counterclaims in this lawsuit is for unpaid commissions. (Deft. Br., Dkt. 343, at 20). Aside from the alleged withholding of his commissions, Jowers articulated no other coercive conduct by MWK. (*See* Tr. II, at 96) (Jowers testifying "I have free will . . . I wasn't physically threatened. I signed it and yeah. I did.").

Next, the Court finds that MWK did not materially breach the Jowers Agreement. Jowers objected to certain modifications of his commission rates and testified that he believes the changes to be unfair, (*see* P-158, Dkt. 341-4, at 1119; Tr. II, at 196). He also argues that Section 14.1 of the Jowers Agreement, which requires that modifications to the Agreement be "in a writing signed by the party to be charged," means that the subsequent modifications to his commission rates were violations of the contract's writing requirement. (Deft. Br., Dkt. 343, at 9) (citing Tr. II, at 189). This argument is unavailing. "Modifications to contracts are permitted despite provisions that all modifications must be in writing 'when one party provides additional consideration for the modification accepted by the other party.'" *Coral Reef Drive Land Dev., LLC v. Duke Realty Ltd. P'ship*, 45 So.3d 897, 902 (Fla. 3d DCA 2010); *see also Rhodes v. BLP Assocs., Inc.*, 944 So.2d 527, 530 (Fla. 4th DCA 2006) ("A written agreement may be modified by the subsequent conduct or course of dealing of the parties," provided the modification is by "mutual consent[] and supported by consideration."). Jowers's employment contract was an at-will contract. (P-2, Dkt. 341-1, at 8). In Florida, "it is well settled" that "continued employment constitutes adequate consideration to

34

support" a change to "a terminable at will contract of employment." *Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. Dist. Ct. App. 1992) (finding that an at-will employee's continued employment constituted consideration for a non-compete agreement that was imposed after the employee began working). The parties do not dispute that Jowers continued his at-will employment following each modification to his commission structure. In addition, if Jowers considers MWK's modifications of the Jowers Agreement to constitute breaches of the contract, he may now be deemed to have acquiesced to those changes. *See Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. Dist. Ct. App. 2005) ("Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.").

    Finally, the Court finds that Jowers's challenge to the liquidated damages clause falls short. While the Court has previously held that Jowers waived his right to challenge the liquidated damages clause, (*See* Dkt. 285, at 21–22), Jowers challenges the award of damages by arguing that there is no evidence MWK would have made the placements Jowers made after leaving MWK. *See supra* Part II.B. However, MWK need not make this showing to receive damages for breach of contract. "The court determines the parties' intent from the four corners of the contract and only considers extrinsic evidence to explain or clarify ambiguous or unclear language. The court finds no ambiguity in the liquidated damages provision." *U.S. ex rel. James B. Donaghey, Inc. v. Dick Corp.*, No. 3:08CV56 MCR MD, 2010 WL 4666747, at *4 n.15 (N.D. Fla. Nov. 9, 2010) (citing *Taylor v. Taylor,* 1 So.3d 348, 350 (Fla. 1st DCA 2009); *Ospina–Baraya v. Heiligers,* 909 So.2d 465, 472 (Fla. 4th DCA 2005)). The liquidated damages clause at issue in this case does not require MWK to demonstrate it would have made the same placements. Instead, it is triggered by Jowers providing personnel placement services to clients and candidates in the year following his termination that he had contact with in the year prior to his termination. (P-2, Dkt. 341-1). Jowers assists with every placement made at his

**Exhibit A to REK Decl.**                              **Page 35 of 44**

recruiting firm. (Trans. II, at 128–30). Further, MWK provided evidence at trial that Jowers or his firm provided personnel placement services to several candidates and clients in violation of the restrictive covenant's terms. (*See supra* Part II.B). Because the Court has found the Jowers Agreement to be a valid contract, it will rely on the terms of the liquidated damages clause to assess damages and declines to consider the extraneous requirements that Jowers proposes.

The Court turns next to damages for breach of the Jowers Agreement. As the Court has found the liquidated damages clause to be valid, the Court will award MWK the amount of the placement fees Jowers made via each breach of the Jowers Agreement identified in Part II.B.[7] Accordingly, the Court will award damages in the following amounts:

| Candidates | |
|---|---|
| Candidate Name | Damages |
| Zhu | $0.00 |
| Chang | $0.00 |
| Ding | $0.00 |
| Kang | $0.00 |
| Wang | $0.00 |
| Usukumah | $0.00 |
| Cooper | $232,500 USD (P-124, Dkt. 341-4, at 615) |
| Patel | 3,170,352 HKD ($404,232.11 USD) (P-124, Dkt. 341-4, at 613) |
| Weber | $56,000 USD (P-121, Dkt. 341-4, Dkt. 578) |
| Ma | $45,000 USD (P-96, Dkt. 341-3, at 100) |
| Xu | 427,900 HKD ($54,525.53 USD) (P-127, Dkt. 341-4, at 666) |
| Su | 1,960,360 HKD ($250,029.97 USD) (P-130, Dkt. 341-4, at 728) |
| Singh | 3,045,767 HKD ($389,016.66 USD) (P-131, Dkt. 341-4, at 763) |

---

[7] With two exceptions: First, the Court will not award damages for the placements of Kang, Usukumah, Chang, Ding, Zhu, and Wang, as the Court declines to impose double damages, and Plaintiff does not seek double damages, (Pl. Br., Dkt. 342, at 50); and second, the Court will not award damages for the placements made at Baker & McKenzie and Gunderson Dettmer, as the Court found no evidence in the record that Jowers contacted these firms during his last year at MWK. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

| Firms[8] | |
|---|---|
| Firm Name | Placement |
| Weil, Gotshal & Manges | 351,528 HKD ($45,070.58 USD) (P-134, Dkt. 341-4, at 807)<br>368,870 HKD ($47,581.39 USD) (P-134, Dkt. 341-4, at 808) |
| Allen & Overy | $80,729 USD (P-121, Dkt. 341-4, 579) |
| Cleary, Gottlieb, Steen & Hamilton | 351,264 HKD ($45,009.61 USD) (P-123, Dkt. 341-4, at 602) |
| Cooley | $81,250 USD (P-124, Dkt. 341-4, at 614)<br>$28,000 USD (P-124, Dkt. 341-4, at 616) |
| DLA Piper | $125,000 USD (P-126, Dkt. 341-4, at 646) |
| Gibson, Dunn & Crutcher | 597,037.50 HKD ($76,446.24 USD) (P-127, Dkt. 341-4, at 657)<br>$55,000 USD (P-127, Dkt. 341-4, at 672)<br>371,925 HKD ($47,438.81 USD) (P-127, Dkt. 341-4, at 658) |
| Morrison & Foerster | 459,463 HKD ($58,757.86 USD) (P-132, Dkt. 341-4, at 775)<br>428,450 HKD ($54,851.43 USD) (P-132, Dkt. 341-4, at 777)<br>431,524.35 HKD ($54,975.46 USD) (P-132, Dkt. 341-4, at 777)<br>814,437 HKD ($103,805.48 USD) (P-132, Dkt. 341-4, at 779)<br>180,000 HKD ($22,977.35 USD) (P-132, Dkt. 341-4, 782) |
| Skadden, Arps, Slate, Meagher & Flom | 353,194 HKD ($45,022.69 USD) (P-133, Dkt. 341-4, at 729)<br>$47,095 USD (P-133, Dkt. 341-4, at 794)<br>$47,500 USD (P-133, Dkt. 341-4, at 795) |
| Latham & Watkins | 458,250 HKD ($58,570.53 USD) (P-130, Dkt. 341-4, at 726)<br>353,194 HKD ($45,022.69 USD) (P-130, Dkt. 341-4, at 729)<br>353,239 HKD ($45,028.43 USD) (P-130, Dkt. 341-4, at 728)<br>78,249.50 HKD ($10,001.34 USD) (P-130, Dkt. 341-4, at 727)<br>$55,000 USD (P-130, Dkt. 341-4, at 729) |
| Kirkland & Ellis | 507,747 HKD ($65,007.43 USD) (P-129, Dkt. 341-4, at 705)<br>158,232 HKD ($20,279.65 USD) (P-129, Dkt. 341-4, at 706) |
| Linklaters | 646,230 HKD ($82,586.36 USD) (P-131, Dkt. 341-4, at 761)<br>379,698 HKD ($48,388.28 USD) (P-131, Dkt. 341-4, at 754)<br>62,224.80 SD ($46,089.91 USD) (P-131, Dkt. 341-4, at 758)<br>250,010 HKD ($31,884.56 USD) (P-131, Dkt. 341-4, at 760)<br>603,510.60 HKD ($77,167.37 USD) (P-131, Dkt.341-4, at 756) |

The total damages for MWK's claim of breach is $3,082,841.72. In addition, the Court will

award MWK reasonable attorney fees. The Jowers Agreement states that "[t]he Employee shall

---

[8] The Court used the date the placement fee was made for the purposes of calculating damages. If that date was not in evidence, the Court used the date the candidate was hired.

Exhibit A to REK Decl.                                                                 Page 37 of 44

indemnify and save the company harmless from all claims, demands, and actions arising out of the

Employee's breach of this Agreement, and shall reimburse the Company for all costs, damages and

expenses, including reasonable attorney's fees which the Company pays or becomes obligated to pay

by reason of such activities or breach." (P-2, Dkt. 341-1, at 8). Under Florida law, a trial court has no

discretion to decline to enforce an attorney fees provision in an underlying contract at issue in a suit;

a contractual attorney fees clause must be enforced absent compelling circumstances. *In re Ranch

House Motor Inn Intern., Inc.*, 335 B.R. 894 (Bankr. M.D. Fla. 2006); *Land & Sea Petroleum, Inc. v.

Business Specialists, Inc.*, 53 So.3d 348 (Fla. 4th DCA 2011); *Point East Four Condominium Corp., Inc. v.

Zevuloni & Assocs., Inc.*, 50 So.3d 687 (Fla. 4th DCA 2010); *M.A. Hajianpour, M.D., P.A. v. Khosrow

Maleki, P.A.*, 975 So.2d 1288 (Fla. 4th DCA 2008). The Court will therefore award reasonable

attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### C.  Loan Agreements

1. 2012 Forgivable Loan

Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove

all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a

note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain

balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing

*Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ). The

parties do not dispute that the Forgivable Loan contains a promissory note and, while Jowers

objects to the assignments of the Forgivable Loan, the Court finds that Plaintiff is the legal owner

and holder of the note. (*See infra* Part III.C.3). Further, the trial evidence demonstrates that Jowers is

the maker of the promissory note. (P-5, Dkt. 341-1, at 22). Finally, Jowers does not dispute that

when he left MWK in December 2016, the balance of the Forgivable Loan was $25,982.18 with a

**Exhibit A to REK Decl.**                                        **Page 38 of 44**

1.17 percent simple interest per annum. (Tr. II, at 100). Thus, MWK has proven all essential

elements for recovery on a promissory note.

　　While Jowers contends that the loan should have been considered a bonus, (Tr. II, at 99), he

provides no evidence or legal support for the contention that a bonus cannot be structured as a

forgivable loan. Jowers testified that he "was expecting a bonus that day but it was -- yes, it switched

on me." (Tr. II, at 95–97). Jowers also testified that he has free will and wasn't physically threatened

to sign the loan agreement. (*See* Tr. II, at 96). The Court also cannot conclude that the trial evidence

supports a finding of duress. Under Texas law, "A common element of duress in all its forms

(whether called duress, implied duress, business compulsion, economic duress or duress of property)

is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and

does interfere with another person's exercise of free will and judgment." *Dallas County Community*

*College v. Bolton*, 185 S.W.3d 868, 878–79 (Tex. 2005). "To meet his burden on his affirmative

defense, Jowers had to establish that MWK threatened to do an act that it had no legal right to do."

*Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 707 (Tex. App. 2014). The Court finds that giving

Jowers a forgivable loan when Jowers was expecting a bonus does not constitute unlawful conduct

or a threat; Jowers could still choose whether or not to sign a forgivable loan agreement. Further,

the evidence shows that Kinney provided Jowers the loan as an "extra reward", (P-37, Dkt. 341-1, at

473), indicating that Jowers was not owed the money he received under the loan agreement, and

therefore was at liberty to reject terms that he found unfavorable without the fear of losing money

that was due to him. Finally, Jowers failed to testify or direct the Court to any evidence supporting

his assertion that MWK materially breached the Forgivable Loan contract, nor did he mention this

defense in his post-trial briefing. The Court therefore declines to rule in Jowers's favor on that basis.

　　As the Court finds that MWK has proven the necessary elements to recover under the

Forgivable Loan agreement, the Court will award damages in the amount of $25,982.18 plus an

**Exhibit A to REK Decl.**                                    **Page 39 of 44**

interest of 78.7 cents per day beginning on December 6, 2021. (Pl. Br., Dkt. 342, at 72; Tr. II, at 100). Therefore, the total that shall be awarded in damages under the Forgivable Loan is $25,982.18 plus $222.72 in interest for a total of $26,204.90 in damages. Further, an award of reasonable attorney fees is mandatory under § 38.001(8) of the Texas Civil Practices and Remedies Code if the plaintiff recovers damages for a breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8); *Plains Cotton Coop. Ass'n v. Gray*, 672 F. App'x 372, 377 (5th Cir. 2016) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002)); *In re Deepwater Horizon*, 807 F.3d 689, 699 n.10 (5th Cir. 2015); *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 421 (5th Cir. 2006); *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015). The Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### 2. 2012 Revolving Loan

The Court's analysis on the Revolving Loan parallels its analysis on the Forgivable Loan. A plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon*, 347 S.W.3d at 324. The parties do not dispute that the Revolving Loan contains a promissory note and, while Jowers objects to the assignments of the Revolving Loan, the Court finds that Plaintiff is the legal owner and holder of the note. (*See infra* Part III.C.3). Further, the trial evidence demonstrates that Jowers is the maker of the promissory note. (P-9, Dkt. 341-1, at 30). However, the parties dispute whether there was a balance due on the promissory note at the time of Jowers's resignation. Jowers provided evidence that MWK's accountant Sommers told him she thought "the remaining regular bonus and Hui Xu commission will just cover the remaining balance, might be a few hundred short." (P-51, Dkt. 341-2, at 1). However, according to Kinney's testimony and the accounting provided by MWK, as of January 2017, the amount due on the loan was

**Exhibit A to REK Decl.**                                    **Page 40 of 44**

$8,001.84. (P-165, Dkt. 341-1, at 1131; Tr. I, at 176–78).

Payment is an affirmative defense, meaning the burden of proof rests on the Defendant. *United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 629–30 (5th Cir. 1992). Jowers has not offered his own accounting of the Revolving Loan, and instead asserts that he cannot owe the amount MWK claims because Sommers told him "*I think* [you] might be a few hundred short." (P-51, Dkt. 341-2, at 1) (emphasis added). However, as this Court noted at the summary judgment stage, "Sommers provides accounting and bookkeeping services for MWK but does not have the power to enter into contracts for MWK." (Dkt. 285, at 17). The trial evidence supports this—Kinney testified that Sommers was an "outside CPA, bookkeeper who worked as an independent contractor, 1099," and that she was not authorized to contract on behalf of MWK. (Tr. I, at 184). The Court finds that Sommers's statement, without more, is insufficient for Jowers to meet his burden of proof that he had paid off the Revolving Loan when he left Kinney. In light of MWK's accounting of the loan showing that Jowers owed $8,001.84 in January 2017, (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131), the Court finds that MWK has met its obligation to show that "a certain balance is 'due and owing.'" *McLernon*, 347 S.W.3d at 324. MWK's testimony and accounting, which Jowers has not rebutted with an accounting of his own, likewise demonstrates that the $30,000 interest-free loan was not converted into the Revolving Loan, but was instead paid off using money withheld from Jowers's last paycheck. (Tr. II, at 6; P-165, Dkt. 341-1, at 1131).

Finally, as with the Forgivable Loan, the Court finds that Jowers was not under duress when he signed the loan agreement, as Jowers provided no evidence MWK threatened to do an act that it had no legal right to do" in order to get Jowers to sign the loan agreement. *Lujan*, 433 S.W.3d at 707. Additionally, Jowers failed to testify or direct the Court to any evidence supporting his assertion that

**Exhibit A to REK Decl.**                                    **Page 41 of 44**

MWK materially breached the Revolving Loan contract, nor did he mention this defense in his post-trial briefing. The Court therefore declines to rule in Jowers's favor on that basis.

As the Court finds that MWK has proven the necessary elements to recover under the Revolving Loan agreement, the Court will award damages in the amount of $14,690.04 plus interest growing a $3.78 per day since December 6, 2021. (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131). Therefore, the total that shall be awarded in damages under the Forgivable Loan is $14,690.04 plus $1069.74 in interest for a total of $15,759.78 in damages. Further, an award of reasonable attorney fees is mandatory under § 38.001(8) of the Texas Civil Practices and Remedies Code if the plaintiff recovers damages for a breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8); *Plains Cotton Coop. Ass'n*, 672 F. App'x at 377. The Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### 3. Choice of Law and Assignment of Employment and Loan Agreements

The Court finds that the Jowers Agreement, Forgivable Loan, and Revolving Loan were all validly assigned. Jowers did not cite any law in support of his contention that the assignment of the agreements renders them invalid. (Deft. Br., Dkt. 343, at 20). The Jowers Agreement and Revolving Loan specifically state that they permit assignments, and the Forgivable Loan does not prohibit assignments. Jowers had notice that the Jowers Agreement was assigned through his W-2s. Further, Courts in Texas have found that debtors have adequate notice of assignments when the amount due is assigned and payment is made to the assignee. *Fed. Deposit Ins. Corp. v. Registry Hotel Corp.*, 639 F. Supp. 812, 814 (N.D. Tex. 1986). The parties do not dispute that Jowers continued using and receiving credits under his loans after each assignment, and Jowers testified that he received accountings each month. (Tr. II, at 102). Therefore, the Court finds that the agreements were validly assigned and that MWK (which has merged with Counsel Holdings, Inc., (*see* tr. I, at 142)), is the successor in interest to the loan agreements.

Exhibit A to REK Decl.                                    Page 42 of 44

### D.  Hui Xu Commission

The Court finds that Jowers was credited with the full value of his commission for the Hui commission on January 31, 2017 when MWK applied the commission to Jowers's balance under the Revolving Loan. (P-165, Dkt. 341-4, at 1131). Jowers has failed to provide his own accounting to demonstrate that he was not credited for the commission, nor does he direct the Court to any compelling testimony or evidence suggesting he was not credited with the commission in his post-trial briefs. (Deft. Br., Dkt. 343, at 14, 20).

### E.  Hong Kong Expenses

The Court declines to hold MWK liable for Jowers's housing expenses while in Hong Kong. The Jowers Agreement states that the company will pay all "usual and ordinary expenses," and Kinney testified that he has discretion to determine what expenses are usual and ordinary. (P-2, Dkt. 341-1, at 4; Tr. 239–42). While Jowers's August, September, and October 2016 housing expenses were charged to the Revolving Loan, the evidence demonstrates that this was because Jowers had already hit the limit on the $30,000 interest-free loan for that year. (D-327, Dkt. 341-8, at 24). The Court has already found that Jowers freely signed each of his loan agreements and therefore is subject to their limitations. (*See supra* Part III.C). Finally, the evidence demonstrates that MWK often reimbursed for non-housing business expenses. (P-36, Dkt. 341-1) (Jowers's paystubs showing $90,883.63 in expense reimbursements).

**Exhibit A to REK Decl.**                                                     **Page 43 of 44**

## IV. CONCLUSION

Based on the findings of fact and conclusions of law, the Court **AWARDS** the following damages to MWK:

| | |
|---|---|
| Misappropriation of Trade Secrets | $515,326.20 |
| Breach of Jowers Agreement | $3,082,841.72 |
| Forgivable Loan | $26,204.90 |
| Revolving Loan | $15,759.78 |
| **Total** | **$3,640,132.60** |

**IT IS FURTHER ORDERED** that the Court will award reasonable attorney fees to MWK for breach of the Jowers Agreement, Forgivable Loan, and Revolving Loan in an amount to be determined upon presentation of attorney fee evidence.

**IT IS FINALLY ORDERED** that post-judgment interest shall accrue beginning with the day the judgment is filed with the Comptroller General. *See* 28 U.S.C. § 1961, 31 U.S.C. § 1304(b)(1)(A); *Transco Leasing Corp. v. United States*, 992 F.2d 552, 557 (5th Cir. 1993). The post-judgment interest rate as of September 15, 2022 is 3.62% per annum. *See* https://www.txwd.uscourts.gov/for-attorneys/post-judgment-interest-rates-weekly/.

A final judgment will be entered separately.

**SIGNED** on September 15, 2022.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

**Exhibit A to REK Decl.**                                    **Page 44 of 44**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MWK RECRUITING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:18-CV-444-RP |
| | § | |
| EVAN P. JOWERS, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| EVAN P. JOWERS, | § | |
| | § | |
| Counterplaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MWK RECRUITING, INC., ROBERT E. | § | |
| KINNEY, RECRUITING PARTNERS GP, | § | |
| INC., KINNEY RECRUITNG, LLC, | § | |
| COUNSEL UNLIMITED, LLC, and | § | |
| KINNEY RECRUITING LIMITED, | § | |
| | § | |
| Counterdefendants. | § | |

## FINAL JUDGMENT

On September 15, 2022, the Court issued its Findings of Fact and Conclusions of Law following a bench trial. Accordingly, the Court renders the following Final Judgment pursuant to Federal Rule of Civil Procedure 58.

**IT IS ORDERED** that judgment is awarded in favor of the plaintiff, MWK Recruiting, Inc. ("MWK").

**IT IS FURTHER ORDERED** that the following damages are **AWARDED** to MWK:

| | |
|---|---|
| Misappropriation of Trade Secrets | $515,326.20 |
| Breach of Jowers Agreement | $3,082,841.72 |

| Forgivable Loan | $26,204.90 |
| Revolving Loan | $15,759.78 |
| **Total** | **$3,640,132.60** |

**IT IS FURTHER ORDERED** that the Court will award reasonable attorney fees to MWK for breach of the Jowers Agreement, Forgivable Loan, and Revolving Loan in an amount to be determined upon presentation of attorney fee evidence. **IT IS FURTHER ORDERED** that MWK shall file a motion for reasonable attorneys' fees and a bill of costs, with supporting documentation, no later than fourteen days after the entry of final judgment, pursuant to Local Rules CV-7(j)(1) and CV-54(a).

**IT IS FURTHER ORDERED** that post-judgment interest shall accrue beginning with the day the judgment is filed with the Comptroller General. *See* 28 U.S.C. § 1961, 31 U.S.C. § 1304(b)(1)(A); *Transco Leasing Corp. v. United States*, 992 F.2d 552, 557 (5th Cir. 1993). The post-judgment interest rate as of September 15, 2022 is 3.62% per annum. *See* https://www.txwd.uscourts.gov/for-attorneys/post-judgment-interest-rates-weekly/.

**IT IS FURTHER ORDERED** that all other relief not specifically granted is denied.

**IT IS FINALLY ORDERED** that this case is **CLOSED**.

**SIGNED** on September 19, 2022.



_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

**Exhibit B to REK Decl., 2/23**                    **Page 2 of 2**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MWK Recruiting, Inc.

-vs-                                            Case No.:    1:18-cv-00444-RP

Evan P. Jowers, et al.

## MOTION FOR ADMISSION *PRO HAC VICE*

TO THE HONORABLE JUDGE OF SAID COURT:

Comes  now    Kevin J. Cole                              ,  applicant  herein,  and

moves this Court to grant admission to the United States District Court for the Western District of

Texas *pro hac vice* to represent    Evan P. Jowers                      in this case, and would

respectfully show the Court as follows:

1.       Applicant is an attorney and a member of the law firm (or practices under the name of)

**KJC Law Group**                                    ,

with offices at

Mailing address:      **9701 Wilshire Blvd., Suite 1000**

City, State, Zip Code:      **Beverly Hills, California 90212**

Telephone:      **(310) 861-7797**

Facsimile:      **310-943-1455**

Email:      **kevin@kjclawgroup.com**

**Exhibit C to REK Decl.**                          **Page 1 of 5**

2.    Since _____July 18, 2018_____, Applicant has been and presently is a member of and in

good standing with the Bar of the State of __California_____.

Applicant's bar license number is __321555_____.

3.    Applicant has been admitted to practice before the following courts:

| Court: | Admission date: |
|---|---|
| Michigan (all courts) | November 17, 2014 |
| U.S. Court of Appeals for the Sixth Circuit | October 14, 2015 |
| U.S Court of Federal Claims | April 9, 2020 |
| U.S. District Court, Northern District of Illinois | May 21, 2021 |

4.    Applicant is presently a member in good standing of the bars of the courts listed above,

except as provided below (list any court named in the preceding paragraph before which

Applicant is no longer admitted to practice):

_____

_____

5.    Applicant has never been subject to grievance proceedings or involuntary removal

proceedings while a member of the bar of any state or federal court, except as provided

below:

_____

_____

6.    Applicant has not been charged, arrested, or convicted of a criminal offense or offenses,

except as provided below (omit minor traffic offenses):

_____

**Exhibit C to REK Decl.**                                          **Page 2 of 5**

7.    Applicant has read and is familiar with the Local Rules of the Western District of Texas and will comply with the standards of practice set out therein.

8.    Select one:

☐    Applicant has on file an application for admission to practice before the United States District Court for the Western District of Texas.

☑    Applicant has co-counsel in this case who is admitted to practice before the United States District Court for the Western District of Texas.

| | |
|---|---|
| Co-counsel: | **Robert Tauler** |
| Mailing address: | **626 Wilshire Blvd., Suite 510** |
| City, State, Zip Code: | **Los Angeles, California 90017** |
| Telephone: | **213-927-9270** |

9.    Should the Court grant applicant's motion, Applicant shall tender the amount of $100.00 *pro hac vice* fee in compliance with Local Court Rule AT-1(f)(2) [checks made payable to: **Clerk, U.S. District Court**].

10.    Should the Court grant applicant's motion, Applicant shall register as a filing user within 10 days of this order, pursuant to Administrative Policies and Procedures for Electronic Filing in Civil and Criminal Cases in the Western District of Texas.

**Exhibit C to REK Decl.**                                                      **Page 3 of 5**

Wherefore, Applicant prays that this Court enter an order permitting the admission of

Kevin J. Cole
_____ to the Western District of Texas *pro hac vice*

for this case only.

Respectfully submitted,

Kevin J. Cole
_____
[printed name of Applicant]

_____
[signature of Applicant]

### CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of this motion upon each attorney of record and the original upon the Clerk of Court on this the ___22___ day of _____November_____, ___2021___.

Kevin J. Cole
_____
[printed name of Applicant]

_____
[signature of Applicant]

- 4 -

**Exhibit C to REK Decl.**                                    **Page 4 of 5**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

MWK Recruiting, Inc.

-vs-                                                     **Case No.** 1:18-cv-00444-RP

Evan P. Jowers, et al.

**O R D E R**

BE IT REMEMBERED on this the _____ day of _____, 20____, there
was presented to the Court the Motion for Admission *Pro Hac Vice* filed by
Kevin J. Cole _____ ("Applicant"), counsel for Evan P. Jowers _____ and
the Court, having reviewed the motion, enters the following order:

IT IS ORDERED that the Motion for Admission *Pro Hac Vice* is GRANTED, and Applicant
may appear on behalf of Evan P. Jowers _____ in the above case.

IT IS FURTHER ORDERED that Applicant, if Applicant has not already done so, shall,
in compliance with Local Court Rule AT-1(f)(2), immediately tender the amount of $100.00,
made payable to: **Clerk, U.S. District Court**.

IT IS FURTHER ORDERED that Applicant, pursuant to the Administrative Policies and
Procedures for Electronic Filing in Civil and Criminal cases in the Western District of Texas, shall
register as a filing user within 10 days of the date of this Order.

IT IS FINALLY ORDERED that Applicant's *Pro Hac Vice* status shall not become effective
until Applicant has complied with all provisions of this Order.

SIGNED this the _____ day of _____ 20____.

_____
UNITED STATES DISTRICT JUDGE

Reset all fields    Print Form

**Exhibit C to REK Decl.**                              **Page 5 of 5**

---

## Activity in Case 1:18-cv-00444-RP MWK Recruiting Inc v. Jowers et al Order on Motion to Appear Pro Hac Vice

---

**TXW_USDC_Notice@txwd.uscourts.gov** <TXW_USDC_Notice@txwd.uscourts.gov>    Mon, Nov 29, 2021 at 11:30 AM
To: cmecf_notices@txwd.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court [LIVE]

### Western District of Texas

## Notice of Electronic Filing

The following transaction was entered on 11/29/2021 at 11:30 AM CST and filed on 11/29/2021
**Case Name:**            MWK Recruiting Inc v. Jowers et al
**Case Number:**        1:18-cv-00444-RP
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Text Order GRANTING [313] Motion to Appear Pro Hac Vice by attorney Kevin J. Cole. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg)**

**1:18-cv-00444-RP Notice has been electronically mailed to:**

Raymond W Mort , III &nbsp &nbsp raymort@austinlaw.com, 7999287420@filings.docketbird.com, ecf@austinlaw.com

Robert Tauler &nbsp &nbsp rtauler@taulersmith.com, lstein@taulersmith.com, vsaryan@taulersmith.com

Robert E. Kinney &nbsp &nbsp robert@kinneyrecruiting.com, john@kinneyrecruiting.com, raymort@austinlaw.com

Tristan C. Loanzon &nbsp &nbsp tristan@loanzon.com, olivette@loanzon.com

**1:18-cv-00444-RP Notice has been delivered by other means to:**

**Exhibit D to REK Decl.**                    **Page 1 of 1**

## Mediation on Nov. 21, 2022

**Robert Kinney** <robert@kinneypc.com>                                      Thu, Sep 22, 2022 at 7:14 PM
To: Robert Kinney <robert@kinneypc.com>
Cc: Kevin Cole <kevin@kjclawgroup.com>, Robert Kinney <robert@kinneypc.com>

Kevin, I realize I may be sounding too nice here.  We just offered a reasonable settlement and Evan's response was to go buy a $90K car and brag about it on Facebook. I guess I should express my intentions more clearly. Let Evan know that this and a lot of the other stuff I know he is doing right now to flush cash qualifies as fraudulent transfers.  I'm going to subpoena all his records, including his email and phone, which you won't be able to stop me from getting.  I will find out what all those transfers are, and as far as the car goes, I'm going to have the sheriff take that car away from his mom while she is watching with someone there to videotape the scene and then I'm going to put it on Youtube and send it to all to see that I did it.  I'm coming after his wife's mink coat that he spent $20K on, his bank accounts, everything.  I'm not going to get played by this joker any more. He needs to pay up.   I will literally spend the rest of my life or his coming after his business.  When he runs to a foreign country, I'll get the court to let me force placement fees he might have any connection to into the registry of the court to be sorted out later.  I'll take his trademarks, I'll take his website, and I'll take his used dental floss.  Running from this problem is NOT going to work.  Please do your best to get this across.  Many thanks.

REK


Robert E. Kinney, Esq.
Attorney at Law
Mobile: +1-512-636-1395

_____
This communication may be privileged or contain confidential information. If it has been sent to you in error, please do not read it, reply to the sender that you received it in error, and delete it.  Any distribution or other reproduction is strictly prohibited.
_____

On Thu, Sep 22, 2022 at 6:43 PM Robert Kinney <robert@kinneypc.com> wrote:
Take my word for it this time - it's a nice, brown Q5 or Q7, I think.  Mom looks very happy in the photo.  I'm not sure if Evan realizes that having his mom participate in a fraudulent transfer to defraud a Texas creditor will subject her to specific personal jurisdiction in Texas, ending up in seizure of that car and whatever else he's giving her. Someone needs to convince him to stop the games.

Robert E. Kinney, Esq.
Attorney at Law
Mobile: +1-512-636-1395

_____
This communication may be privileged or contain confidential information. If it has been sent to you in error, please do not read it, reply to the sender that you received it in error, and delete it.  Any distribution or other reproduction is strictly prohibited.
_____

On Thu, Sep 22, 2022 at 6:37 PM Kevin Cole <kevin@kjclawgroup.com> wrote:
Thanks, Robert.  It was nice speaking with you, too.  I'll convey all this to Evan.

I have no idea about what he is or isn't doing; but nonetheless, will discuss this ASAP.

On Thu, Sep 22, 2022 at 4:28 PM Robert Kinney <robert@kinneypc.com> wrote:
It's my understanding from various sources that Evan's flushing his cash already.  When I start seizing new Audi Q-series cars that he just gifted his mother, for example, it's going to get real for him, if not sooner.  I don't know why he thinks I will not do that.

**Exhibit E to REK Decl.**                                               **Page 1 of 3**

I need $200,000 if he wants any sort of stay.

Robert E. Kinney, Esq.
Attorney at Law
Mobile: +1-512-636-1395

_____

This communication may be privileged or contain confidential information. If it has been sent to you in error, please do not read it, reply to the sender that you received it in error, and delete it. Any distribution or other reproduction is strictly prohibited.

_____

On Thu, Sep 22, 2022 at 6:00 PM Robert Kinney <robert@kinneypc.com> wrote:
Kevin,

Thanks for trying to help in this process. Evan really needs someone who is intelligent and dispassionate to help him look at this situation. I hope you are that guy. Sending this to you only because I view it as a confidential and privileged settlement discussion. Please treat it as such.

To reiterate our call:

1. I'm willing to come to a mediation Nov 21, but I would like Evan to show that he realizes the fix he's in by starting to pay something down on the judgment. If he wants us to delay execution, this is a must. I propose $200,000.

2. If Evan wants to start the healing, then he needs to drop his two cases in FL and HK. They have negative merit. In summary, I can't speak for Mark Poe but I would hope he'd agree to a walk away; also, the HK case is one Evan is going to lose and pay fees on. It's just a question of when and how much. Right now, it's just getting worse.

3. Regardless of Evan's position on any of the above, **we should be able to agree to the fees, costs, and interest in this case**, thereby saving the court and ourselves some work and Evan some costs. You know I'm willing to do the work if I have to. Let's do this first, by tomorrow ideally.

4. Finally, I do understand Evan's emotional reaction to this situation, but he has got to understand by now that the best way out of this is to pay his way out. If I can help him find enough equilibrium to pay the piper by sitting down with him at a mediation and shaking his hand, I will. But I brought valid claims against him and, instead of getting decent advice, he hired DLA and then RT to work to terrorize me for asserting rights we clearly had. He should not expect to just talk his way out of this now that there's a judgment any more than he could on December 18, 2016. I'm prepared to collect on this judgment. What we have offered is a reasonable offer.

I look forward to the result of your discussions with Evan, especially with regard to the fees, interest and costs.

One other issue: I would like to file a motion to change the style of the case to conform to the evidence presented, that the Plaintiff is now called Counsel Holdings, Inc. Can you confirm whether you would be opposed to such a motion, which I could handle along with the fees, interest, and costs if we are so lucky to have agreement?

Robert E. Kinney, Esq.
Attorney at Law
Mobile: +1-512-636-1395

_____

This communication may be privileged or contain confidential information. If it has been sent to you in error, please do not read it, reply to the sender that you received it in error, and delete it. Any distribution or other reproduction is strictly prohibited.

_____

On Thu, Sep 22, 2022 at 2:56 PM Kevin Cole <kevin@kjclawgroup.com> wrote:
Hi Robert:

It was nice speaking with you earlier today. I appreciate you having reached out.

Following up on the vm I just left you; I've also included Judge Keel on this email.

Judge Keel conveyed the offer to me, which I've already discussed with Evan.  Even after hearing the offer, Evan has insisted on an in-person mediation, and has agreed to pay the full mediation fees.

The only request on our end is that the parties stipulate to stay enforcement of the judgment until Nov. 21.  First, we requested an earlier mediation date with Judge Keel, but Nov. 21 is the earliest date Judge Keel has available.  Second, my understanding is enforcement efforts are automatically stayed for a certain period in any event, and so I view this as a reasonable request (especially considering Evan's offer to pay all the mediation fees).

Thanks in advance,

--
**Kevin J. Cole, Esq.**
Partner


**KJC Law Group, A.P.C.**

9701 Wilshire Blvd., Suite 1000

Beverly Hills, CA  90212

Telephone: (310) 861-7797

Facsimile: (818) 994-9200

**www.kjclawgroup.com**



**Beverly Hills | Los Angeles | Alhambra | Detroit**


--
**Kevin J. Cole, Esq.**
Partner


**KJC Law Group, A.P.C.**

9701 Wilshire Blvd., Suite 1000

Beverly Hills, CA  90212

Telephone: (310) 861-7797

Facsimile: (818) 994-9200

**www.kjclawgroup.com**



**Beverly Hills | Los Angeles | Alhambra | Detroit**

**Exhibit E to REK Decl.**                              **Page 3 of 3**

*For hearing before Master*          *on 30th November 2022 at 02:30 p.m.*

**Plaintiff: 4th: EJ: 8 /2.2022**

HCA 826/2019

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ACTION NO. 826 OF 2019

—————————

BETWEEN

|  |  |
|---|---|
| EVAN P. JOWERS | 1st Plaintiff |
| ALEJANDRO VARGAS | 2nd Plaintiff |
| YULIYA IVANOVNA VINOKUROVA | 3rd Plaintiff |
| and |  |
| ROBERT EMMETT KINNEY | 1st Defendant |
| KINNEY RECRUITING LIMITED | 2nd Defendant |

—————————

——————————————————————————

**4TH AFFIDAVIT OF EVAN P. JOWERS**

——————————————————————————

I, Evan P. Jowers, of Room 1104, Crawford House, 70 Queen's Road Central, Central, Hong Kong, do make oath and say as follows:

1.     I am the 1st Plaintiff in this action. I am the same Evan P. Jowers who made the 1st Affidavit of Evan P. Jowers dated 27 August 2019, the 2nd Affidavit of Evan P. Jowers dated 23 October 2019, and the 3rd Affidavit of Evan P. Jowers dated 9 December 2019 in these proceedings. I am duly authorized by the 3rd Plaintiff ("**Yuliya**") to make this Affidavit on her behalf.

2.     Unless otherwise stated, the facts and matters deposed to herein are within my

**Exhibit F to REK Decl.**                    **Page 1 of 14**

personal knowledge and are true.    Insofar as they are not within my personal knowledge, they are true to the best of my knowledge, information and belief and are derived in each case from the sources stated.

3.    This Affidavit is made in opposition to the Defendants' application ("**Application**") against me and the 3rd Plaintiff by Summons dated 17 August 2022 for security for costs incurred up to and including the Case Management Conference of this Action in the sum of HK$657,000.

4.    In this Affidavit I will also respond, where appropriate, to the 3rd Affidavit of Robert Emmett Kinney filed on 17 August 2022 ("**Kinney 3rd**"). Where I have not specifically addressed matters in Kinney 3rd, this should not be construed as an acceptance of the validity of the points made.

5.    Yuliya and I oppose the Application and contest both liability and quantum to pay security. In summary:-

   (a)    I am ordinarily resident in Hong Kong and I operate a business in Hong Kong. Whilst I am currently overseas, I have every intention to return to Hong Kong once the situation permits and become a permanent resident here.

   (b)    My address as stated in the Amended Writ of Summons i.e. "*Suite 5136, Four Seasons Place, 8 Finance Street, Central, Hong Kong*" ("**Four Seasons Place Address**") is correct and not misstated.

   (c)    I have substantial assets in Hong Kong which can be reached by judicial process and are capable of being enforced.

   (d)    There is a strong likelihood of success on the merits of the Plaintiffs' claim.

   (e)    As to Yuliya, her claims in these proceedings are made jointly with mine

**Exhibit F to REK Decl.**                    **Page 2 of 14**

which arose out of the same cause(s) of action. Any cost orders, if made, are likely to be made jointly against both of us which I demonstrably have the ability and means to meet in full.

(f)     In any event, the quantum sought by the Defendants is manifestly excessive in that it contains work for which the Defendants would not be entitled to costs if successful at trial, for example as a result of unreasonable duplication of work.

## A.      Liability to Pay Security for Costs

### A1.     Ordinarily Resident within Hong Kong

6.      It is wholly incorrect for the Defendants to say that I am ordinarily resident out of the jurisdiction. As a matter of fact, Hong Kong is my place of residence and I have been continuously living in Hong Kong up until early 2020 (at which time I had to leave Hong Kong for the United States for personal and business purposes which I shall explain below). Both my wife and I have Hong Kong Identity Cards. There are now produced and shown to me marked exhibit "**EJ-10**" copies of my wife's and my Hong Kong Identity Card (with personal information redacted). Upon my return to Hong Kong, I intend to become a permanent resident by continuously residing in Hong Kong for 7 years.

7.      When I left Hong Kong for the USA in around early 2020, my departure was intended to be temporary. My temporary absence from the jurisdiction since then was occasioned by a combination of unanticipated events which I now endeavour to explain.

8.      As stated in paragraph 2 of the Amended Statement of Claim dated 31 May 2022 ("**ASOC**"), Yuliya, the 2nd Plaintiff and I have since around December 2016 been, and still are, attorney recruiters of a consulting and recruiting firm in Hong Kong called Legis Ventures (HK) Company Limited ("**Legis**"). Due to the nature of my work,

3

**Exhibit F to REK Decl.**                              **Page 3 of 14**

which requires me to source attorney candidates and place them in the Asian offices of US and UK based law firms, there is a need for me to travel frequently.

9. I note that the Defendants have in paragraph 3 of the Amended Defence dated 28 September 2022 accepted that the Plaintiffs had formed Legis on 20 November 2016.

10. I had in fact travelled to the US in early 2020 for business, to visit my family in the US and also to attend to the US proceedings (see paragraph 12(a) below).

11. As this Honourable Court will be well aware, since the outbreak of COVID-19 in around late 2019 or early 2020, the Hong Kong government has implemented a series of restrictions on travel and quarantine measures which made it extremely difficult and unpredictable to travel. I wish to highlight the fact that since March 2020, all inbound travellers who have stayed in certain overseas countries (such as the US) were subject to a 14 or 21 day compulsory quarantine, which served as a major deterrent to expatriate residents (like myself) returning to Hong Kong for as long as the policy remained in place. Further still, until fairly recently, travellers who tested positive during quarantine would be transferred to a government-designated medical facilities for an uncertain period of time. For that reason, during the period at which the stringent compulsory quarantine requirements were in place (i.e. from 2020 to 2022), many expatriates such as myself left Hong Kong temporarily. But in no way does that mean that I did not intend to return – to the contrary, I have every intention of doing so.

12. Against the above backdrop, my stay in the USA has lasted longer than expected owing to the following reasons:-

(a) MWK Recruiting, Inc ("**MWK**"), a legal recruiting firm with its principal place of business in Austin, Texas and a company owned by the 1st Defendant, had commenced proceedings on 11 March 2017 against me before the United States District Court for the Western District of Texas (Austin Division) (Case

4

1:18-CV-444-RP) ("**US Proceedings**").

(b)     As a result of the US Proceedings, I was required to be constantly present in the United States in order to meet with my attorneys and to handle numerous court filings. Needless to say, I also had to physically attend various court hearings from time to time. In particular, trial of the US Proceedings took place on 7 and 8 December 2021 (and Judgment was recently handed down on 15 September 2022 ("**US Judgment**")).

(c)     As a result of the US Proceedings, and given the stringent travel restrictions which had been in Hong Kong at the material times, I was compelled to remain in the USA until the conclusion of the US Proceedings and/or when travel bans were relaxed or lifted.

(d)     As a result of the pandemic, my wife and my elderly mother decided to stay in the United States for the time being until the global health situation improved.

13.     In light of the recent relaxation of travel restrictions, I plan to return to Hong Kong once my visa is approved. In fact, my application for employment visa for myself and my wife is well under way. There is now produced and shown to me marked exhibit "**EJ-11**" copy of my visa application and a letter dated 15 September 2022 issued by the Immigration Department to Legis showing that my visa application is in progress.

14.     I have always resided at the Four Seasons Place whenever I am in Hong Kong for more than 28 days. There is now produced and shown to me:-

14.1.     Marked exhibit "**EJ-12**" a letter from IFC Development Limited on behalf of Four Seasons Place dated 25 October 2022 confirming the periods during which I had stayed in the Four Seasons Place from 2017 to 2019;

14.2.     Marked exhibit "**EJ-13**" receipts issued by the Four Seasons Place for various

**Exhibit F to REK Decl.**                    **Page 5 of 14**

periods in January-February 2018; March-April 2018; September-October 2018; November-December 2018; March-April 2019; April-May 2019; and November-December 2019; and

14.3.  Marked exhibit "**EJ-14**" Long Staying Agreements dated 9 January 2017, 31 July 2017, 7 September 2017, 27 November 2017, 27 December 2017, 5 February 2018, 29 August 2018, 29 October 2018, 4 January 2019, 25 February 2019, 23 April 2019, and 17 October 2019.

15.  These exhibits clearly show the periods during which I was not travelling and hence was staying in Hong Kong. As can be seen from these exhibits, I had been residing in Suite 5136 of the Four Seasons Place (i.e. the Four Seasons Place Address) on the last two occasions when I stayed at the Four Seasons Place in 2019. I intend to stay at the Four Seasons Place Address once I return to Hong Kong.

16.  My intention to remain in Hong Kong for settled purposes is further fortified by the fact that I have continued to pay salaries tax to the Hong Kong Government notwithstanding my temporary absence. There are now produced and shown to me marked exhibit "**EJ-15**" various payment vouchers issued by the Inland Revenue Department to me and evidence of payment between May 2021 and July 2022.

17.  Finally, in reply to paragraphs 5 to 15 of Kinney 3rd where the Defendants seek to rely on four declarations and a statement made by me in the US Proceedings, the Defendants have taken them out of context. In fact, the gist of these declarations and statement was to show that while I am a citizen of US, I had relocated to and have been residing in Hong Kong since June 2015 for employment reasons. See below a few examples of statements made by me to such effect:-

17.1.  REK-2 pp1-4 (P1 May 2018 Declaration): "*Although I temporarily relocated to Hong Kong in June 2015 for work, I do not intend to remain in Hong Kong long term"* (paragraph 4); "*I have also maintained other apartments at various time in the same area in Florida since relocating to Hong Kong... I do not*

**Exhibit F to REK Decl.**                                    **Page 6 of 14**

intend to take up <u>permanent residence</u> in Hong Kong" (paragraph 5); "I do not own any <u>real</u> property in Hong Kong... I <u>lease</u> a furnished apartment to sleep in while I am working in Hong Kong" (paragraph 6); "Both I and Mr. Vargas, who is the sole owner and officer of Legis ventures, work at Legis Ventures in <u>Hong Kong</u>" (paragraph 7).

17.2.   REK-2 pp5-12 (P1 June 2018 Declaration): "... I relocated to and began <u>working full time in Hong Kong</u>... in June 2015" (paragraph 2); "I am <u>currently</u> an attorney recruiter in Hong Kong" (paragraph 3); "While I often work <u>full time</u> in Hong Kong..." (paragraph 5); "I ... eventually relocated to Hong Kong in June 2015" (paragraph 8).

17.3.   REK-2 pp34-41 (P1 2019 Declaration): "When I relocated to and began working full time in Hong Kong... in June 2015" (paragraph 2); "I am currently an attorney recruiter in Hong Kong" (paragraph 3); "... I would have been located or working <u>almost exclusively</u> in Florida (prior to June 2015) <u>or in Hong Kong (in June 2015 or later)</u>" (paragraph 9).

18.   In other words, the statements and declarations in fact support the position that I do in fact ordinarily reside in Hong Kong – and have since June 2015. Whilst I had then stated that I did not intend to take up permanent residence in Hong Kong, my intention had since then changed (as earlier explained in paragraph 6 above). In any event, I have been advised (without waiving privilege) and I verily believe that the concept of "ordinarily resident" is a question of fact and degree which does not depend upon the duration of residence but upon the way a person's life is actually ordered, and that permanent residence is not required.

19.   As to paragraph 9 of Kinney 3rd, the reliance placed by the Defendants on my statements made in the US Proceedings is entirely misplaced. Those statements simply show that I had indeed been in Hong Kong until the pandemic started, whereupon I was forced to remain in the US until the situation in Hong Kong

7

improved.

A2.   Four Seasons Place Address is my Place of Residence

20.    As explained in paragraphs 14 and 15 above, I have always resided at the Four Seasons Place when I am in Hong Kong and I will continue to do so upon my return. It is clear that I was residing in Hong Kong at the Four Seasons Place when the Writ of Summons dated 9 May 2019 was filed.

21.    As such, the Four Seasons Place is my place of residence in Hong Kong and the Four Seasons Place Address has been correctly stated in the Writ of Summons.

A3.   Assets Available in Hong Kong

22.    The Defendants do not dispute that I own 82% of the shares in Legis, which is a company incorporated in Hong Kong. As stated in paragraph 2 of the ASOC, Legis is the corporate vehicle of my consulting and recruiting business in Hong Kong trading under the name of Jowers / Vargas. There is now produced and shown to me marked exhibit "**EJ-16**", copy of a Form NSC1 (Return of Allotment) filed with the Companies Registry on 19 July 2022 showing my shareholding in Legis.

23.    Legis has been profit-generating. There is now produced and shown to me marked exhibit "**EJ-17**" extracts of the Directors' Report and Financial Statements of Legis for the year ended 31 March 2020, showing that Legis' aggregate profits for the year ended 31 March 2020 was over HK$12 million and its aggregate profit was HK$725,275. Whilst the latest financial statements are still in the process of being audited, I understand and verily believe that the revenue of Legis based on unaudited financial records for the financial year ending March 2022 is over HK$22.3 million. By reason of the above, it is plain that I own substantial assets carrying on business within Hong Kong.   There is now produced and shown to me marked exhibit "**EJ-17A**" the unaudited statement of Legis for the year ending March 2022.

8

**Exhibit F to REK Decl.**                         **Page 8 of 14**

24.     All in all, I have substantial assets in Hong Kong which can be reached by judicial
process and are capable of being enforced.

A4.     <u>Strong Merits of Plaintiffs' Claims</u>

25.     I have been advised (without waiving privilege) and I verily believe that there is a
strong likelihood of success on the merits of the Plaintiffs' claim for defamation. In
this regard, I shall leave it to counsel to advance submissions on my behalf. Suffice to
say, whilst the US Judgment (which was recently handed down) ruled against me, I
intend to lodge an appeal.

26.     In brief, it was alleged in the US Proceedings that I had submitted 6 MWK candidates
through the founder of Legis whilst I was still employed with MWK, which meant
that I had misappropriated MWK's trade secrets related to information about law firm
clients and attorney candidates.

27.     I do not accept these allegations. Without waiving privilege, I have been advised by
my US Counsel that the following are the non-exhaustive grounds for appealing
against the US Judgment:-

(a)     Whether information regarding the six candidates at issue should be
considered trade secrets of MWK, given that MWK did not actually possess,
control, or maintain any information about the candidates in any medium, nor
did it ever take any measures to keep information about those candidates
confidential. Quite the contrary, MWK had given evidence at trial that the
information about those candidates was "ephemeral", and existed only for a
brief moment in time.

(b)     Whether the US Court erred by failing to apply Hong Kong law in construing
the parties' employment relationship. In particular, had Hong Kong law been

**Exhibit F to REK Decl.**                              **Page 9 of 14**

applicable instead of Florida law, the non-complete clause relied on by MWK would be inapplicable or unenforceable as against me.

(c)   As regards a liquidated damages clause in the employment contract:-

(i)   Whether the US Court erred in rejecting my defence of waiver and holding that I had fully waived my right to challenge the same; and

(ii)   Whether it is valid as a matter of Floridan law in circumstances where it has the effect of "renewing" for 12 months each time I come into "contact with" any candidate or client in my line of work anywhere in the world.

28.   Without waiving privilege, I have been advised by my US Counsel that there are strong merits in my appeal against the US Judgment.

29.   In any event, I have been advised (without waiving privilege) and I verily believe that merits is but one factor relevant to the exercise of discretion by this Honourable Court on whether to grant security for costs.

A5.   Yuliya's Position

30.   Yuliya has made three claims under the ASOC against the Defendants. These are claims for damages for libel, including aggravated and exemplary damages, in respect of:-

(a)   An email dated 10 January 2017 sent at around 1:48 p.m. and published or caused to be published by the 1st and 2nd Defendants and which contained defamatory statements concerning me and Yuliya (see ASOC paragraph 32);

(b)   An email dated 20 July 2017 sent at around 12:43 p.m. and published or

10

**Exhibit F to REK Decl.**                    **Page 10 of 14**

caused to be published by the 1st and 2nd Defendants and which contained defamatory statements concerning me and Yuliya (see ASOC paragraph 37A); and

(c)    An email dated 28 November 2017 sent at around 7:01 p.m. and published or caused to be published by the 1st and 2nd Defendants and which contained defamatory statements concerning me and Yuliya (see ASOC paragraph 38).

31.    As can be seen from the above, Yuliya's claims made in these proceedings are all jointly made with my claims. I have been advised (without waiving privilege) and I verily believe that, as our claims arose out of the same cause(s) of action, any cost orders in respect of Yuliya's claims, if made, are likely to be made jointly against both of us, which I demonstrably have the ability and means to meet in full. In this regard, I shall leave it to counsel to advance submissions on my behalf.

32.    In passing, I note that the Defendants had in paragraphs 34-35 of Kinney 3rd claimed that the 2nd Plaintiff's causes of action herein are different from mine. Whilst I deny that this is the case for reasons I have just stated (in relation to Yuliya), this point is simply irrelevant because the Defendants are not presently seeking any order for security for costs as against the 2nd Plaintiff in this Application.

**B.    Quantum**

33.    In any event, and without prejudice to the above position, the amount of security for costs sought by the Defendants is manifestly excessive in that it contains work for which the Defendants would not be entitled to costs if successful at trial, for example as a result of unreasonable duplication of work by senior lawyers. There is now produced and shown to me marked exhibit **"EJ-18"** a List of Objections of the Defendants' draft Statement of Costs.

34.    In this regard, I shall leave submissions to be advanced by my lawyers on my behalf

11

**Exhibit F to REK Decl.**                    **Page 11 of 14**

at the hearing of the Application.

**C.     Conclusion**

35.     For the reasons set out above, I respectfully pray that the Application be dismissed with costs to the 1st and 3rd Plaintiffs.

And I make oath and say that the contents of this Affidavit are true.

SWORN at *Saint Johns, Florida*  )

on this *8* day of *December* 2022  )

EVAN JOWERS

Before me, *Alexander Lull*

> ALEXANDER LULL
> Notary Public · State of Florida
> Commission # HH 208735
> My Comm. Expires Dec 15, 2025
> Bonded through National Notary Assn.

This Affidavit is filed on behalf of the 1st and 3rd Plaintiffs.

12

**Exhibit F to REK Decl.**                    **Page 12 of 14**

HCA 826/2019

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ACTION NO. 826 OF 2019

———————————

Between

| | |
|---|---|
| EVAN P. JOWERS | 1st Plaintiff |
| ALEJANDRO VARGAS | 2nd Plaintiff |
| YULIYA IVANOVNA VINOKUROVA | 3rd Plaintiff |

and

| | |
|---|---|
| ROBERT EMMETT KINNEY | 1st Defendant |
| KINNEY RECRUITING LIMITED | 2nd Defendant |

———————————

———————————————————

**4TH AFFIDAVIT OF EVAN P. JOWERS**

———————————————————

Dated the 8th day of December 2022.
Filed on the 12th day of December 2022.

**DLA PIPER HONG KONG**
Solicitors for the 1st, 2nd and 3rd Plaintiffs
25th Floor
Three Exchange Square
8 Connaught Place

13

Central, Hong Kong
Tel: 2103 0808
Fax: 2810 1345
Ref.: MN/SWA/WSHA/394055/2

**Exhibit F to REK Decl.**                    **Page 14 of 14**

 

 **Evan Jowers** is at **Audi New Orleans.**

12h · Metairie, LA, United States · 👥

We surprised my wonderful mom with a new car today! 🖤



👍❤ 122                    22 comments

 Like         Comment         Send

**Exhibit G to REK Decl.**                    **Page 1 of 1**

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

David Whitley
Secretary of State



## Office of the Secretary of State



Exhibit No.

P-14

### CERTIFICATE OF MERGER

The undersigned, as Secretary of State of Texas, hereby certifies that a filing instrument merging

MWK RECRUITING INC.
Domestic For-Profit Corporation
[File Number: 802960224]

Into

COUNSEL HOLDINGS INC
Domestic For-Profit Corporation
[File Number: 802959106]

has been received in this office and has been found to conform to law.

Accordingly, the undersigned, as Secretary of State, and by the virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing the acceptance and filing of the merger on the date shown below.

Dated: 12/31/2018

Effective: 01/01/2019



David Whitley
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555
Prepared by: Lisa Sartin

Fax: (512) 463-5709
TID: 10343

Dial: 7-1-1 for Relay Services
Document: 858259140002

**Exhibit H to REK Decl.**                    **Page 1 of 5**

**Form 622**
(Revised 12/15)
Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512 463-5709
**Filing Fee: see instructions**



**Certificate of Merger**
**Combination Merger**
**Business Organizations Code**

This space reserved for office use.

F I L E D
In the Office of the
Secretary of State of Texas

DEC 3 1 2018

Corporations Section

### Parties to the Merger

Pursuant to chapter 10 of the Texas Business Organizations Code, and the title applicable to each domestic filing entity identified below, the undersigned parties submit this certificate of merger.

The name, organizational form, state of incorporation or organization, and file number, if any, issued by the secretary of state for each organization that is a party to the merger are as follows:

| Party 1 |

Counsel Holdings Inc.
*Name of Organization*
The organization is a ____for-profit corporation____ It is organized under the laws of
*Specify organizational form (e.g., for-profit corporation)*
TX    USA _____ The file number, if any, is    0802959106 _____
*State    Country                                        Texas Secretary of State file number*
Its principal place of business is   824 W 10th Street, Suite 200    Austin    TX
                                    *Address                              City            State*
☑ The organization will survive the merger.    ☐ The organization will not survive the merger.

☐ The plan of merger amends the name of the organization.  The new name is set forth below.

_____ *Name as Amended* _____

| Party 2 |

MWK Recruiting Inc.
*Name of Organization*
The organization is a ____for-profit corporation____ It is organized under the laws of
*Specify organizational form (e.g., for-profit corporation)*
TX    USA _____ The file number, if any, is    0802960224 _____
*State    Country                                        Texas Secretary of State file number*
Its principal place of business is   2406 Harris Blvd    Austin    TX
                                    *Address                  City            State*
☐ The organization will survive the merger.    ☑ The organization will not survive the merger.

☐ The plan of merger amends the name of the organization.  The new name is set forth below.

_____ *Name as Amended* _____

| Party 3 |

_____
Name of Organization
The organization is a _____ It is organized under the laws of
*Specify organizational form (e.g., for-profit corporation)*

Form 622    ‑1‑

_____ The file number, if any, is _____

*State*        *Country*                                                                 *Texas Secretary of State file number*

Its principal place of business is _____

                          *Address*                              *City*                    *State*

☐ The organization will survive the merger.    ☐ The organization will not survive the merger.

☐ The plan of merger amends the name of the organization. The new name is set forth below.

_____

*Name as Amended*

### Plan of Merger

☐ The plan of merger is attached.

*If the plan of merger is not attached, the following statements must be completed.*

### Alternative Statements

Instead of providing the plan of merger, each domestic filing entity certifies that:

1. A plan of merger is on file at the principal place of business of each surviving, acquiring, or new domestic entity or non-code organization that is named in this form as a party to the merger or an organization created by the merger.

2. On written request, a copy of the plan of merger will be furnished without cost by each surviving, acquiring, or new domestic entity or non-code organization to any owner or member of any domestic entity that is a party to or created by the plan of merger and, if the certificate of merger identifies multiple surviving domestic entities or non-code organizations, to any creditor or oblige of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

*Item 3A is the default selection. If the merger effected an amendment to, a restatement of, or an amendment and restatement of the certificate of formation of a surviving filing entity, you must select and complete one of the options shown below. Options 3B and 3C require the submission of the described attachment.*

3A.  No amendments to the certificate of formation of any surviving filing entity that is a party to the merger are effected by the merger.

3B.  ☐ No amendments to the certificate of formation of any filing entity are being effected by the merger or by the restated certificate of formation of the surviving filing entity named in the attached restated certificate of formation.

3C.  ☐ The plan of merger effected an amendment and restatement of the certificate of formation of a surviving filing entity. The amendments being made and the name of the surviving entity restating its certificate of formation are set forth in the attached restated certificate of formation containing amendments.

3D.  ☐ The plan of merger effected amendments or changes to the following surviving filing entity's certificate of formation.

_____

*Name of filing entity effecting amendments*

The changes or amendments to the filing entity's certificate of formation, other than the name change noted previously, are stated below.

Form 622                                    2

*Amendment Text Area*

4. Organizations Created by Merger

The name, jurisdiction of organization, principal place of business address, and entity description of each entity or other organization to be created pursuant to the plan of merger are set forth below. The certificate of formation of each new domestic filing entity to be created is being filed with this certificate of merger.

| *Name of New Organization 1* | | *Jurisdiction* | *Entity Type (See instructions)* |
|---|---|---|---|
| *Principal Place of Business Address* | *City* | *State* | *Zip Code* |

| *Name of New Organization 2* | | *Jurisdiction* | *Entity Type (See instructions)* |
|---|---|---|---|
| *Principal Place of Business Address* | *City* | *State* | *Zip Code* |

| *Name of New Organization 3* | | *Jurisdiction* | *Entity Type (See instructions)* |
|---|---|---|---|
| *Principal Place of Business Address* | *City* | *State* | *Zip* |

## Approval of the Plan of Merger

The plan of merger has been approved as required by the laws of the jurisdiction of formation of each organization that is a party to the merger and by the governing documents of those organizations.

☐ The approval of the owners or members of _____
*Name of domestic entity*

was not required by the provisions of the BOC.

## Effectiveness of Filing (Select either A, B, or C.)

A. ☐ This document becomes effective when the document is accepted and filed by the secretary of state.

B. ☑ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: January 1, 2019

C. ☐ This document takes effect on the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

Form 622                                           3

*Text Area*

### Tax Certificate

☐ Attached hereto is a certificate from the comptroller of public accounts that all taxes under title 2, Tax Code, have been paid by the non-surviving filing entity.

☑ Instead of providing the tax certificate, one or more of the surviving, acquiring or newly created organizations will be liable for the payment of the required franchise taxes.

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument. The undersigned certifies that the statements contained herein are true and correct, and that the person signing is authorized under the provisions of the Business Organizations Code, or other law applicable to and governing the merging entity, to execute the filing instrument.

Date:    12/22/2018

Counsel Holdings Inc.
Merging Entity Name

Signature of authorized person (see instructions)

Robert E Kinney
Printed or typed name of authorized person

MWK Recruiting Inc.
Merging Entity Name

Signature of authorized person (see instructions)

Robert E Kinney
Printed or typed name of authorized person

Merging Entity Name

Signature of authorized person (see instructions)

Printed or typed name of authorized person

Form 622                                    4

**Exhibit H to REK Decl.**                **Page 5 of 5**

N THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT,
IN AND FOR MONROE COUNTY, FLORIDA
PLANTATION KEY DIVISION

EVAN JOWERS,

    Plaintiff,                  CASE No.: 22-CA-00462-K

v.

MARK POE,

    Defendant.

_____/

## AMENDED ORDER

(AS TO MOTION FOR SECTION 57.105 SANCTIONS)

Pursuant to the Notice of Hearing for (1) Defendant Mark Poe's Motion To Strike The

First Amended Complaint As A Sham Pleading; Or In The Alternative To Dismiss, and (2)

Defendant Mark Poe's Motion for Section 57.105 Sanctions, the above-captioned matter came

on for hearing on December 12, 2022, the Honorable Luis M. Garcia presiding.

Having considered the papers on file in this matter and the arguments of the parties at the

December 12, 2022 hearing, the Court rules as follows:

Defendant Mark Poe's motion to dismiss is granted on the ground that the Court lacks

personal jurisdiction over Mr. Poe.  In support of his jurisdictional arguments, Mr. Poe submitted

a declaration (attached as Exhibit A) attesting to his negligible contacts and activities with the

state of Florida.  "Once a nonresident defendant files an affidavit contesting the allegations

contained within a complaint concerning personal jurisdiction . . . the burden shifts to the

plaintiff to prove by affidavit the basis for personal jurisdiction." *Two Worlds United v. Zylstra,*

1

**Exhibit I to REK Decl.**             **Page 1 of 7**

46 So. 3d 1175, 1177 (Fla. 2d DCA 2010). With his opposition papers, Plaintiff Evan Jowers

failed to provide factual evidence to contest Mr. Poe's affidavit. Nor did Mr. Jowers proffer

such factual evidence at the December 12 hearing. Accordingly, Mr. Poe's motion is

GRANTED.

Dated: _December 20, 2022_   By: _____

Hon. Luis M. Garcia
Monroe County Circuit Judge


CC:

Mark Poe, Esq., mpoe@gawpoe.com

Zachary Zermay, Esq., zach@zermaylaw.com

2

**Exhibit I to REK Decl.**                              **Page 2 of 7**

# Exhibit A

**Exhibit I to REK Decl.**                **Page 3 of 7**

Filing # 156403838 E-Filed 08/30/2022 12:30:59 PM

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT,
IN AND FOR MONROE COUNTY, FLORIDA
KEY WEST DIVISION

EVAN JOWERS,

      Plaintiff,                                    CASE No.:  22-CA-00462-K

v.

MARK POE,

      Defendant.

_____/

## DECLARATION OF MARK POE IN SUPPORT OF MOTION TO STRIKE OR IN THE ALTERNATIVE TO DISMISS

    I, Mark Poe, declare as follows:

    1.    I am a California-licensed attorney and acting as pro se counsel for myself in this matter. I am over the age of 18, and if called to testify at a hearing, would truthfully testify to the following facts.

### THE "VALERIO BRIEF" AND THE KINNEY LETTER

    2.    Attached as **Exhibit A** hereto is a true and correct copy of what the FAC labels the "Valerio Brief," which is actually titled "Defendants' Opposition to [Tauler's] Motion to Compel Depositions." This brief was filed on August 14, 2020 in a California state-court case titled *Tauler Smith LLP v. Valerio et al.*

    3.    Attached as **Exhibit B** hereto is a true and correct copy of the September 30, 2020 letter written by Robert Kinney that was submitted to the Admissions Committee for the Western District of Texas ("the Kinney Letter"). As indicated in the header information of that document, I retrieved Exhibit B from the PACER system for the Western District of Texas. The

1

**Exhibit I to REK Decl.**                                    **Page 4 of 7**

Kinney Letter had been filed in those proceedings by Mr. Jowers' counsel in that case, Robert Tauler, on August 31, 2021, as an exhibit to a declaration he filed in those proceedings.

4.      The Valerio Brief is publicly available to anyone who accesses the document management system of the Los Angeles Superior Court, creates an account, and searches for either the case number or one of another of the parties' names. Attached as **Exhibit C** hereto is a true and correct copy of the court's webpage associated with the *Tauler Smith LLP v. Valerio et al.* case, which shows that all documents in the case from the initial "Civil Case Cover Sheet" through the Memorandum of Costs "are available electronically." Document No. 10 in that listing is the "Valerio Brief."

5.      All one must do to retrieve the Valerio Brief is check the box for Document No. 10 and click "submit." Doing so takes one to another webpage where the requester authorizes payment of the nominal court fee to retrieve the document. Attached as **Exhibit D** hereto is a true and correct copy of that page for the Valerio Brief.

6.      To illustrate the process, I retrieved the Valerio Brief through the court's website on August 23, 2022. Attached as **Exhibit E** hereto is a true and correct copy of the receipt for that transaction as generated by the court.

## TEXAS FEDERAL COURT ORDER SHOWING REASON FOR TAULER'S NEGATIVE RECCOMMENDATION

7.      Attached as **Exhibit F** hereto is a true and correct copy of the August 2, 2021 Order by U.S. District Court Judge Robert Pitman (with highlighting added by me) in which he recites: "On February 16, 2021, the Committee recommended that Mr. Tauler's Application be denied based on his failure to provide truthful answers to questions 15 (b) and (c) on the Application form and a supplemental question submitted by the Committee."

**Exhibit I to REK Decl.**                              **Page 5 of 7**

## TENTATIVE RULING IN TAULER SMITH V. VALERIO SANCTIONING TAULER FOR HIS FRIVOLOUS MOTION TO COMPEL

8.    Attached hereto as **Exhibit G** is a true and correct copy of the Los Angeles Superior Court's tentative ruling in the *Valerio* action sanctioning Tauler $1,060 because "The numerous procedural defects in Plaintiff's Motion to Compel Further and Request for Sanctions demonstrate that it was not brought with substantial justification.

### PERSONAL JURISDICTION

9.    I was served with the Complaint in this matter on July 13, 2022, when I was a resident of California. I have since moved, and am now a resident of Hawaii.

10.    Attached as **Exhibit H** hereto is a true and correct copy of the business record for Trendsettah USA, Inc., retrieved from the Florida Department of Corporations' website at www.sunbiz.org on August 20, 2022.

11.    As the Court will see should it review the dockets in *In Re Checking Account Overdraft Litigation* (Case No.: 1:09-MD-02036-JLK) (S.D. Fla.) and *New England Carpenters Health Benefits Fund, et al v. First Databank, Inc. et al.* (Case No.: 8:08-MC-00012) (M.D. Fla.), I did not even make an appearance as counsel in either case.

12.    I have visited the State of Florida a total of four times in my life. The first time was in 1987 when I was 11 years old, on a family vacation to see Disneyworld, the Everglades, and Fort Jefferson. The next two times were in 2014, when I was representing Capital One Bank, N.A. in MDL proceedings before Judge King in the Southern District of Florida, through my then-employment with Morrison & Foerster LLP. *See generally In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2014 WL 12557839 (S.D. Fla. June 24, 2014). For that case, I attended one court hearing and one deposition. The fourth time was in January 2016,

**Exhibit I to REK Decl.**                                    **Page 6 of 7**

to attend a mediation in Miami for a case that was then-pending in the Central District of California.

13.     Other than representing Capital One Bank in the 2014 proceedings, I have never provided any "service activities within this state." Fla. Stat. § 48.193(1)(a)(6). Nor have I ever "engaged in solicitation" in the State of Florida. Nor have I ever "processed, serviced, or manufactured" "products [or] materials" in Florida. *Id.*

I declare under penalty of perjury under the laws of the United States and the state of Florida that the foregoing is true and correct. Executed on August 30, 2022, at Honolulu, Hawaii.

_____
Mark Poe

### CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically and e-Served by the Florida Court's E-Filing Portal to the following counsel of record on August 30, 2022:

Zachary Z. Zermay
zach@zermaylaw.com
203 Labelle Ave.
Fort Myers, FL 33905
*Counsel for Plaintiff*

s/ Mark Poe
Mark Poe

4

**Exhibit I to REK Decl.**                                    **Page 7 of 7**

EXHIBIT-C

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA
GAINESVILLE DIVISION

EVAN JOWERS,

      Plaintiff,

      v.                          Case No.: 01-2022-CA-3042, Division K

ROBERT E. KINNEY, and
MWK RECRUITING, INC.,

      Defendants

---

**<u>DEFENDANT ROBERT E. KINNEY'S MOTION FOR SANCTIONS</u>**

## I.    Introduction

Pursuant to Florida Statutes section 57.105, Defendant Robert Kinney respectfully moves this court for an order imposing sanctions against Plaintiff Evan Jowers and his counsel Zachary Zermay for filing this action against Mr. Kinney and MWK Recruiting, Inc. (now known as Counsel Holdings, Inc.) ("**MWK**"). From its inception, each claim in this case was unsupported "by the material facts necessary to establish the claim" and the Complaint's causes of action "[w]ould not be supported by the application of then-existing law to those material facts." Fla. Stat. § 57.105(1). "The central purpose of section 57.105 is, and always has been, to deter meritless filings and thus streamline the administration and procedure of the courts." *Mullins v. Kennelly*, 847 So.2d 1151, 1154 (Fla. 5th DCA 2003). If ever there was an appropriate case for these sanctions, this is it, because not one single basis for jurisdiction or claim in this matter is supported by the material facts or any application of the law to those facts, and all the allegedly injurious statements were absolutely privileged.

## II.    Statement of the Case

As described in detail in the Motion to Dismiss of Defendant Robert E. Kinney, filed February 26, 2023 (the "**Motion to Dismiss**"), Mr. Jowers and Mr. Zermay filed this suit against Defendants because Mr. Kinney represented MWK in obtaining (in Texas) a judgment of more than $3.6 million against Jowers for his thefts and breaches of employment related agreements (the "**Texas Judgment**"). *See* Motion to Dismiss, at 1. This case is part of the petty vendetta and scheme for retribution and obstruction that Mr. Jowers has been implementing since prior to the issuance of the Texas

Judgment, and he has promised that it will continue. *See* Compl. ¶16 (promising a "multiplicity of suits"); Motion to Dismiss, at 1 fn. 2 (citing dismissed Monroe County, Florida, case against attorney Mark Poe also filed by Mr. Jowers).

### III.    Mandatory Nature of Sanctions when Warranted

Mr. Jowers's motivation is irrelevant to an analysis under Fla. Stat. 57.105. What is important under the statute is whether a movant can "show that the party and counsel 'knew or should have known' that any claim or defense asserted was (a) not supported by the facts or (b) not supported by an application of 'then-existing' law." *Boca Burger, Inc. v. Forum*, 912 So. 2d 561, 570 (Fla. 2005). If the movant makes the requisite showing under section 57.105, then sanctions are mandatory. *See Albritton v. Ferrera*, 913 So.2d 5, 8-9 (Fla. 1st DCA 2005) (noting that the word "shall" in section 57.105 evidences "the legislative intent to impose a *mandatory* penalty in the form of reasonable attorney's fees to discourage baseless claims, by placing a price tag on losing parties who engage in these activities"); *see also*, *de Vaux v. Westwood Baptist Church*, 953 So. 2d 677, 685 (Fla. Dist. Ct. App. 2007) ("[W]e again remind the bar that section 57.105 expressly states courts 'shall' assess attorney's fees for bringing, or failing to timely dismiss, baseless claims or defenses." The mandatory nature of these sanctions represents a value judgment by the Florida Legislature that the Supreme Court has recognized: "While counsel does have an obligation to be faithful to his client's lawful objectives, that obligation cannot be used to justify unprofessional conduct by elevating the perceived duty to zealously represent over all other duties." *Boca Burger, at* 571 (citation omitted).

### IV.    Safe Harbor

Before filing this motion for section 57.105 sanctions, Defendants complied with the twenty-one-day "safe harbor" provision of section 57.105(4) by sending a copy of this Motion to Mr. Zermay on February 24, 2023. Mr. Zermay did not withdraw the claims following notice of Defendants' intention to seek sanctions.

### V.    Summary of Material Facts and Argument

In this case, any reasonable attorney would have known or should have known that the facts completely undermine each of the claims Mr. Jowers makes in this case. The reasons this is true are elaborated in the Motion to Dismiss, but the following summary with page references to the Motion to Dismiss may assist the Court:

1.    The communications at issue were sent from a person in Texas (Mr. Kinney) to a person in California (Mr. Cole) and were not sent to anyone in Florida, making personal jurisdiction predicated on those communications unavailable. Motion to Dismiss, at 7-8.

2.    Mr. Jowers claimed to be a resident of Hong Kong at the time that his alleged injuries under the FCCPA occurred and thereafter. Motion to Dismiss, at 9.

3.    When Mr. Kinney sent the communications to Mr. Cole in California, Mr. Jowers was physically located in Louisiana. Motion to Dismiss, at 9.

4.    No other actions of MWK or Mr. Kinney in Florida were the basis for any of Mr. Jowers's claims. Motion to Dismiss, at 10.

5.    Neither Mr. Kinney nor MWK have the sort of continuous and systematic contacts with Florida that would justify the exercise of general jurisdiction over them. Motion to Dismiss, at 9.

6.    Mr. Kinney is an attorney who represents MWK, and the communications sent by him to Mr. Cole in California were settlement communications related to an ongoing litigation matter, rendering them completely privileged under well-established law. Motion to Dismiss, at 10-11.

7.    The debt in question is debt primarily related to Mr. Jowers's thefts and breaches of his employment agreements, and therefore is not consumer debt within the meaning of the FCCPA. Motion to Dismiss, at 12-14.

8.    Mr. Kinney did not tell Mr. Jowers anything, let alone that he or any person employing him would disclose information affecting Mr. Jowers's reputation.  Motion to Dismiss, at 15.

9.    Mr. Kinney did not communicate with Mr. Jowers or a member of his family with unreasonable frequency or engage in conduct that could reasonably be expected to abuse or harass him. Motion to Dismiss, at 16.

10.    Mr. Kinney did not use "profane, obscene, vulgar, or willfully abusive language" in communicating with Mr. Jowers. Motion to Dismiss, at 16.

11.    Mr. Kinney did not assert the existence of a legal right he knew did not exist. Motion to Dismiss, at 17.

12.    Mr. Kinney did not publish or threaten to publish Mr. Jowers's name on a "deadbeat list." Motion to Dismiss, at 18.

## VI.    Pro Se Attorney Mr. Kinney is Entitled to Recover Fees for his Time

As an attorney representing himself in this matter, Mr. Kinney is entitled to recover attorney fees just as if he were represented by counsel. *Albritton v. Ferrera*, 913 So. 2d 5, 10 (Fla. Dist. Ct. App. 2005) (collecting cases and holding, "[b]ecause an

award of attorney's fees under section 57.105 is proper, [pro se attorney] is entitled to such a fee for representing himself just as though he had hired outside counsel. In fact, he is entitled to reasonable fees even if the award results in a windfall.").

### VII.   Argument

As noted, although this is an entirely frivolous case by any standard, the Court need not make a finding of frivolousness. *Martin Cty. Conservation Alliance v. Martin Cty.,* 73 So. 3d 856, 858 (Fla. 1st DCA 2011). Rather, the Court **must** award sanctions if either the claims are "not supported by the material facts," or if the claims "[w]ould not be supported by the application of then-existing law to those material facts." Fla. Stat. § 57.105(1)(a), (b). In this case, both provisions apply.

### A.    Jurisdiction over MWK and Mr. Kinney is obviously lacking.

First, the central allegation, that Mr. Kinney made statements to Mr. Jowers that implicate the FCCPA and provide the Court with a basis to assert jurisdiction over Mr. Kinney and MWK, is false. As is evident from the statements themselves, as quoted in the Complaint, Mr. Kinney never said anything to Mr. Jowers, but rather to his attorney, Mr. Cole. Moreover, the allegations in the Complaint do not even bother to assert that Mr. Kinney purposefully directed those statements into Florida. In fact, the statements were made to Mr. Cole in California, Mr. Jowers was located in Louisiana and was claiming to be "ordinarily resident in Hong Kong." Motion to Dismiss, at 9. Mr. Jowers and Mr. Zermay were aware of all these material facts, and they should have known these facts undermine any claim for this Court to exercise jurisdiction over these defendants, but they did not care.

### B.    The litigation privilege applies to the allegedly injurious statements.

A further material fact related to the Court's determination regarding sanctions is that Mr. Kinney was acting as an attorney for MWK when he made the statements in question to Mr. Cole, acting as Jowers's attorney, during these proceedings. Mr. Zermay and Mr. Jowers were aware of this. They are also well aware that such communications made in connection with judicial proceedings is privileged under the "absolute immunity" conferred by Florida's "litigation privilege." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So.2d 606, 608 (Fla. 1994). *See Jackson v. Bell South Telecomms.*, 372 F.3d 1250, 1276 (11th Cir. 2004) ("Events taking place outside the courtroom during discovery or settlement discussions are no less an integral part of the judicial process, and thus deserving of the protection of the [litigation] privilege, than in-court proceedings").

Mr. Zermay cannot avoid liability by claiming that he was unfamiliar with the doctrine of litigation privilege.[1] The seminal case—*Levin*—is not some obscure precedent. According to Westlaw, *Levin*'s explanation of the "absolute immunity" conferred by the litigation privilege has been quoted in 226 opinions over the 28 years since it was written. Filing a lawsuit that is plainly barred by the litigation privilege is sanctionable under section 57.105(1)(b). *See Davis v. Bailynson*, 268 So.3d 762, 769–70

---

[1] Should the Court award section 57.105 sanctions solely under subsection (1)(b) for the Complaint being unsupported by law, those sanctions are to be awarded only against Mr. Zermay, for pursuing baseless legal theories. *See Davis v. Bailynson*, 268 So.3d 762, 767 (Fla. 4th DCA 2019) ("We, as well as our sister courts, have consistently held that under 57.105(1)(b), only a party's attorney may be ordered to pay attorney's fees under section 57.105(3)(c).") (collecting cases).

(Fla. 4th DCA 2019) (affirming sanctions because "Cohen [i.e., the lawyer] should have known [the litigation privilege] applied").

## C.    The debt under the Texas Judgment is not consumer debt within the meaning of the FCCPA.

As is described in the Motion to Dismiss, the judgment debt Jowers owes is debt which was created by his thefts of trade secrets and his breach of employment-related agreements. This is not consumer debt, which is a requirement of every violation under section 559.72 charged by Mr. Jowers. Motion to Dismiss, at 12-14.  Mr. Jowers does not even bother to allege that the debts in question are consumer debts, and they are not. "Indeed, court ordered obligations that do not arise from consumer transaction are consistently held to not constitute "debts" for the purposes for the Acts." *Id.* (citing *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1371 (11th Cir.1998) for the proposition that "the obligation of a tortfeasor did not arise from a "transaction" needed to give rise to a "debt"). Courts interpreting the FDCPA have also uniformly refused to consider obligations for damages for theft to be covered by the definition of "debt." *See Beauvoir v. Israel*, 794 F.3d 244, 247-48 (2d Cir. 2015) ("We join our sister circuits and hold that money owed as a result of theft is not an 'obligation or alleged obligation of a consumer to pay money arising out of a transaction' and, therefore, does not constitute a 'debt' for purposes of the FDCPA. 15 U.S.C. § 1692a(5).").

## D.    Even if the debts were consumer debts, the facts do not support the specific allegations under the FCCPA.

For the reasons described in further detail in the Motion to Dismiss, each of the alleged violations of section 559.72 is not supported by the material facts that were

known to Mr. Jowers and Mr. Zermay or by any good faith application of the law to those facts. *See* Motion to Dismiss, at 14-18.

### VIII.  Conclusion

"[S]ection 57.105 requires claimants to continuously evaluate the merits of their claims." *Bowen v. Brewer*, 936 So. 2d 757, 762 (Fla. 2d DCA 2006). Given that Jowers and Zermay refused to withdraw their claims after they learned (not later than MWK and Mr. Kinney's safe-harbor notice of February 27, 2023) that their complaint was unsupported "by the material facts necessary to establish [their] claim," and that their Complaint could not be "supported by the application of then-existing law," Fla. Stat. § 57.105(1)(a), (b), they should now face the mandatory consequences that follow from having further wasted this Court's time, Mr. Kinney's time, and the time of local counsel MWK was required to instruct in order to respond to the Complaint.

Dated: March 17, 2023                    Respectfully Submitted,

                                        /s/ Robert E. Kinney
                                        Robert E. Kinney
                                        Texas State Bar No. 00796888
                                        Robert@KinneyPC.com

                                        **Robert E. Kinney**
                                        824 West 10th Street, Suite 200
                                        Austin, Texas 78701
                                        Tel: (512) 636-1395

                                        **ATTORNEY PRO SE**

## CERTIFICATE OF SERVICE

I certify that the foregoing document was sent to the following counsel of record in substantially the same form by email on February 24, 2023, and then filed electronically and e-Served by the Florida Court's E-Filing Portal on March 17, 2023.

Zachary Z. Zermay
zach@zermaylaw.com
203 Labelle Ave.
Tice, FL 33905
*Counsel for Plaintiff*

                                        /s/ Robert E. Kinney
                                        Robert E. Kinney

EXHIBIT-D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| COUNSEL HOLDINGS, INC.<br><br>**Plaintiff**<br><br>v.<br><br>**EVAN P. JOWERS, LEGIS VENTURES (HK) COMPANY LIMITED, JOWERS VARGAS LLC, and JOWERS LANGER LLC,**<br><br>**Defendants.** | **Civil Action No. 1:23-CV-711** |

**DEFENDANTS EVAN P. JOWERS'S**
**<u>MOTION TO DISMISS</u>**

Defendants Evan P. Jowers ("**Jowers**") moves to dismiss the claims asserted against Defendants in the Original Complaint For Declaratory and Injunctive Relief (the "**Complaint**") [ECF Doc. No. 5] filed by Plaintiff Counsel Holdings, Inc., formerly known as MWK Recruiting, inc. ("**MWK**") for lack of standing under Fed. R. Civ. P. 12(b)(1), and lack of personal jurisdiction under Rule 12(b)(2).

# TABLE OF CONTENTS

# TABLE OF AUTHORITIES

## PRELIMINARY STATEMENT

Well, its Groundhog Day—again—and Robert Kinney ("Kinney") is suing Evan Jowers in the United States District Court for the Western District of Texas. As the Court may recall, the underlying litigation bearing case number 1:18-cv-00444 (the "First Lawsuit")  that gave rise to this case (the "Collateral Proceedings") involves a litigious ex-employer, attorney recruiter, and who is actively moonlighting as a consumer debt collector and unlicensed lawyer in the State of Florida, who is using this Collateral Proceedings to harass Evan P. Jowers. The lawsuit, which targets Jowers and seeks to get a second bite at the apple (and Mr. Jowers). Fortunately, the Court and Mr. Jowers are not doomed to relitigate this case because "[t]he doctrine of res judicata contemplates, at minimum, that courts not be required to adjudicate, nor defendants to address, successive actions arising out of the same transaction." *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 563 (5th Cir. 1983). Moreover, MWK has completely failed to satisfy the Rule 12(b)(6) standards and state sufficient ultimate facts to demonstrate that any of the named defendants are Mr. Jowers's alter ego, or otherwise pierce a corporate veil.

Moreover, the Court lacks personal jurisdiction over Mr. Jowers. At all relevant times, Jowers worked primarily in Hong Kong and the State of Florida. The Complaint fails does not allege a single act that Mr. Jowers ever took in Texas. While Mr. Jowers accepts that the Court found personal jurisdiction in the First Lawsuit—given that these are Collateral Proceedings attempting to modify the original judgment—he must again raise it so as to avoid waiving the argument in the First Lawsuit.

Furthermore, the Complaint fails to state a claim. It is a hodgepodge of conclusory allegations that fail to state a plausible claim and constitutes an impermissible shotgun pleading that fail to satisfy the *Twiqbal* pleading standards. *See Bell Atlantic Corp. v. Twombly*, 550 U.S.

544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). For the reasons set forth in full below, the Complaint must be dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

From April 2006 until June 2015, Jowers was an attorney recruiter and employee of Kinney Recruiting, LLC (and its predecessor), an attorney placement business at which Robert Kinney is the principal officer and manager. *See* Amended Petition ¶ 11; **Ex. A, Declaration of Evan P. Jowers** ("**Jowers Decl.**") ¶ 2. While employed there, he was based exclusively in Miami, Florida. Amended Petition ¶ 20; Jowers Decl. ¶ 8. Jowers recruited attorneys for placements at large U.S. and U.K. based law firms. *See id.* Over time, acting on his own initiative, Jowers began to focus his efforts almost exclusively on placing candidates in such firms' Asian offices. *Id.*

Although Jowers signed an Associate Recruiter Employment Agreement ("**Employment Agreement**") with Kinney Recruiting, L.P. on May 1, 2006, he never became an employee of Kinney Recruiting, L.P. and that company never paid him any wages. [ECF Doc. No. 1-3 at 28]; Jowers Decl. ¶ 4; *see* Amended Petition ¶ 8. The Employment Agreement is governed by Florida law, and contains certain restrictive covenants, including an indefinite and draconian confidentiality provision and non-solicitation covenants purporting to require him not to solicit any of the employees or candidates or clients of Kinney Recruiting, L.P. for a period of 1 year after the termination of his employment. [ECF Doc. No. 1-3 at 31–32, 33 (Employment Agreement §§ 7.2, 8.1, 8.2, 12.1)].

In June 2015, Jowers relocated primarily to Hong Kong, where he worked on behalf of Kinney Recruiting Limited, a Hong Kong limited company ("**Kinney Recruiting Hong Kong**"). Jowers Decl. ¶ 2; *see* Amended Petition ¶¶ 11, 24. In December 2016, he resigned from Kinney Recruiting Hong Kong and soon thereafter became an attorney recruiter for Legis Ventures. Jowers

Decl. ¶¶ 2, 4. Although Legis Ventures refers to itself in some marketing materials as Jowers/Vargas, Jowers is not an officer, owner, director, or other governing person of Legis Ventures. *Id.* ¶ 10. About the same time, Jowers's ex-wife, Yuliya Vinokurova, who was an attorney recruiter for Kinney Recruiting, LLC, left that company and became a recruiter with Legis Ventures as well. Amended Petition ¶ 34.

MWK filed its Original Petition on March 27, 2017, in state district court in Travis County, Texas, which included a request for injunctive relief. [ECF Doc. No. 9-1 at 2]. Although citations (i.e., Texas summons) were issued, service was not accomplished and nothing took place in the lawsuit. [*See id.*] On March 26, 2018, one day shy of a year after commencing the suit, MWK filed its Amended Petition, dropping its request for injunctive relief, which MWK had never set for hearing. [*See id.*] More than a year after filing, MWK requested issuance of new citations and served Jowers and—purportedly through Jowers—Legis Ventures. [*See id.*] On May 25, 2018, Jowers timely removed the case to this Court.

The Amended Petition alleges a number of claims against Jowers, his ex-wife Vinokurova, and Legis Ventures. In essence, its only specific complaints under the Employment Agreements are that Jowers allegedly was in contact with six candidates—which MWK knows because Jowers sent a candid email discussing these facts—and that Vinokurova also left her employment at Kinney Recruiting. Amended Petition ¶¶ 33–34 & Ex. 8; [ECF Doc. No. 1-3 at 118]. It also claims that Jowers owes certain outstanding "loans" for pay advances (which he doesn't) under certain loan agreements governed by Texas law. Amended Petition ¶ 61. Otherwise, it largely regurgitates its breach of contract claims as various tort or statutory claims, including fraud, tortious interference, and misappropriation under the Texas Uniform Trade Secrets Act ("**TUTSA**").

## APPLICABLE LEGAL STANDARDS

### A.  Standard Under Rule 12(b)(1).

Standing is an indispensable component of subject matter jurisdiction and may be challenged under Rule 12(b)(1). *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 (1992). "Standing requires, at a minimum, three elements: injury in fact, a 'fairly traceable' causal link between that injury and the defendant's conduct, and the likelihood that the injury will be 'redressed by a favorable decision.'" *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 560–61). "There are three avenues for a movant to demonstrate a lack of jurisdiction: (1) on the face of the complaint alone; (2) the complaint supplemented by undisputed facts in the record; and (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." *Lifesize, Inc. v. Chimene*, A. No. 1:16-CV-1109-RP, 2017 WL 1532609, at *3 (W.D. Tex. Apr. 26, 2017) (citing *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004)). The burden of demonstrating jurisdiction rests with MWK—the party invoking it. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.  Standard Under Rule 12(b)(2).

"A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Mink v. AAAA Dev., LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Because Texas's long-arm statute extends to the limits of due process, the principal question is whether jurisdiction is consistent with the U.S. Constitution. *Id.*

The plaintiff has the burden to make a prima facie showing that personal jurisdiction is proper. *Luv N' Care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). To do so, the

plaintiff must show both that the nonresident defendant "purposefully availed [itself] of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state" and that "the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). Sufficient minimum contacts may give rise to either specific or general jurisdiction. *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002). "Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Mink*, 190 F.3d at 335. "General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'" *Id.*

### C. Standard Under Rule 12(b)(5).

Sufficiency of service of process prior to removal of a case to federal court is determined under state law. *E.g.*, *Robinson v. Roxy Invs., L.P.*, Civ. Ac. No. 3:07-cv-189 HTW-LRA, 2008 WL 3165834, at *2 (S.D. Miss. Aug. 1, 2008) (citing *Freight Terminals, Inc. v. Ryder Systems, Inc.*, 461 F.2d 1046, 1052 (5th Cir. 1972)). Under Texas law, "the plaintiff has the burden of affirmatively showing *strict compliance* with the [long-arm] statute." *MobileVision Imaging Servs., L.L.C. v. LifeCare Hospitals of N. Tex., L.P.*, 260 S.W.3d 561, 564 (Tex. App.—Dallas 2008, no pet.) (quotation omitted) (emphasis added). "If strict compliance is not affirmatively shown, the service of process is invalid and has no effect." *Barker CATV Const., Inc. v. Ampro, Inc.*, 989 S.W.2d 789, 792 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (citing *Uvalde Country Club v. Martin Linen Supply*, 690 S.W.2d 884, 885 (Tex. 1985)).

### D. Standard Under Rule 12(b)(6).

As set forth in *Twombly* and *Iqbal*, Rule 8 requires that a pleading contain sufficient facts to, if accepted as true, state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). This requires more than threadbare, unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT AND AUTHORITIES

### A.  MWK Lacks Standing to Bring Claims Against Defendants.

#### 1.  *MWK Lacks Standing to Assert its Breach of Contract Claims.*

As a threshold matter, MWK lacks standing to bring any claims against Defendants. Ordinarily, under both Texas and Florida law, a nonparty to a contract may not bring suit to enforce it. *E.g.*, *Young Refining Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 386–87 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Gallagher v. Dupont*, 918 So. 2d 342, 347 (Fla. 5th DCA 2005). The only nonparties that have standing to enforce a contract are third party beneficiaries where the contract contains a clear indication that the actual parties intended to confer a direct benefit on the third party. *Young*, 46 S.W.3d at 387. Incidental benefits are not enough. *Id.* For this reason, under Texas law, "[t]here is a presumption against, not in favor of, third party beneficiary agreements." *Id.* Further, under Florida law, a third party cannot file suit to enforce a restrictive covenant, such as a non-solicitation or confidentiality clause, as a third party beneficiary unless the agreement expressly states that the restrictive covenant is intended for the benefit of the third party. FLA. STAT. ANN. § 542.335(1)(f)(1).

MWK is indisputably a nonparty to the agreements attached to its Amended Petition. The Employment Agreement is with *Kinney Recruiting, L.P.*, not MWK. [*See* ECF Doc. No. 1-3 at 28, 34, 35 (Amended Petition, Ex. 1)]. The "Promissory Note" and "Loan Agreement" dated

December 29, 2012 are between Evan P. Jowers and *Counsel Unlimited LLC*, not MWK. [*See id.* at 53, 59, 76 (Ex. 3)]. The same is true of the "Security Agreement" dated October 15, 2012. [*See id.* at 78, 95 (Ex. 3)]. Similarly, the "Forgivable Loan Agreement" dated February 1, 2012, is between Evan P. Jowers and *Recruiting Partners GP, Inc. d/b/a Kinney Recruiting, Inc.*, as is the accompanying "Promissory Note" of the same date. [*See id.* at 101, 105, 106 (Ex. 4).]

      MWK does not allege that it is an intended third party beneficiary of any of the agreements, nor has it alleged that it is an assignee of any of the contracting parties or that any assignment agreements exist. Standing must exist at the time a cause of action commences; it cannot be created later. *E.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). MWK has not alleged that any of the seven agreements attached to the Amended Petition were ever assigned to it or that it is a successor of the contracting party, much less that each of them were assigned *prior* to the filing of the instant suit. Since MWK is not even mentioned or referred to in any of the agreements, the presumption against third party beneficiaries bars it from claiming that it has standing to bring suit under the agreements governed by Texas law, and Florida statutes bar it from suing to enforce Jowers's Employment Agreement. *See Young*, 46 S.W.3d at 387; Fla. Stat. Ann. § 542.335(1)(f)(1).

      Further, Jowers was only an employee of Kinney Recruiting, LLC during the relevant time period. Jowers Decl. ¶ 2. He was never an employee of MWK Recruiting, Inc. or its predecessor, MWK Recruiting, LLC, or of Kinney Recruiting, L.P., the entity with which he entered into the Employment Agreement. *Id.* ¶ 4. He never received any paycheck from either MWK entity or Kinney Recruiting, L.P.—instead, he was employed by and received payments from Kinney Recruiting, LLC. *Id.* Further, MWK itself did not place any candidates, send invoices to clients, or receive any payments. *Id.* MWK cannot assert any benefits under the Employment Agreement,

particularly where Jowers's actual former employer, Kinney Recruiting, LLC, is still operating in the same line of business, because MWK has no legitimate business interest in Jowers's prior relationship with Kinney Recruiting, LLC. *See id.* Nor for that matter could Kinney Recruiting, LLC, which is not a party to the Employment Agreement.

      2. *MWK Lacks Standing to Assert Its Tort and Derivative Tort Claims.*

For similar reasons, MWK also lacks standing to bring its fraud, tortious interference, TUTSA, and derivative civil conspiracy claims against Defendants.

MWK alleges that it was fraudulently "induce[d] … to provide [Jowers] advance payments and loans." *See* Amended Petition ¶ 43. But the actual agreements state that MWK did not provide Jowers with advances or loans—Counsel Unlimited, LLC and/or Recruiting Partners GP, Inc. did. [ECF Doc. No. 1-3 at 53, 59, 76 (Ex. 3); *id.* at 101, 105, 106 (Ex. 4)]. Similarly, MWK alleges that "Jowers misrepresented the need for more money … claiming he had placed sufficient candidates with future start dates to provide security for all outstanding loans … ." *Id.* ¶ 43. Because Jowers was employed only by Kinney Recruiting, LLC and because he allegedly received loans under contracts with Counsel Unlimited, LLC and/or Recruiting Partners GP, Inc., not MWK, MWK lacks standing to bring this fraud claim because it is based on alleged representations related to loan agreements to which MWK is not a party. And, MWK itself *never paid* Jowers any of these alleged amounts, so it cannot sue to collect them. Jowers Decl. ¶ 4.

Similarly, the TUTSA claim alleges that "[a]ll MWK employees involved in the development or use of MWK property … have access to MWK's other confidential information." *Id.* ¶ 49. But, MWK indisputably never employed Jowers—Kinney Recruiting, LLC did. Jowers Decl. ¶ 4. Thus, the information that MWK is describing—assuming it was really a trade secret in the first place (it wasn't)—must have belonged to Kinney Recruiting, LLC, not to MWK itself.

The same is true as to the tortious interference claims. The alleged contracts that form the basis for those claims are "the [Employment] Agreements [MWK] entered into with Jowers and Vinokurova," unspecified relationships with clients, and "contractual relations with [unspecified] existing and prospective candidates." Amended Petition ¶ 59. But all of those items were exclusively associated with Kinney Recruiting, LLC, not MWK. *See* Jowers Decl. ¶ 4.

In sum, MWK cannot assert any of these claims because all of the interests at issue belong to other parties. Therefore, it lacks standing to bring any of its alleged claims.

## B. The Court Lacks Personal Jurisdiction Over Defendants.

### 1. *Defendants Are Not Subject to the Court's General Jurisdiction.*

Defendants do not have the necessary contacts with Texas to permit the Court to exercise general jurisdiction over them. The Amended Petition does not allege and Defendants certainly do not have "continuous and systematic" contacts with Texas sufficient to render them "essentially at home" in Texas. *See Daimler AG v. Bauman*, 134 S.Ct. 746, 754 (2014). Under *Daimler*, an entity's place of incorporation and the principal place of business are the "paradigm … bases for general jurisdiction." *Id.* at 760 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011)). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Id.* "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear*, 564 U.S. at 924.

Here, Jowers is a non-resident of Texas and a citizen of Florida, where he maintains a physical address, and Legis Ventures is a foreign Hong Kong company limited by shares with its principal place of business in Hong Kong. *See* Jowers Decl. ¶¶ 5–6. The Amended Petition itself admits these basic facts. *See* Amended Petition ¶¶ 3, 5. Neither Jowers nor Legis Ventures has any

place of business, office, or other facility in Texas, any assets in Texas, or any employees or agents in Texas. *See* Jowers Decl. ¶¶ 5–6.

In sum, Defendants have no presence in Texas that could support the exercise of general jurisdiction. Certainly, neither of Defendants has "continuous and systematic" Texas contacts.

       *2.  Defendants Are Not Subject to the Court's Specific Jurisdiction.*

Additionally, Defendants are not subject to specific jurisdiction in Texas because none of MWK's alleged claims arises out of any purposeful contact by Defendants with Texas.

To show specific jurisdiction, "[i]t is essential that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Clemens v. McNamee*, 615 F.3d 374, 379 (5th Cir. 2010). "The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* Communications with a person in the forum, whether by phone, e-mail, or mail, are not sufficient. *See Bonner v. Triple-S Mgmt. Corp.*, 661 Fed. Appx. 820, 822–23 (5th Cir. 2016); *Renoir v. Hantman's Associates, Inc.*, 230 Fed. Appx. 357, 360 (5th Cir. 2007). These rest "on nothing but the mere fortuity that the plaintiff happens to be a resident of the forum." *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1146–47 (5th Cir. 1985).

***First***, Defendants have not taken *any* relevant action in the State of Texas. Jowers was employed in Miami, Florida by Kinney Recruiting, LLC until June 2015, when he relocated to Hong Kong to become an attorney recruiter under contract with Kinney Recruiting Hong Kong. Jowers Decl. ¶ 2. In December 2016, Jowers terminated his relationship with Kinney Recruiting Hong Kong and subsequently became an attorney recruiter with Legis Ventures. *Id.* ¶ 3. Jowers recruits candidates almost exclusively in Asia. *Id.* Since well before leaving his employment with

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 10**

Kinney Recruiting, Jowers has not contacted any attorney candidate in Texas, whether on behalf of Kinney Recruiting, LLC, Kinney Recruiting Hong Kong, Legis Ventures, or otherwise, for placement anywhere, nor has he has placed a candidate at any law office in Texas. *Id.* At no relevant time was Jowers in Texas, nor did he have anything to with Texas. *See id.* ¶¶ 3, 6–8.

Similarly, Legis Ventures is a recruiting firm that primarily places candidates at large law U.S. and U.K. based law firms in their offices in Asia. *Id.* ¶ 7. It does not have, nor has it ever had, any office, facility, place of business, or operations in Texas. *See id.* ¶¶ 6–7. Further, it has never placed a candidate at any law office located in Texas, or even at any law firm that is headquartered in Texas. *Id.* ¶ 7. Nor has Legis Ventures ever recruited any attorney located in Texas for placement at any law office in Asia—it has had no phone conversations, no meetings, and no email exchanges with any attorney candidate in Texas. *See id.*

**Second**, all of the alleged actions in the Amended Petition that form the basis for MWK's claims occurred outside of Texas.

As the Amended Petition admits, Jowers was based in Miami, Florida for essentially the entire period of his employment with Kinney Recruiting, and certainly for years prior to any events relevant to this lawsuit. *See* Amended Petition ¶ 20; *see also* Jowers Decl. ¶ 8. After his relocation to Hong Kong, Jowers became an attorney recruiter under contract with Kinney Recruiting Hong Kong. Jowers Decl. ¶¶ 2, 8. While working for Kinney Recruiting Hong Kong, Jowers worked exclusively in Asia, placing candidates at the Asian offices of large U.S. and U.K. based law firms. *Id.* Since well before he relocated to Hong Kong, Jowers has not placed any candidates in Texas, and he has not recruited any candidates in Texas for placements either in Texas or outside of Texas. *Id.* Nor has Jowers had any phone conversation, meeting, or email exchange with any attorney located in Texas during that time period. *Id.*

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 11**

None of the acts described in the Amended Petition occurred in Texas. Instead, at all relevant times, Jowers was either in Florida or in Asia. *Id.* ¶ 9. Jowers made all of the email communications described in paragraphs 29, 30, 31, 32, and 33 of the Amended Petition outside of Texas. *Id.* Further, all of the candidates that MWK incorrectly accuses Jowers of improperly recruiting, including those referred to in paragraphs 33, 39, and 40 of the Amended Petition, were candidates located outside of Texas; out of those candidates, only three individuals took positions at the offices of new law firms, all of which were located in Asia. *Id.* Jowers has never met with the alleged candidates referred to in paragraphs 33, 39, and 40 of the Amended Petition in Texas. *Id.* None of the funds that MWK alleges that Jowers received in paragraphs 15–23 and 32 of the Amended Petition, whether as "loans" or otherwise, were paid to Jowers in Texas or deposited in any bank account located in Texas. *Id.* All payments that Jowers received from Kinney Recruiting, LLC or Kinney Recruiting Hong Kong, if any, were made to him in Florida. *Id.* Further, even assuming that Jowers actually received confidential business information from Kinney Recruiting, LLC or access to trade secrets as alleged in paragraphs 30, 35, 36, 37, and 38 of the Amended Petition—which he disputes—Jowers would have received such information outside of Texas, such information would have concerned individuals or business operations located outside of Texas, and, given that he has not recruited any candidate in Texas or attempted to place any candidate in Texas, he could not have "used" such information in Texas. *Id.*

And, neither Kinney Recruiting, LLC, Kinney Recruiting Hong Kong, nor MWK provided Jowers with the identities of any of the candidates that MWK incorrectly accuses Jowers of improperly recruiting in paragraphs 33, 39, and 40 of the Amended Petition. *See id.* In fact, the vast majority of attorney candidates that Jowers placed while employed at Kinney Recruiting, LLC were identified exclusively by Jowers or were referred directly to Jowers, and no other employee

of Kinney Recruiting was involved, and Jowers received no information from Robert Kinney or Kinney Recruiting, LLC concerning such candidates. *Id.* Jowers did not receive any information from Robert Kinney or Kinney Recruiting concerning the candidates that are referred to in paragraphs 33, 39, and 40 of the Amended Petition; of those candidates, all were either personal friends of Jowers or were referred directly to him by personal friends. *Id.*

Similarly, Legis Ventures has never placed any candidate in Texas, or recruited any candidate located in Texas. *Id.* ¶ 10. Jowers has never taken any action on behalf of Legis Ventures in Texas. *Id.* Legis Ventures has never received any funds or payments from MWK or had any interaction with MWK of any kind, and it is not a party to any contract with MWK. *Id.* And, Jowers's ex-wife, Yuliya Vinokurova, was located in Russia and had been for a number of years when she left Kinney Recruiting and joined Legis Ventures. *Id.* ¶ 11.

For these reasons, neither Jowers nor Legis Ventures has in any way purposefully availed themselves of Texas law. To do so, they would have had to purposefully reach out and take actions *in* Texas. They didn't. Thus, the Court lacks personal jurisdiction over Defendants.

***Third***, as discussed above, MWK is not a party to *any* of the various agreements between Jowers and other entities, including Kinney Recruiting, L.P., Recruiting Partners GP, Inc., and Counsel Unlimited, LLC, referred to in and attached to the Amended Petition. Because it is not a party, assignee, or third party beneficiary of any of those agreements, it cannot rely upon any forum or venue selection clauses contained in those agreements.

Similarly, Legis Ventures has never entered into any agreement with MWK of any kind. Jowers Decl. ¶ 10. Legis Ventures is indisputably not a party to any of the alleged agreements attached to the Amended Petition. *See id.* Indeed, Legis Ventures didn't even exist at that time those agreements were allegedly entered into. *Id.* ¶ 6. It is not and cannot be bound by any

provisions in any of those alleged agreements, including any agreements related to forum or venue. For these reasons, those documents are wholly irrelevant to the question of personal jurisdiction over Legis Ventures.

**Fourth**, contrary to MWK's claim in the Amended Petition, even if MWK were a party to any of the relevant agreements, it could not rely on them because they have no provision requiring dispute resolution in Texas. On the contrary, they refer only to the "venue" for any dispute being in Travis County. Under Texas law, "[t]he distinction between a forum selection clause and a venue selection clause is critical." *Liu v. CiCi Enters., L.P.*, No. 14–05–00827–CV, 2007 WL 43816, at *2–3, (Tex. App.—Houston [14th Dist.] Jan. 9, 2007, no pet.). "A 'forum'-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a 'venue'-selection agreement chooses a particular county or court within that state or sovereign." *In re Great Lakes Dredge & Dock Co., L.L.C.*, 251 S.W.3d 68, 73–74 (Tex. App.—Corpus Christi 2008, no pet.). An agreement that expressly refers to a particular "venue" is "an unambiguous venue selection clause." *See Liu*, 200 WL 43816 at *3. For these reasons, the venue selection clauses in the alleged loan documents are not forum selection clauses.

Further, Jowers's Employment Agreement requires that "the **exclusive forum** for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Florida … ." Amended Petition at 32 (emphasis added). While the same provision does refer to venue in Travis County, courts in Texas treat questions of forum selection and venue selection separately. *See Liu*, 200 WL 43816 at *3. The venue provision comes only after an express provision selecting Florida as the sole location for the resolution of disputes and is therefore subject to the foregoing clause. While this is not ambiguous on its face, the obvious reason for the slight discrepancy is that Robert Kinney—the principal officer and manager of

Kinney Recruiting, LLC, Kinney Recruiting Hong Kong, and MWK and the undisputed drafter of the provision—changed the agreement to select Florida instead of the default of Texas, but simply forgot to change this particular portion of the clause. *Cf.* Amended Petition, at 44 (Vinokurova Employment Agreement, § 13.1) (containing identical language, but selecting Texas as a forum instead of Florida). Additionally, the Employment Agreement provides that it is governed by Florida law, *see* Amended Petition at 32, which militates in favor of a finding that the parties intended for disputes to be heard in Florida. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (recognizing importance of Florida choice of law clause in determining whether personal jurisdiction was proper and holding that Court of Appeals).

And, even if the provision were ambiguous, Texas courts construe ambiguous provisions against the drafter, using it as "a tie-breaking device [] to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 677 (Tex. App.—Austin 2003, no pet.). As the Amended Petition admits, Robert Kinney was indisputably the drafter of Jowers's Employment Agreement. *See* Amended Petition ¶ 27 ("All Kinney Recruiting employees, including Jowers and Vinokurova, are made aware of and required to agree to … Employment Contract[s]."). Thus, if the Court employs this "tie-breaking device," it must construe this provision in favor of the exclusive forum selection of Florida, particularly where that statement is much clearer than the subsequent statement concerning Travis County in the Employment Agreement.

***Fifth***, the Court's exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice. MWK's claims are inextricably tied to Asia, and specifically to Hong Kong. *See* Jowers Decl. ¶ 9. Jowers is a nonresident of Texas who has lived in Florida since 2003 and who now works full time in Hong Kong. *Id.* ¶¶ 2, 5. The only specific candidates that

MWK accuses Jowers of recruiting in violation of any contractual provision were all placed at law offices in Asia. *See id.* Further, Jowers was never an employee of MWK. *Id.* ¶ 4. Legis Ventures is based in Hong Kong and has never had any operations in or other connection with Texas, let alone with respect to the allegations in this lawsuit. *See id.* ¶ 10. Ms. Vinokurova is located in St. Petersburg, Russia and has been since long before she left Kinney Recruiting, LLC. *Id.* ¶ 11. Further, *all* invoices and payments for placements in Asia were sent to and from Kinney Recruiting Hong Kong in Hong Kong, not any entity in Texas. *Id.* ¶ 4. In sum, Texas has no dog in this fight. Forcing Defendants to litigate this matter in Texas would not only upset the express agreement between Jowers and Kinney Recruiting, L.P. to litigate claims in Florida, but it would be contrary to all parties' reasonable expectations regarding the forum for resolving any disputes. Thus, it would fly in the face of traditional notions of fair play and substantial justice.

For these reasons, Defendants have no relevant contacts with Texas and have not purposefully availed themselves of Texas law. Because MWK cannot demonstrate a prima facie showing that jurisdiction is proper, the Court should dismiss all of MWK's claims.

### C. MWK Failed to Properly Serve Legis Ventures.

Despite waiting over a year to do so, MWK failed to properly serve Legis Ventures with process. For that reason, the claims against Legis Ventures must be dismissed.

Under Texas law, service of process on a "foreign corporation" may be accomplished through service on the president and each vice president of the corporation or on a "foreign entity" that is *not* a corporation, limited liability company, or partnership through service on a "governing person" of that entity. TEX. BUS. ORG. CODE § 5.225.[1] A "governing person" includes "a person

---

[1] While "foreign corporation" is not defined, "foreign" means "with respect to an entity, that the entity is formed under, and the entity's internal affairs are governed by, the laws of a jurisdiction other than this state [i.e., Texas]."

serving as part of the governing authority of the entity," and the "governing authority" means "the person or group of persons entitled to manage and direct the affairs of an entity under this code and the governing documents of the entity," but expressly excludes "an officer who is acting in the capacity of an officer." *Id.* § 1.002(35), (37).

Legis Ventures is a Hong Kong company limited by shares, which is analogous to a corporation. *See, e.g.*, *Flextronics Int'l USA, Inc. v. Sparkling Drink Sys. Innovation Ctr.*, 186 F. Supp. 3d 852, 861 (N.D. Ill. 2016). MWK's return of service as to Legis Ventures claims that the process server served "Jowers-Vargas Recruiting," a "corporation," by serving "Evan Jowers" as "Owner" at 3555 S. Ocean Dr., Hollywood, Florida 33019 [ECF Doc. No. 1-10 at 2].

However, Jowers is categorically not an agent for service of process on Legis Ventures (aka "Jowers-Vargas Recruiting"). Jowers Decl. ¶ 10. Jowers is not a president, vice president, or other officer of Legis Ventures. *Id.* Nor is he a director, manager, or other governing person of Legis Ventures. *Id.* He owns no shares or other equity interests in that entity. *Id.* He has no legal authority to direct the operations of Legis Ventures. *Id.* In fact, at the present time, Jowers is merely a contractor with Legis Ventures—not an employee. *Id.* Thus, regardless of whether Legis Ventures is considered to be a "foreign corporation" or a "foreign entity," Jowers is not a person who could be properly served on Legis Ventures's behalf.

**D.  MWK Has Failed to State a Claim Upon Which Relief Can Be Granted.**

*1.  MWK's Fraud Claim Cannot Be Granted.*

MWK's common law fraud claim must be dismissed because the Amended Petition fails to allege fraud with particularity as required by Rule 9(b) and because it is barred by the economic

---

TEX. BUS. ORG. CODE § 1.002(27). "Foreign entity" means "an organization formed under, and the internal affairs of which are governed by, the laws of a jurisdiction other than [Texas]." *Id.* § 1.002(28).

loss rule. The particularity standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). Said another way, the standard requires the Plaintiff's pleading to allege answers to "newspaper questions" ("who, what, when, where, and how") of the alleged fraud. *Melder v. Morris*, 27 F.3d 1097, 1100 n. 5 (5th Cir. 1994).

Under Texas law, a fraud claim has six elements: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *E.g.*, *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n.45 (Tex. 2002).[2]

Here, the Amended Petition fails to plead these elements with particularity. At most, it vaguely alleges that Jowers said he was going on vacation and had other expenses and that he needed an advance on commissions to cover those personal expenses. *See* Amended Petition ¶ 43. This is not sufficient to answer the so-called "newspaper questions." After all, these alleged representations were made in late 2016, *see id.* ¶ 32, but the loan agreements attached to the Amended Petition are dated from early or late 2012. *Id.* at 52, 58, 77, 100. Even as alleged, Jowers cannot have plausibly used fraudulent representations to obtain advances under four-year-old loan documents that provided him with the ongoing right to obtain further advances. The professed "reason" for the advances was patently irrelevant. And the Amended Petition even fails to

---

[2] Arguably, because all of the relevant alleged actions took place in Hong Kong, Hong Kong law applies. However, for purposes of the Texas law claims alleged in the Amended Petition, Defendants will discuss Texas law.

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 18**

plausibly allege that the representations were false—in fact, it implicitly admits that Jowers went on the vacation he described. *See id.* ¶ 43. The fact that an advance was made and used for the purpose for which it was requested is not transformed into a fraudulent representation just because Kinney now wishes he had withheld the advance.

Additionally, the fraud claims fail to specifically identify how MWK supposedly relied on Jowers's "vacation representations." Instead of specific actions and amounts, MWK merely alleges that it made "loans ($51,000)" and unspecified advances of salary and commissions to Jowers. *See id.* ¶¶ 32 & 44. This is not particularized—it is merely a generalized allegation of payments. To plead reliance with particularity, MWK must specifically allege the advances that were made, the dates on which they were made, the amounts of those advances, and what it believed each advance would be used for. Without such allegations, its fraud claim doesn't even show that the advances were actually made *after* the alleged representations.

Further, the fraud claim is barred by the economic loss rule. "Under the economic loss rule, if a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract, he cannot maintain a tort action against a defendant." *Sterling Chemicals, Inc. v. Texaco, Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "In general, the rule 'precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy.'" *Levco Const., Inc. v. Whole Foods Market Rocky Mountain/Sw. L.P.*, 2017 WL 3429939, at * (Tex. App.—Houston [1st Dist.] Aug. 10, 2017, no pet.) (quoting *Chapman Custom Homes v. Dallas Plumbing*, 445 S.W.3d 716, 718–19 (Tex. 2014) (per curiam)). "In deciding whether the economic loss rule applies in this case, [the court] examine[s] the source of the defendant's duty and the nature of the claimed injury." *Id.* The essence of the economic loss rule is that using a fraud claim

to duplicate a breach of contract claim for the purpose of obtaining punitive or other tort damages is improper. *See, e.g.*, *Spring Street Apts. Waco, LLC v. Phila. Indem. Ins. Co.*, No. 6:16-cv-315-RP-JCM, 2017 WL 5244285, at *3–4 (W.D. Tex. Apr. 5, 2017) (dismissing fraud claim as barred by economic loss rule due to nature of remedy requested and source of duty sounding only in contract).

Here, it is beyond dispute that the alleged fraud damages and alleged duty to MWK flow exclusively from a contractual relationship. *See id.* ¶¶ 32 (referring to "additional advanced pay loans"), 44 ("MWK … rel[ied] on Jowers's false representations and provided advance salary and commission draws to Jowers.") & 61 (discussing loans under the agreements attached to the Amended Petition). Thus, either the advance payments were made under the loan agreements attached to the Amended Petition, or they were made as part of a separate contractual arrangement that they would be repaid in future.[3] Either way, the failure to repay advances of salary and commissions under a written agreement is exclusively the subject matter of the law of contracts, not tort. For these reasons, the economic loss rule bars MWK's claim for fraud. Its sole remedy— if it had standing to bring such a claim—would be for breach of contract.

## 2. *MWK Fails to State a Claim for Breach of Restrictive Covenants.*

MWK has failed to state a claim for breach of any restrictive covenants in Jowers's Employment Agreement.

The Employment Agreement, which is between Jowers and *Kinney Recruiting, L.P.*, a company for which he has never worked, is governed by Florida law. Under Florida law, restrictive covenants, including non-solicitation and confidentiality provisions like the ones in the

---

[3] The fact that it is unclear what contract the alleged advances were made under demonstrates that the fraud claim has not been pleaded with the required specificity.

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 20**

Employment Agreement, are considered under a comprehensive statutory scheme. Under the statute, restrictive covenants are enforceable if: (i) they are reasonable in time, area, and line of business, and (ii) the person seeking enforcement *pleads* and *proves* that a legitimate business interest justifies the restrictive covenant. FLA. STAT. ANN. § 542.335(1), (1)(b). "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." *Id.* § 542.335(1)(b).

Here, the Amended Petition fails to plead facts that would, if they were true, prove that the restrictive covenants are enforceable.

***First***, Jowers relocated from the Miami area to Hong Kong in June 2015. *See* Amended Petition ¶¶ 20–22, 24. He became a representative of Kinney Recruiting Hong Kong and he ceased working for Kinney Recruiting, LLC in the United States. *See id.* This was more than a year prior to the events set forth in the Amended Petition. Because, by its terms, the non-solicitation covenant only lasts for one year after the end of Jowers's employment (with Kinney Recruiting, L.P., which ironically never employed him), on its face it was no longer valid in December 2016 and onward when the alleged "solicitations" took place.

***Second***, the Amended Petition does not plead any specific legitimate business interests. While it does refer generically to trade secrets and confidential information, these are discussed only in conclusory terms, such as Jowers having vague "access to all plans and documentation." *Id.* ¶ 26. However, the actual allegations in the Amended Petition reveal that Kinney did not generally put Jowers in contact with candidates; rather, Jowers independently obtained referrals— hence the large commissions he received for those placements. *Id.* ¶¶ 25–26. The Amended Petition makes no attempt to argue otherwise. Similarly, the only concrete information that it claims Jowers actually obtained are the names of six individual attorney candidates, each of

whom—the Amended Petition does not dispute—Jowers personally knew or was introduced to independently of Kinney, insisted on working with Jowers regardless of whether he was with Kinney Recruiting Hong Kong or otherwise, and that had no ties or contact with Kinney Recruiting Hong Kong itself and certainly not with any attorney recruiters in Texas, such as Robert Kinney. *See id.* ¶ 33 & Ex. 8. MWK cannot have had any legitimate interest in information it did not provide to Jowers, particularly where the identities of attorneys who may be candidates and the names of large law firms themselves are hardly secret; indeed, large law firms advertise their lawyers on a nearly constant basis and virtually always disclose open positions and take referrals of candidates from a large number of different recruiters.

**Fourth**, any argument of legitimate business interests is belied by the fact that Kinney waited more than one year—*i.e.*, beyond the final date on which the non-solicitation covenant would have allegedly expired—to actually serve Jowers with the instant lawsuit. In fact, MWK's Original Petition in this suit sought injunctive relief, but that request was never even set for hearing and was later dropped from the Amended Petition. [ECF Doc. No. 1-2 at 29–32 (Original Petition ¶¶ 58–65); ECF Doc. No. (State Court Docket)]. There are no indications of ongoing attempts to serve Jowers; service attempts only moved forward with the Travis County court put the case on notice for dismissal for want of prosecution. [*See* ECF Doc. No. 9-1 at 2]. Such conduct contradicts any claim that MWK had actual business interests at stake sufficient to warrant restrictive covenants. Moreover, MWK is not a party to the Employment Agreement, and regardless of whatever interests Kinney Recruiting, L.P. supposedly had, MWK cannot use such interests to support the covenant. [*See* ECF Doc. No. 1-3 at 28].

**Fifth**, the confidentiality restrictions and non-solicitation covenants are not reasonable as to time. The non-solicitation covenants last for a period of 1 year after the termination of Jowers's

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 22**

employment. [*See* ECF Doc. No. 1-3 at 32 (Petition, Ex. 1 §§ 8.1, 8.2]. The confidentiality restriction essentially lasts forever. [*Id.* (Petition, Ex. 1 § 7.2)]. Under the Florida statutory scheme, a restrictive covenant sought to be enforced against a former employee (other than in the sale of a part of a business) that lasts for more than 2 years is *presumptively* unreasonable. FLA. STAT. ANN. § 542.335(1)(d)(1).[4] Only if the covenant lasts for 6 months or less is it presumptively reasonable. *Id.* As the confidentiality covenant contains no time limit, it is presumptively unreasonable and is not enforceable under Florida law, particularly given the lack of any allegation in the Amended Petition that a covenant of unlimited duration is necessary. Further, with a one-year duration, the non-solicitation covenant is not entitled to any presumption, implying a higher level of scrutiny. Under the facts alleged in the Amended Petition, Jowers did not have access to any actual confidential information or trade secrets that would support a covenant of any duration, must less one year. Thus, all of the restrictive covenants in the Amended Petition are overbroad and unenforceable as written.

### 3. *MWK Fails to State a Claim Under TUTSA.*

MWK should not be permitted to proceed on its claim under TUTSA for alleged misappropriation of trade secrets because it does not plausibly allege that any actual trade secrets were misappropriated.[5]

A cause of action under TUTSA requires proof that (i) the plaintiff owned a trade secret; (ii) that the defendant misappropriate a trade secret; and (ii) that the misappropriation caused injury. TEX. CIV. PRAC. & REM. CODE §§ 134A.002(1), (3), (6), 134A.004(a). A "trade secret"

---

[4] As discussed below, the Amended Petition doesn't plausibly allege that MWK had any trade secrets.

[5] As with MWK's other claims, the Amended Petition implausibly assumes that the supposed trade secrets at issue belonged to MWK, as opposed to Kinney Recruiting Hong Kong or Kinney Recruiting, LLC. As stated above, MWK lacks standing to bring this claim.

**DEFENDANTS EVAN P. JOWERS'S MOTION TO DISMISS—Page 23**

means "information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers that: (A) derives independent economic value … from not being generally known to, and not being readily ascertainable by proper means by, other persons … and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 134.002(6).

Here, the Amended Petition does not allege that Jowers obtained or used any trade secrets as that term is defined in the statute. At most, the Amended Petition alleges that Jowers spoke to six candidates and solicited a single employee, his ex-wife Yuliya Vinokurova. *See* Amended Petition ¶¶ 33–34. This is not sufficient information to constitute trade secrets. The names of a mere six attorneys—all of whom the Amended Petition implicitly admits were identified as potential candidates by Jowers himself, not by Kinney Recruiting Hong Kong—do not constitute trade secrets. *See* Amended Petition at 117 ("These persons all asked me to make sure I am representing them and leave no chance to the possibility that I would lose representation after leaving Kinney.") (describing how the six leads were identified, including several personal friends of Jowers). The Amended Petition does not allege that Jowers took a *list* of candidates, only that he contacted a mere six individuals, each of whom specifically asked him to continue representing them. *See id.* Further, it is extraordinarily overreaching for MWK to claim that it had a protectable interest in the identity of Jowers's own ex-wife, whom Jowers introduced to Robert Kinney in the first place.

Further, MWK's allegations are insufficient to establish that this information was not generally known or readily ascertainable by other persons. To the contrary, attorneys at large law firms are easily identifiable by their website biographies and prevalence in the legal press. Indeed, large law firms often mass canvass legal recruiters with requests for referrals to fill open positions.

Further, the only six specific candidates referenced in the Amended Petition either made direct contact with Jowers or, in the case of four of the six individuals, were actually friends of Jowers or put directly in contact with him through friends. [*See* ECF Doc. No. 1-3 at 118]. MWK does not allege any facts that contradict these statements, and it cannot plausibly claim that the identity of attorneys referred directly to Jowers, rather than being submitted through MWK itself, constituted its trade secrets. Finally, there are no allegations that the identity of these individuals were the subject of reasonable efforts to maintain their "secrecy" or even that they were "secret" at all. *See id.* ¶¶ 49–53.

For these reasons, the Amended Petition does not establish the basic requirements of the most essential element of a TUTSA claim—that a protectable trade secret actually existed.

### 4.  *MWK Has No Claim for Tortious Interference.*

MWK's tortious interference claims fail because it makes only conclusory statements in support.

To establish a claim for tortious interference with contract, the plaintiff must show: (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred. *E.g.*, *Johnson v. Baylor Univ.*, 188 S.W.3d 296, 304 (Tex. App.—Waco 2006, pet. denied). To be willful, the interfering party must have had actual knowledge of the contract or relationship and the plaintiff's interest. *Amigo Broadcasting, LP v. Spanish Broadcasting System, Inc.*, 521 F.3d 472 (5th Cir. 2008) (applying Texas law)

As to prospective contractual relations, the plaintiff must show: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant

did such act with a conscious desire to prevent the relationship from occurring, or it knew that the interference was certain or substantially certain to occur as a result of the defendant's conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference. *Id.* "Independently tortious" means conduct that would violate some other recognized tort duty. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Further, there must be a reasonable probability that the plaintiff would have entered into a contract but for the interference, which means more than mere negotiations. *Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 403–04 (5th Cir. 2008) (applying Texas law).

Here, the Amended Petition fails to state either of these claims. In particular, it generically argues that "[Legis Ventures] intentionally and willfully interfered with … the rights of MWK Recruiting … under the [Employment] Agreements." Amended Petition ¶ 58. However, it fails to allege an affirmative act by Legis Ventures to interfere with the terms of the agreements. Merely retaining Jowers or Vinokurova as attorney recruiters is not sufficient. The Amended Petition would need to allege an *willful act* of *interference* (e.g., specifically directing Jowers to contact candidates that Legis Ventures knew had *exclusivity* agreements contracts with MWK for the actual purpose of inducing them to breach). There are no such allegations in the Amended Petition. *See id.* ¶¶ 33, 39, 58–59.

With respect to clients, MWK merely alleges that "Jowers, Vinokurova, and Jowers/Vargas have … interfered with contractual relations between MWK and its clients … and prospective candidates." *Id.* ¶ 59. These conclusory, threadbare accusations are just attempts to throw out claims in the hope that something sticks. The Amended Petition does not ever allege that MWK had actual *contact* with any specific candidate, let alone facts that it would show the candidate was close to entering a contractual agreement with MWK. Similarly, with respect to clients, MWK

does not actually allege that any law firm had a contract or was actually going to enter into a contract with MWK for any placement, including with respect to the only named firm in the pleading. *See id.* ¶ 39.

Further, with respect to prospective contractual relations, the Amended Petition doesn't allege any independently tortious conduct. *Id.* ¶ 59 Instead, it simply argues that Defendants "interfered with" contractual relations with unidentified "prospective candidates." *Id.* There is no allegation of an independent duty in tort to MWK. This conclusory allegation and is not sufficient to state a claim.

### 5. *MWK's Conspiracy Claim Fails.*

MWK's civil conspiracy claim fails for two reasons.

***First***, to establish a claim for civil conspiracy, a plaintiff must establish the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Apani Sw., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (applying Texas law). However, the Amended Petition fails to allege these elements. Instead, it merely alleges that all of the Defendants have "embarked upon a [] scheme to conspire to tortuously [sic] to interfere with MWK's existing and prospective contractual relationships" and "to misappropriate MWK's trade secrets." Amended Petition ¶ 55.

These conclusory statements are insufficient to state a claim for joint and several liability for conspiracy. There is no allegation of a meeting of minds or that any individual defendant took an *unlawful*, over act in furtherance of the conspiracy. Instead, MWK is trying to use this claim to lump all three defendants together for purposes of liability. While the Amended Petition implies that Jowers spoke to a handful of individuals while working with Legis Ventures, it does not

establish that Legis Ventures took any unlawful, overt action to actively assist Jowers. *See id.* ¶¶ 30–31, 58–59. (And the third defendant, Vinokurova, is scarcely mentioned in the entire Petition). *See id.* ¶¶ 16, 34. The Amended Petition does not even allege all five elements of a conspiracy claim, much less facts to support each element.

   ***Second***, under Texas law, civil conspiracy is a derivative tort for imposing joint and several liability and is not an independent claim for damages. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (applying Texas law). Thus, "[i]f a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails." *Id.* A conspiracy claim cannot be based on breach of contract because it's not a tort. *See, e.g., Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 463 (5th Cir. 2003) (applying Texas law).

   For the reasons set forth above, MWK has failed to set forth any viable tort claim, including for common law fraud, under TUTSA, or for tortious interference.

### 6. The "Loans" Breach of Contract Claim is Devoid of Content.

   MWK's alleged breach of contract claims for the "Jowers Line of Credit" and the "2012 Forgivable Loan" fails to state a claim because it does not even allege the elements of a breach of contract claim.[6] Amended Petition ¶ 61. The Amended Petition simply alleges that certain "balances" exist on these items, but it alleges nothing further. *Id.* In fact, the contracts are barely described. *Id.* ¶¶ 18–19.

   This is not enough. MWK doesn't even allege all four individual elements of a breach of contract claim. *See id.* ¶ 61. A breach of contract claim requires more detail, particularly where these are revolving or declining loans with varying balances. MWK's alleged facts don't show that

---

[6] Again, the Amended Petition does not allege any facts to show that MWK has standing to bring this claim.

the balance was correctly calculated or that payments have been applied according to the terms. It merely alleges that the balances are outstanding. The Court should dismiss this claim.

### 7. *Exemplary Damages Are Not Available.*

Finally, the Amended Petition does not allege an adequate factual basis for the imposition of exemplary damages. Under Texas law, exemplary or punitive damages may *only* be awarded for a tort claim upon a showing of clear and convincing evidence of fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

The Amended Petition does not allege sufficient conduct to permit the recovery of exemplary damages. As discussed above, MWK's fraud claim is implausible and barred by the economic loss rule, so those allegations cannot support the recovery of exemplary damages. Even if MWK could proceed on any of its other tort claims, it only alleges that Defendants' conduct was "willful and intentional" or "in conscious disregard of MWK's rights." Amended Petition ¶ 63. This neither alleges the standard of fraud or malice required by Section 41.003, nor satisfies the requirement to plead facts showing that MWK is entitled to this relief.

Further, as to the TUTSA claim, the Amended Petition alleges only that "[b]y Jowers's admission" the supposed misappropriation was "willful" and "done with the intent of harming Kinney Recruiting," but this is belied by the actual content of the email attached as Exhibit 8 to the Amended Petition. [ECF Doc. No. 1-3 at 118]. No reasonable factfinder could review this email and Jowers's alleged conduct of speaking to six individual attorney candidates—whom he personally knew or were referred directly to him—and determine that the conduct rose to the level of malice. And, finally, because the underlying TUTSA claim fails, by extension so does any request for exemplary damages associated with such claim.

8. *Attorneys' Fees*

Finally, the Amended Petition insupportably requests an award of attorneys' fees under TUTSA. For the same reasons set forth with respect to exemplary damages, the conduct alleged in the Amended Petition—minus MWK's use of inflammatory adjectives—does not rise to the level of "willful[] and malicious[]." *See id.* ¶ 65. Further, because the TUTSA claim fails, the Court should also dismiss MWK's request for attorneys' fees under that statute.

## CONCLUSION

For the reasons set forth above, the Court should dismiss all of MWK's claims against Defendants under Rule 12(b)(1), 12(b)(2), and 12(b)(6), and additionally against Legis Ventures under Rule 12(b)(5). Defendants also request all further relief to which they may be entitled.

Dated: June 8, 2018.               Respectfully submitted,

               By:    */s/ Marc D. Katz*
                      Marc D. Katz
                      State Bar No. 00791002
                      marc.katz@dlapiper.com
                      James C. Bookhout
                      State Bar No. 24087187
                      james.bookhout@dlapiper.com
                      **DLA PIPER LLP (US)**
                      1717 Main Street, Suite 4600
                      Dallas, TX 75201
                      Telephone: (214) 743-4500
                      Facsimile:  (214) 743-4545

                      **COUNSEL FOR DEFENDANTS**
                      **EVAN P. JOWERS AND LEGIS**
                      **VENTURES (HK) COMPANY LIMITED**

## CERTIFICATE OF SERVICE

     I hereby certify that, on June 8, 2018, a true and accurate copy of the foregoing document was served via the Court's CM/ECF facilities and via certified mail, return receipt requested to all counsel of record.

                      */s/ James C. Bookhout*
                      James C. Bookhout